IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>CEDAR HAVEN ACQUISITION, LLC<br><br>Debtor. | Case No. 1:26-bk-00118-HWV<br><br>Chapter 11<br><br>(Related Items 13 and 26) |

**CHARLES BLALACK AND STONE BARN MANAGEMENT, LLC'S
RESPONSE IN SUPPORT OF THE U.S. TRUSTEE'S MOTION TO APPOINT A
CHAPTER 11 TRUSTEE AND IN OPPOSITION TO THE DEBTOR'S MOTION TO
RETAIN MICHAEL F. FLANAGAN**

Charles Blalack ("Blalack") and Stone Barn Management, LLC ("Stone Barn"), as and for their Response in Support of the *Motion of the United States Trustee for an Order Directing the Appointment of a Trustee Under 11 U.S.C. § 1104 of the Bankruptcy Code* [ECF # 26][1] (the "UST Motion"); and in Opposition to the *Debtor's Motion Pursuant to Section 363(b) of the United States Bankruptcy Code to Retain Michael F. Flanagan and Flanagan & Associates, LLC to Manage the Affairs of the Debtor as of the Petition Date* [ECF # 13] (the "Retention Motion"), respectfully represent as follows:

1. Blalack owns 100% of the membership interests in Stone Barn Holdings, LLC ("SB Holdings") and in Stone Barn. SB Holdings owns 100% of the membership interests in the Debtor. Blalack, further owns 100% of the equity interests in Fremont Lake LLC ("Fremont") which had previously loaned the Debtor approximately $1.5 million in secured exit financing to enable the Debtor to emerge from its first chapter 11 case filed in the United States Bankruptcy Court for the District of Delaware on August 2, 2019 under Case No. 19-11736 (JKS) (the "Initial Chapter 11

---

[1] Numerals preceded by "ECF #" refer to docket entries in the Debtor's chapter 11 case, bearing case number 1:26-bk-00118-HWV (the "Chapter 11 Case") pending before the United States Bankruptcy Court for the Middle District of Pennsylvania (the "Court").

1

Case").[2] Blalack was the largest general unsecured creditor in the Initial Chapter 11 Case, having provided the Debtor with in excess of $3.1 million in loans to satisfy payroll and related obligations to maintain operations.

2. Since the Debtor's emergence from the Initial Chapter 11 Case, Blalack continued to make short-term emergency bridge loans to meet payroll and otherwise keep the Debtor's business afloat and protect its residents. Blalack is owed approximately $195,000 on account of such prepetition loans. In addition, under Blalack's direction, Cedar Haven held back payment of over $760,000 in management fees otherwise due and owing to Stone Barn.

3. Blalack and Stone Barn have reviewed the UST Motion and believe that the United States Trustee (the "UST") makes valid arguments for the appointment of a chapter 11 trustee. One point that the UST makes deserves particular emphasis: Mr. Flanagan (the "Receiver") was appointed as Receiver by order of the Court of Common Pleas of Lebanon County, Pennsylvania (the "Receivership Order")[3] "solely for the benefit and protection of the rights and interests of [the Landlord]" with no "affirmative duty to act on behalf of or defend [the Debtor]" (*UST Motion* ¶ 8).

4. Counsel has advised the Court that the Debtor intends "to sell its assets and transfer its operations" in this Chapter 11 Case.[4] Stone Barn and Blalack have been advised by the Landlord that this sale will include not only the Debtor's assets, but also the real property on which the Debtor operates its business owned by the Landlord (the "Real Estate"). Accordingly, the

---

[2] Prior to the commencement of this chapter 11 case, The Arba Group, Inc., an affiliate of the Debtor's landlord, 590 South 5th Avenue, LLC (the "Landlord") purchased the secured loan from Fremont.

[3] A copy of the Receivership Order is attached to the Retention Motion as Exhibit A.

[4] *See Debtor's Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors-in-Possession [sic] to Obtain Poet-Petition Financing; (ii) Granting Liens and Providing Superpriority Administrative Expense Status; (iii) Modifying Automatic Stay; and (iv) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001,* ¶ 20 [ECF #10].

allocation of the overall purchase price between the Debtor's assets and the Real Estate will likely be of critical importance to the resolution of the Chapter 11 Case. Indeed, it may very well be the heart of this case. The more the proceeds are allocated to the Debtor's assets, the better for the Debtor's creditors. Conversely, the more allocated to the Real Estate, the better for the Landlord. The allocation of the purchase price between estate assets (the Debtor's business) and non-estate assets (the Real Estate) is therefore critical to creditor recoveries and must be supervised by a fiduciary free of any control by, or allegiance, to the Landlord.

5. Though he argues otherwise,[5] the Receiver is conflicted. Because the Receivership Order directs the Receiver to act solely for the Landlord's benefit and limits duties accordingly, the Receiver cannot be the neutral decision-maker negotiating and allocating sale consideration on behalf of all creditors. A chapter 11 trustee will ensure an independent, estate-focused process to evaluate bids, structure a fulsome sale process, and allocate consideration consistent with the Bankruptcy Code's priorities and the estate's best interests.

6. The Receiver's conflict is further evidenced by the involvement of Priority Care Group ("Priority") in this case. The Receiver (and the Landlord) brought in Priority upon the entry of the Receivership Order to replace Stone Barn as the management company for the Debtor's business. Priority and its affiliates, upon information and belief, have been engaged in negotiations with the Landlord and the Receiver for the purchase of the Debtor's assets and the Real Estate. Presumably, Priority or an affiliate of Priority will become the proposed stalking horse.

---

[5] In paragraph 17 of the Retention Motion the Debtor (as of the Petition Date under the Receiver's control) asserts that the "Receiver represents no other entity in this case, it is a disinterested party within 11 U.S.C. §101(3), and does not represent or hold an interest adverse to the interest of the Debtor's estate with respect to the matters in which the Receiver is to be retained".

7. Priority's continued involvement in the Debtor's management may prove to be an impediment to a fair and robust sale process and to the maximization of value of the Debtor's estate. A chapter 11 trustee would, at a minimum, re-examine the post-petition involvement of Priority on behalf of the estate and determine whether such involvement is consistent with a fair and robust sale process.[6]

8. Courts have appointed chapter 11 trustees where serious potential conflicts of interest exist. *See In re SunCruz Casinos, LLC*, 298 B.R. 821, 832 (Bankr. S.D. Fla. 2003) ("The Court finds that ample cause exists to appoint a trustee, given the sheer number of conflicting interests of the Boulis Estate, its opportunity and apparent ability to act in its own self interests to the detriment of the Debtors' other creditors…"); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) ("A chapter 11 debtor and its managers owe fiduciary duties to the estate … Where they suffer from material conflicts of interest, an independent trustee should be appointed under § 1104(a)(2)"); *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D. W.Va. 1980) ("I am of the opinion and do find (a) that the continuation of current management will result in serious potential conflicts of interest; (b) that it would be more economical, beneficial and advantageous to the creditors and equity security holders to have current management replaced by a Chapter 11 trustee; and (c) that the interests of the creditors and equity security holders would be better served by the appointment of an experienced and independent Chapter 11 trustee, whose sole motivation will be to realize the maximum amount of monies possible from a liquidation of [the Debtor's] assets"). Accordingly, and for all of the reasons set forth in the UST Motion, Stone Barn and Blalack respectfully request that the UST Motion be granted.

---

[6] Stone Barn would consider returning to the management role to ensure a fair sale process. Under Stone Barn's management, the facility was recognized by the Official Community's Choice Awards, Lebanon Valley in 2023, 2024 and 2025 as Lebanon Valley's Best Nursing Home.

9. Relatedly, counsel, in the Retention Motion, asks the Court to authorize the Receiver to continue managing the Debtor's affairs "as occurred pre-Petition," to pay himself a $20,000 monthly flat fee from estate funds without further application, and to carry forward receivership immunities.[7] These requests conflict with the U.S. Trustee's showing that a receiver, as a custodian, cannot serve as the Debtor's representative in chapter 11 and that appointment of a chapter 11 trustee is necessary and in the interests of creditors. Moreover, the Receiver's role would be largely (or even entirely) supplanted by a chapter 11 Trustee. The Court should therefore deny the Retention Motion.

10. For the foregoing reasons, Blalack and Stone Barn respectfully request that the Court grant the UST Motion directing the appointment of a chapter 11 trustee and deny the Retention Motion.

Dated: February 9, 2026

COZEN O'CONNOR

*/s/ Mark E. Felger*
Mark E. Felger
(PA Bar I.D. 56266)
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 665-2000
Email: mfelger@cozen.com

-and-

Frederick E. Schmidt, Jr.
3 WTC, 175 Greenwich Street
New York, NY 10580
Telephone: (212) 883-4948
Email: eschmidt@cozen.com

*Counsel for Charles Blalack and Stone Barn Management, LLC*

---

[7] The Receivership Order provided for the Receiver to also receive 1% of the sale proceeds. It is unclear whether this remains part of the compensation request for the Receiver.