| | |
|---|---|
| In re: | Case No. 1:26-bk-00118-HWV |
| CEDAR HAVEN ACQUISITION, LLC | Chapter 11 |
| Debtor. | (Related Item # 120) |

**CHARLES BLALACK AND STONE BARN MANAGEMENT, LLC'S
OBJECTION TO PROPOSED SALE PROCEDURES**

Charles Blalack ("Blalack") and Stone Barn Management, LLC ("Stone Barn"), as and for their Objection (this "Objection") to that portion of the *Motion of the Chapter 11 Trustee for Cedar Haven Acquisition, LLC to Set Sale Procedures and to Approve Sale of Assets and Business Free and Clear of all Liens, Claims, Encumbrances, and Other Interests* [ECF # 120][1] (the "Motion")[2] seeking Court approval of bidding procedures set forth therein (the "Sale Procedures"), respectfully represent as follows:

1.      Blalack and Stone Barn are general unsecured creditors in the Chapter 11 Case. Blalack also owns 100% of the membership interests in Stone Barn Holdings, LLC ("SB Holdings") and in Stone Barn.  SB Holdings owns 100% of the membership interests in the Debtor. Blalack, further owns 100% of the equity interests in Fremont Lake LLC ("Fremont") which had previously loaned the Debtor approximately $1.5 million in secured exit financing to enable the Debtor to emerge from its first chapter 11 case filed in the United States Bankruptcy Court for the District of Delaware on August 2, 2019 under Case No. 19-11736 (JKS) (the "Initial Chapter 11

---

[1]  Numerals preceded by "ECF #" refer to docket entries in the Debtor's chapter 11 case, bearing case number 1:26-bk-00118-HWV (the "Chapter 11 Case") pending before the United States Bankruptcy Court for the Middle District of Pennsylvania (the "Court").

[2]  Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

1

Case").[3] Blalack was the largest general unsecured creditor in the Initial Chapter 11 Case, having provided the Debtor with in excess of $3.1 million in loans to satisfy payroll and related obligations to maintain operations.

2.      Since the Debtor's emergence from the Initial Chapter 11 Case, Blalack continued to make short-term emergency bridge loans to meet payroll and otherwise keep the Debtor's business afloat and protect its residents.  Blalack is owed approximately $195,000 on account of such prepetition loans.  In addition, under Blalack's direction, Cedar Haven held back payment of over $760,000 in management fees otherwise due and owing to Stone Barn.

### THE OBJECTION

3.      Blalack and Stone Barn object to the Debtor's proposed Sale Procedures on a number of grounds which are set forth on the chart annexed hereto as Exhibit A.  Those specific objections may be categorized under the general issues below.  Overall, the Sale Procedures are unacceptable and appear to be designed to benefit Arba rather than the Debtor's estate and creditors (the "Estate").  They clearly will not maximize the value of the Estate.  The value of Arba's Real Property is undeniably enhanced by the proposed inclusion of the Debtor's going-concern skilled nursing facility in the sale.  The Debtor (which is controlled by a chapter 11 trustee), however, will receive only a paltry share of the sale proceeds, insufficient even to cover sale costs.[4]  Indeed, the

---

[3]  Prior to the commencement of this chapter 11 case, The Arba Group, Inc., an affiliate of the Debtor's landlord, 590 South 5th Avenue, LLC (the "Landlord" or together with The Arba Group, Inc. "Arba") purchased the secured loan from Fremont.  The Court has also approved up to $2,000,000.00 in secured debtor-in-possession financing from Arba [ECF # 96].

[4]  On February 17, 2026, the Debtor filed an *Application to Approve Employment of Investment Banker* [ECF # 87] (the "Tower Retention Application") seeking Court approval of its retention of Tower Partners, LLC ("Tower") as investment banker, on the terms and conditions set forth in an *Agreement Between Cedar Haven Acquisition, LLC, 590 South 5th Avenue, LLC and Tower Partners, LLC* attached to the Tower Retention Application (the "Tower Engagement Agreement").  The Tower Engagement Agreement provides that Tower is to be paid a fee, in cash, at the closing of any "Transaction" of $150,000 (as a flat fee) and 10% of overbids above the Stalking Horse Bid of $27 million.  The Tower Engagement Agreement does not apportion the obligation to pay Tower its compensation as between the Debtor and 590 South 5th Avenue, LLC.

2

LEGAL\113856716\3

proposed sale is akin to a federal foreclosure of the Debtor's assets, with no funds going to pay anything other than sale costs and Arba's secured claims.

4.      Though nominally set up as a sale of the Debtor's property alone with a stalking horse bid of $100,000, the Sale of the Debtor's assets is tethered to a corresponding sale of Arba's Real Property, with Arba retaining substantially all of the sale proceeds.  The Sale Procedures require any competing bidder on the Debtor's assets to also make a related overbid on Arba's Real Property, resulting in a combined required overbid of at least $900,000 over the proposed $27 million stalking horse bid. This de facto initial increment is nine times the Estate's entire allocation, a structure that suppresses bidder participation and violates the mandate to maximize value.  So too does the prohibition on bidding on the Debtor's assets alone or submitting initial bids which simply reapportion the purchase price to more heavily weigh it in favor of the Debtor's assets.

5.      The Sale Procedures key off of a $27 million proposed stalking horse bid from MDA Capital Group, LLC ("MDA"), the terms of which are set forth in an LOI[5] attached to the

---

On February 26, 2026, the Court entered an Order granting the Tower Retention Application, approving Tower's retention by the Debtor "upon the terms and conditions of the Agreement entered into by the Debtor and Tower Partners, LLC" [ECF #106].

On March 2, 2026, the United States Trustee ("UST") filed a *Motion of the United States Trustee to Amend Orders Approving Applications to Employ Special Counsel and Broker With Consent* [ECF # 117] (the "UST Motion") whereby the UST advised that it had reached an agreement with the Debtor regarding certain revisions to the orders approving the Debtor's retention of Tower and of its special counsel.  On March 3, 2026, the Court entered an *Amended Order* approving Tower's retention [ECF # 122] (the "Amended Tower Order").  The Amended Tower Order retained the language approving Tower's retention "upon the terms and conditions of the Agreement entered into the by the Debtor and Tower Partners, LLC".  However, paragraph 2 thereof limits the fees to be paid by the Debtor to those incurred "with respect to the estate property sold which might cause fees to be owed" and to exclude "fees which might be owed by 590 South 5th Avenue, LLC under its engagement with Tower."  The Amended Tower Order does not expressly amend the Tower Retention Agreement, nor does it set forth any formula to apportion responsibility for the payment of Tower's fees.

[5] The Sale Motion refers to both a "Letter of Intent" and an "LOI".  For example, paragraph 7 of the Sale Motion states that a "Letter of Intent" is annexed as Exhibit A thereto even though "LOI" is defined in that same paragraph. For the purposes of this Objection, Blalack and Stone Barn assume that the terms "LOI" and "Letter of Intent" are interchangeable and that each refers to the document annexed to the Sale Motion as Exhibit A.

3

Motion as Exhibit A. The LOI does not itself split the sale between Debtor and non-Debtor assets, and more importantly does not allocate the purchase price to be paid between Debtor and non-Debtor assets. Notwithstanding the absence of any such allocation, the Motion asserts that "[u]nder the Letter of Intent, MDA is to purchase the Debtor's Assets for $100,000.00" (*Motion*, ¶ 24). Further, despite assertions to the contrary (*See Motion* ¶¶ 7, 33(f), no asset purchase agreement memorializing the terms of the LOI is attached to the Motion nor has any such agreement since been filed by the Debtor, leaving potential bidders with no agreement to redline against as required by the proposed Sale Procedures.

6.      The proposed stalking horse bid for the Debtor's assets is paltry and the floor set by such bid is of no value to the Estate. Even excluding sale costs, the proceeds of the stalking horse bid would be insufficient to provide a recovery for any creditor other than Arba, which would still retain its liens against the Debtor's remaining assets for any insufficiency. The patently inadequate allocation of the sale proceeds is grossly unfair to the Estate and is not supported by any allegations in the Motion or the terms of the LOI.

7.      The proposed Sale Procedures add insult to injury by imposing an effective $900,000 initial bidding increment on competing bids. Although $100,000 is nominally proposed to be the initial (and subsequent) bidding increment with respect to the *Debtor's* assets, competing bidders are required to bid an additional $800,000 on the Real Property in order to cover the $900,000 breakup fee Arba agreed to pay MDA. As a result, the effective initial bidding increment is $900,000. The inclusion of a $900,000 initial bidding increment on a proposed $100,000 sale of estate Assets is preposterous and will utterly chill bidding to the detriment of the Estate.

8.      Because debtors must maximize value for the estate, bid protections, like the proposed bid increments here, are closely scrutinized. *In re Hupp Indus., Inc.*, 140 B.R. 191, 195-96 (Bankr. N.D. Ohio 1992) ("[i]n the bankruptcy context, however, bidding incentives such as

LEGAL\113856716\3

break-up fees and bid increment limitations are carefully scrutinized in § 363(b) asset sales to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected").

9. Breakup fees in bankruptcy sales typically fall into the range of 2 – 3% of the stalking horse purchase price. In those instances, the initial bidding increment, which is designed to cover the payment of a breakup fee, would be of a similar percentage to the purchase price. Here, the effective $900,000 breakup fee completely skews the overbidding increment. Rather than having a bidding increment which represents a small percentage of the stalking horse bid, the Debtor proposes a bidding increment which is 800% of the stalking horse bid as it is allocated to the Debtor. This is the opposite of value maximization. It is value minimization.

10. Where, as here, the sale will serve only to benefit a secured creditor, the secured creditor must accept sale procedures which are fair. *Id.*, at 137 ("[t]o the extent that secured creditors desire the benefits of a sale in Chapter 11, they must accept bidding procedures that satisfy the mandate for fairness"). Arba, accordingly, may not insist on an initial $900,000 bidding increment that is unfair to both the Estate and potential bidders. Nor should it be permitted to reserve veto power over the selection of the winning bid as proposed by the Sale Procedures (*Motion,* ¶ 33(j)), nor insist that a competing bid do anything more than simply allocate more of the $27 million purchase price to the Estate in order to be a Qualified Bid.

11. In the Motion, the Debtor does not and, indeed cannot, meet its burden to demonstrate that the proposed sale and Sale Procedures are in the best interests of the Estate. The Debtor's conclusory remarks regarding the sound exercise of its business judgment are belied by the facts and, in any event, are not sufficient to meet its burden. A debtor must actually articulate cogent reasons that a proposed sale is a sound business determination. *See Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1069 (2d Cir. 1983); ("the statute

5

requires notice and a hearing, and these procedural safeguards would be meaningless absent a further requirement that reasons be given for whatever determination is made**")**; *In re Diocese of Camden,* 653 B.R. 722, 735 (Bankr. D. N.J. 2023) ("[t]he movant has the burden of proof under … section 363 of the Bankruptcy Code" to show that the price being paid in a proposed "sale is reasonable"); *Parker v. Motors Liquidation Co., (In re Motors Liquidation Co.)*, 430 B.R. 65, 83 (S.D.N.Y. 2010) ("The overriding consideration for approval of a Section 363 sale is whether a 'good business reason' has been articulated"); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 428 (Bankr. S.D. TX 2009) ("The movant must show that there is a need to sell prior to the plan confirmation hearing. It is not sufficient to suggest in an uncontested hearing that the secured lender will be the only beneficiary under either scenario. The Fifth Circuit requires a showing of a business justification for the § 363(b) sale prior to plan confirmation, not merely a showing that it doesn't matter"); *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. Del. 2008) ("The sale of assets which is not in the debtor's ordinary course of business requires proof that: (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith") (*citing In re Delaware & Hudson Railway Co.,* 124 B.R. 169, 176 (D. Del. 1991)). *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153, 1999 U.S. Dist. LEXIS 18710, *15-16 ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions).

12.     This burden requires the Debtor to put the Estate's interest first, not those of its secured creditor Arba:

> The Trustee's decision of what is best for the estate should be undertaken with the goal of maximizing the value of the estate. *See In re Integrated Re., Inc.,* 147 B.R. 650, 659 (S.D.N.Y. 1992) *citing*

LEGAL\113856716\3

*In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (N.D. Ga. 1988) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible *for the estate*.") (emphasis added); *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998). A trustee maximizes value for creditors by selecting the "highest and best bid, and thereby protecting the interests of [the debtor], its creditors, and its equity holders." *In re Fin. News Networks, Inc.*, 126 B.R. 152, 157 (S.D.N.Y. 1991), *aff'd sub nom.* 980 F.2d 165, 169 (2d Cir. 1991). *See also In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) ("[T]he debtor will need to demonstrate to the bankruptcy court that the proffered purchase price is the highest and best offer."), *aff'd* 147 B.R. 650 (S.D.N.Y. 1992). This duty is an obligation to the estate as a whole, not to individual creditors. *See In re Lionel*, 722 F.2d at 1071 ("In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.").

*In re GSC, Inc.*, 453 B.R. 132, 169-70 (Bankr. S.D.N.Y. 2011).

13.     The Second Circuit Court of Appeals has fashioned a number of considerations to assist bankruptcy courts in determining whether a proposed sale passes muster:

In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*In re Lionel Corp.*, 722 F.2d at 1071.

14.     The failure to meet this burden will result in the proposed sale not being approved:

7

> The Debtor and the Committee failed to establish at the Hearing that the Sale satisfies any of the foregoing requirements. The timing, relationship of J. Kachkar to Exaeris, the proposed release of J. Kachkar, the dearth of evidence of marketing, *the absence of any evidence of the value of assets, no evidence whatsoever about the negotiations* between J. Kachkar and Debtor or the Committee, require the Court to proceed with extreme caution and applying the facts to the legal standards for the Sale mandates that the Court deny the Motion.

*In re Exaeris Inc.*, 380 B.R. at 744. (emphasis added).

15. The absence of a valid and articulated business justification for a sale of assets may also result in a denial of proposed sale procedures. *See e.g. In re Encore Healthcare Associates*, 312 B.R. 52, 57 (Bankr. E.D. Pa. 2004) (denying motion for approval of sale and auction procedures where "the proposed sale not only generates funds solely for the secured creditor which could realize the value of its collateral by foreclosing and selling the assets itself but more significantly advances no purpose of a Chapter 11 proceeding").

16. Local Bankruptcy Rule 6004-3 requires the Debtor to file a sale procedure motion "which will detail the bidding procedures". Value maximization for the Estate, not unnecessary bid-chilling giveaways, must be the touchstone. *See In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D.Mo. 2004) ("[s]tructured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests").

> The purpose and goal of any asset sale is to maximize the recovery of value for the benefit of the bankruptcy estate. In many instances, a "stalking horse" offer will facilitate a realization of that value, by establishing a framework for competitive bidding. But unless the bidding process remains fair and equitable, competitors will refrain from the type of full participation that is needed to assure bids for the highest reasonable value. For these reasons, the court will not approve bidding procedures that undermine principles of fair play.

*In re Jon J. Peterson, Inc.* 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009).

LEGAL\113856716\3

17. The Motion fails to articulate any cogent reason for why a sale is needed now or why any such sale should only have a one-month marketing period. Instead, the Debtor simply describes its prepetition financial difficulties and obligations (*Motion ¶¶ 14 – 19*). The results of post-petition operations are not disclosed, and the Debtor has yet to file a monthly operating report. In addition, although the Court approved up to $2,000,000 in debtor-in-possession financing, the Motion does not disclose what borrowing capacity may remain. Further, no budget is annexed nor any assertion that the Debtor's business assets are losing value or that the Debtor is quickly running out of liquidity. Having utterly failed to explain why a quick sale is required, the Debtor nonetheless proposes (without any discussion) a marketing period of approximately one month for the sale. The truncated marketing period is neither fair to potential competing bidders, nor designed to maximize the value of the Estate.

18. The Motion further fails to explain how, given the bid-chilling effect of the proposed bidding increments and the extremely truncated marketing period, the Sale Procedures could conceivably maximize the value of the Debtor's assets.

19. Not only are the Debtor's proposed Sale Procedures inherently unfair and value-minimizing, but the process by which the Debtor seeks approval is also unfair. The Debtor has failed to file any asset purchase agreement which bidders may review (and which they are required to redline) and the notice that the Debtor sent out regarding the Motion misrepresented the approval of the Sale Procedures as a *fait accompli*. Neither the original *Notice to All Creditors and Other Parties in Interest of Initial Hearing on the Motion to Set Sale Procedures and to Approve Sale of Assets and Business Free and Clear of All Liens, Claim, Encumbrances, and Other Interests* [ECFG # 120-3] nor the Amended Notice [ECF # 121] contains any notice of the date and time of the hearing to consider approval of the Sale Procedures, nor any deadline to object to approval of same. Worse, both notices state that the Court has *already approved* the Sale Procedures thus

limiting the ability of parties in interest to object to the Sale Procedures.  Paragraph 2 of the Notice falsely states as follows:

> The Court has entered an Order (the "Sale Procedures Order") approving the sale procedures for the sale transaction.  The Sale Procedures Order includes terms for the sale and bids for the Assets.  A summary of such terms is set forth below.  Interested parties are urged to read the Sale Procedures Order and Sale Motion.

## CONCLUSION

For all of the foregoing reasons, and for the reasons in the attached Exhibit A, Blalack and Stone Barn respectfully request that approval of the Sale Procedures be denied.

Dated:  March 12, 2026

COZEN O'CONNOR

*/s/ Mark E. Felger*
Mark E. Felger
(PA Bar I.D. 56266)
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone:  (215) 665-2000
Email: mfelger@cozen.com

-and-

Frederick E. Schmidt, Jr.
3 WTC, 175 Greenwich Street
New York, NY 10580
Telephone: (212) 883-4948
Email: eschmidt@cozen.com

*Counsel for Charles Blalack and Stone Barn Management, LLC*

10

LEGAL\113856716\3