# EXHIBIT "A"

| Objection | Objectionable Provisions |
|---|---|
| The Sale Procedures do not benefit the estate and are not in the best interests of creditors other than the Landlord. | 1. The Sale Procedures seek to allocate $26.9 million of the $27 million stalking horse bid (the "Stalking Horse Bid") to non-Debtor real property owned by Arba, with only $100,000 allocated to estate assets. The $100,000 allocation is not even sufficient to cover the cost of the proposed sale. Aside from legal fees attributable to the sale, Tower is to receive a flat fee of $150,000 plus a percentage of overbids payable at closing.<br><br>2. Contrary to the assertion of the Debtor, the LOI itself does not mandate a $100,000.00 purchase price for the Debtor's assets.[1] To the extent that any allocation of the $27 million purchase price was ever reached, it was not via the LOI. The Debtor does not disclose how, when, or with whom it negotiated the allocation of the purchase price for the estate and non-estate assets.<br><br>3. The Debtor asserts that "[t]he Real Property has been appraised at or more than $27,000,000.00". *Motion*, ¶ 11. Such appraisal is not annexed to or discussed further in the Motionj, and is believed to have been issued more than five years ago. Presumably, the Real Property would be worth significantly less than the appraised value if it did not remain an operating skilled nursing facility. There is no discussion or assertion as to how much less valuable the Real Property would be in such case, which may provide a proxy for the value of the Debtor's business.<br><br>4. Proposed overbidding increments are nominally set at twice the level of the initial stalking horse bid for the estate assets ($100,000).<br><br>5. Even though the estate is not required to pay the $900,000 breakup fee for the purchase of the non-estate Real Property, competing bids are required to be in the amount of $27.9 |

---

[1] The Motion states, without equivocation: "Under the Letter of Intent, MDA is to purchase the Debtor's Assets for $100,000.00" *Motion* ¶ 24.

1

| | million. This results in an effective overbid of $900,000 and will have a tremendously chilling effect on competing bids. |
|---|---|
| | 6. The Debtor's lease of the Real Property is not one of the assets which appears included in the Sale. The absence of the Lease as an asset for sale effectively eliminates the possibility that a bidder could purchase the estate's assets only and assume the Lease (without a corresponding purchase of the Landlord's real estate). |
| | 7. The Debtor claims that there "will be certain costs of closure, as well as payment of various administrative costs of the winding up of the Facility's Business and the case" (*Motion* ¶ 43) but does not provide any estimate as to what those costs would be or, given the paltry $100,000 purchase price on the table and Arba retaining liens on Debtor property which is not part of the proposed sale, why the Debtor should continue to incur administrative costs in a chapter 11 rather than converting to a chapter 7 before selling its assets. |
| | 8. Arba, although it is already protected by credit bid rights, is provided with a veto over whether any competing bid is deemed the Winning Bid ("The highest and best Qualified Bid received by the Debtor, in its discretion, but not over the objection of Arba, unless the Court orders otherwise, shall be deemed the Winning Bid.") *Motion* ¶ 33(j). |
| The Stalking Horse Bid provides no benefit to the Estate, and the proposed bid protections will chill competitive bidding | 1. The motion does not make any case for a truncated 30-day marketing period. There is no assertion that the Debtor will run out of money to operate before that time nor any allegation that an enlargement of the 30-day marketing period would not make it more likely that the estate would receive competing bids. The limited marketing period is a form of bid protections and benefits only MDA and Arba. The stalking horse bid's $100,000 purchase price does not even clear sale costs, much less secured debt. |
| | 2. MDA, whose affiliate, inserted as the management company by the Receiver at Arba's suggestion, has had a paid look at the Debtor's operations since October 31, 2025 and was discussing a potential purchase prior to that time. In contrast, potential bidders are to be provided with 30 days or less in which to conduct due diligence and submit bids. |

2

LEGAL\113856716\3

| | |
|---|---|
| | 3. Under the proposed Sale Procedures, a competing bid would have to beat the stalking horse bid by $900,000 in order to be qualified – an 800% increase over the stalking horse bid for the Debtor's assets. |
| | 4. The Motion states that MDA "will receive a breakup fee of $900,000.00" but that "no breakup fee is being paid in this case." *Motion* ¶ 33(d). Presumably, this means that the breakup fee would be paid by Arba out of the proceeds of the Real Property Sale. The proposed Order, however, specifically provides that MDA "shall have the right to request at the Final Hearing that it be awarded a breakup fee for providing the initial offer and up to [sic] maximum of $900,000.00 as compensation for its expenses in connection with the transaction set forth herein (together, the 'Bid Protections') subject to approval by the Court at the Final Hearing. *Proposed Order* ¶ 3(o). The two provisions are inconsistent with one another. |
| The Debtor has not demonstrated that the proposed Sale is required or a sound exercise of business judgment. | 1. The Debtor has not yet filed a monthly operating report, and the motion contains no discussion of the Debtor's post-petition operating results. |
| | 2. The motion contains no discussion regarding any untapped borrowing capacity that the Debtor may have under the $2 million DIP facility. |
| | 3. The motion contains no projections which would demonstrate that the Debtor's business is a "melting ice cube". |
| Notice served on all creditors and parties in interest is defective and misleading. | 1. The Debtor served an *Amended Notice to All Creditors and Other Parties In Interest of Initial Hearing on the Motion to Set Sale Procedures and to Approve Sale of Assets and Business Free and Clear of All Liens, Claims, Encumbrances, and Other Interests* [ECF #121] (the "Notice"). The accompanying Certificate of Service states that the Notice was served upon what appears to be all creditors and other parties-in-interest on March 3, 2026. The Notice failed to notify creditors and parties in interest of the day and time of the hearing to consider the Sale Procedures. Instead, the Notice asserts in paragraph 2 that "[t]he Court has entered an Order (the 'Sale Procedures Order') approving the sale procedures for the sale transaction". That assertion was false. As a result, creditors or parties in interest who may have otherwise objected to the Sale Procedures were |

LEGAL\113856716\3

|  | misled by the Notice that the Court had already entered an order approving the Sale Procedures. |
|  | 2. Despite assertions to the contrary in the Notice and the Motion, the Debtor has not filed an Agreement[2] or APA. This is important because paragraph 33(f) of the Motion and corresponding language in the Notice require "bids [t]o include a redline markup of the form of Asset Purchase Agreement ('APA') between the Debtor and MDA, a copy of which is attached [to the Motion and Notice] as Exhibit A." |
|  | 3. The Notice fails to disclose that a competing bid must be in the minimum amount of $27.9 million and must be not only for the Debtor's Assets, but also for the Real Property |
|  | 4. Neither the Motion nor the Notice sufficiently identify what is included in the "Assets" and the "Excluded Assets". |
|  | 5. The Notice provides that out of the proceeds of the Sale, $40,000 in legal fees and expenses will be paid to Cunningham, Chernicoff & Warshawsky, P.C. notwithstanding that such payment is not requested in the Motion and has not been authorized by the Court. |

---

[2] Like "LOI" and "Letter of Intent", the terms "APA" and "Agreement", as used in the Motion, also appear to be interchangeable. The term "Agreement" is defined twice in paragraph 7 of the Motion. The Motion further states that "[t]he form of Agreement is attached hereto as Exhibit 'B' and made a part hereof" though there is no Exhibit B to the Motion, nor has any Agreement been filed by the Debtor. The term "APA" is defined in paragraph 33(f) of the Motion and states that "a copy … is attached hereto as Exhibit A." As noted above, Exhibit A to the Motion is the LOI.

4

LEGAL\113856716\3