IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Case No. 1:26-bk-00118-HWV |
| CEDAR HAVEN ACQUISITION, LLC, | : | |
| Debtor. | : | Chapter 11 |
| | : | |
| CEDAR HAVEN ACQUISITION, LLC, | : | |
| Movant, | : | |
| | : | |
| 590 SOUTH 5TH AVENUE, LLC, | : | |
| CAPITAL FUNDING, LLC, | : | |
| RETIREMENTHOME TV CAPITAL, | : | |
| THE ARBA GROUP, INC., | : | |
| SOUTH LEBANON TOWNSHIP, | : | |
| LEBANON COUNTY TAX CLAIM BUREAU, | : | |
| CORNWALL-LEBANON SCHOOL DISTRICT, | : | |
| Respondents. | | |

**ORDER APPROVING DEBTOR'S SALE PROCEDURES
AND SETTING A FINAL SALE HEARING**

This matter having come before the Court on the motion (the "Motion") of Leon P.
Haller, Chapter 11 Trustee for Cedar Haven Acquisition, LLC, on March 2, 2026 [Doc
120] for the entry of an order requesting approval of the auction sale and sale procedures
regarding the Debtor's Personal Property, Bid Approvals, and Businesses granting related
relief pursuant to Sections 105, 363(b), (f), (k), (m), and (n), and 365 of Title 11 of the
United States Code (the "Bankruptcy Code" or "Code") and Rules 2002, 6004, 6006, 9013,
and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").[1]

---

[1] All terms not defined in this Order shall be as set forth in the Motion.

Objections to the Motion were timely filed by the United States Trustee for Region Three (the "UST") [ECF # 133] (the "UST Objection"), Charles Blalack and Stone Barn Management, LLC ("Blalack & Stone Barn") [ECF # 134] (the "Blalack and Stone Barn Objection"), by Premier Healthcare Management LLC ("Premier") [ECF #137] (the "Premier Objection"), and by the Commonwealth of Pennsylvania Department of Human Services ("DHS") [ECF # 138] (the "DHS Objection" or, together with the UST Objection, the Blalack and Stone Barn Objection, and the Premier Objection, the "Objections").

The Court has further considered the Motion and the matters reflected in the record of the hearings held on the Motion. The UST, Blalack & Stone Barn, Premier, and DHS do not object to the entry of this Order. All capitalized terms used herein, not otherwise defined, have the meanings ascribed to them in the Motion. It appears that the Court has jurisdiction over this proceeding; that this is a core proceeding; that notice of the Motion has been provided to all interested parties and upon any entity that asserts a lien or interest in the Personal Property by U.S. Mail and by the ECF system, and is due and sufficient in all regards; that the relief sought in the Motion as to the procedures is in the best interests of the Debtor's bankruptcy estate and the creditors thereof; and that good and sufficient cause exists for such relief.

**THE COURT HEREBY FINDS AND CONCLUDES THAT:**

A.      Debtor is a debtor under Chapter 11 of the United States Bankruptcy Code.

B.      This Court has jurisdiction over Debtor, all of Debtor's assets, including without limitation its Personal Property, Bed Approvals, and Businesses (as defined in the Motion), wherever located, and all creditors of Debtors. This Court has jurisdiction to hear

and to rule upon the Motion, and the Motion constitutes a core proceeding pursuant to 28 U.S.C. §157(b)(2).

C.    Notice regarding the Motion and the relief as to the procedures requested in the Motion has been made in accordance with the Bankruptcy Rules, and the Local Rules of the United States Bankruptcy Court for the Middle District of Pennsylvania.

D.    Reasonable opportunity to object to, or be heard regarding, the relief requested in the Motion as to the procedures has been afforded to all interested persons and entities, including but not limited to all creditors and all parties who claim interests in or liens against any of the Debtor's assets, including its lease of nonresidential real property located at 590 South 5th Avenue, Lebanon, PA (the "Lease"), the Personal Property (as defined in the Motion), Bed Approvals, and Businesses (collectively, the "Assets").  The Assets do not include any license and enrollment in any program requiring separate governmental approval.

E.    The revised and modified Sale Procedures set forth below are in the best interest of the Debtor's estate, its creditors, and all parties in interest.

**THE COURT HEREBY ORDERS THAT:**

1.    The auction sale and bidding procedures set forth below (the "Sale Procedures") are approved.

2.    The Sale Procedures are reasonably designed to maximize the value to be achieved for the Debtor's Assets.

3.    The Sale Procedures to be utilized in the sale and marketing of the Debtor's Assets are as follows:

a. An Amended Operations Transfer Agreement (the "Agreement") has been entered into by the Trustee and MDA Capital Group, Inc. ("MDA"), or its assigns, for the sale of the Debtor's Personal Property, Bed Approvals, and Business (the "Assets"), for the total Purchase Price of $100,000 (the "Offer"). The Trustee intends to seek offers and bids for the Assets from other parties. Such offers shall be solicited for the period up until five (5) days prior to the Final Hearing (the "Final Hearing") to be held on April ___, 2026 (the "Bid Deadline"), following which time the Trustee will submit to the Court what it believes to be the highest and best offer. A true and correct copy of the Agreement is attached hereto.

b. All competing offers must be made on or before the Bid Deadline, be in writing, and should be sent by email to Robert E. Chernicoff, Esquire at rec@cclawpc.com or by facsimile to (717) 238-4809 and to Erv Terwilliger, Tower Partners, erv@towerpartners.com.

c. The Final Hearing on the approval of the buyer or buyers is set for April ____, 2026 at ____ a.m. at which time the Successful Bidder may be approved.

d. Competing bids shall meet the following sale procedures and terms in order to be considered qualified ("Qualified Bids"):

   i. As part of the consideration as to the highest and best bids and offers, the Trustee may consider any monetary or non-monetary provision in any qualified bid that provides one or more specific benefits to the Residents.

   ii. Bids shall be for any or all of the Assets in totality. n

   iii. Such bids must be received by the Trustee's special counsel, Robert E. Chernicoff, Esquire and Tower Partners, at the email addresses set forth in paragraph 3(b) above, on or before the Bid Deadline. The Bid Deadline date shall be subject to a change by the Trustee through his special counsel

   iv. For the avoidance of doubt, nothing in this Order approves any breakup fee or bid protection for the sale of the Assets.

   v. Competing bids must include a purchase agreement, which shall utilize the form of the Agreement as much as possible. If the proposed purchase agreement utilizes the form of the Agreement, such competing bid must include a redline markup of the Agreement.

vi. Competing bids must be cash bids, in any amount, but with no financing or other contingencies (except for Court approval of the Sale), with the exception that all credit bid rights pursuant to Section 363(k) of the Bankruptcy Code are preserved and credit bids shall be accepted from Arba. A deposit of 10% (the "Deposit") of the purchase price for the Assets must be provided to Erv Terwilliger, Tower Partners, 5950 Symphony Woods Road, Suite 302, Columbia, MD 21044, with a copy of the transmittal to special counsel for the Trustee, Robert E. Chernicoff, Esquire, Cunningham, Chernicoff & Warshawsky, P.C., rec@cclawpc.com, 2320 North Second Street, Harrisburg, PA 17110, before April ___, 2026. The Deposit shall thereafter be held by Leon P. Haller, Chapter 11 Trustee. Nonetheless, to the extent of any credit bid by Arba, a deposit of ten percent (10%) of such credit bid above is not required. Proof of financial ability to close on the purchase of the Assets must be provided with any bid. The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind by the Trustee or his agents, the Debtor and/or the Estate and their respective agents. Competing bids may not be subject to further due diligence by the bidder. Qualified Bids must contain a commitment to close by no later than the date set forth in the APA.

vii. Each Qualified Bid must contain a binding and irrevocable agreement by the bidder to serve as an "Alternate Bidder" (as defined herein), if so selected by the Trustee in accordance with the Sale Procedures; and is irrevocable until the earlier of: (a) ninety (90) days after the Court authorizes and approves a Successful Bid, or, Bids, for the Assets that are the subject of the Bid; and (b) the closing of the sale for the Assets that are the subject of the Bid, provided that if the bid is not selected as the Successful Bid or Alternate Bid, the Bid may be revoked after the Auction.

viii. Without the prior written consent of the Trustee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

ix. Each bid which conforms to the above shall be determined by the Trustee to be a Qualified Bid.

x. In the event that a Qualified Bid is received, MDA shall have the right to provide an overbid above any Qualified Bids received from any third parties for the Assets, which overbid shall be made one day prior to the Auction set forth in paragraph 3(e) below. An auction and ability for overbids may occur as set forth below.

e. In the event there are one or more Qualified Bids, an auction shall be conducted at the offices of Cunningham, Chernicoff & Warshawsky, P.C., on April ___, 2026, at 2:00 p.m. (the "Auction"). The Auction shall be conducted in-person, telephonically or online, as determined by the Trustee. Other bidding parties and interested creditors who request notice of the Auction will be notified as to the date and method of any Auction in advance of the auction. At the beginning of the Auction, the Trustee shall announce the highest and best Qualified Bid, against which overbids will be solicited (the "Starting Auction Bid").

f. At the conclusion of the Auction, the highest and best Qualified Bid received by the Trustee, in his business discretion, unless the Court orders otherwise, shall be deemed the Successful Bidder. The Successful Bidder shall enter into an Agreement of Sale, similar to the Agreement within two (2) days after the date of the Final Hearing.

g. Arba shall have the right to bid all or any portion of its allowed, undisputed secured claim for any of the Assets. Nonetheless, if Arba is the Successful Bidder, costs of the sale allocated to the buyer, if any, must be funded in cash by Arba at closing.

h. Notwithstanding the foregoing, Arba shall be deemed to be a Qualified Bidder. Further, Arba shall not make any determination as to the highest and best bidder for the Assets.

i. The Trustee may consider any monetary or nonmonetary provision in any Qualified Bid that provides one or more specific and articulated benefits to the Residents of their Facilities in determining which Qualified Bid presents the highest and best offer to purchase the Assets.

j. In the event there is more than one Qualified Bid as set forth above, an auction will be conducted electronically prior to the Final Hearing. Any party who has timely submitted a Qualified Bid and wishes to consider submitting an overbid must participate in the auction and shall arrange for such participation by contacting Ervin Terwilliger, (443) 325-5290 x 201, (443) 895-8882 – cell, erv@towerpartners.com, the Trustee's investment banker, Tower Partners.

k. The Trustee will consider, as part of his determination as to the highest and best bid, such bidder's ability to close, including whether such bid is likely to meet the criteria for the assumption and assignment of executory contracts and unexpired leases (if such assumption and assignment is part of such competing bid) under section 365(b) of the Bankruptcy Code  The Trustee may consider the well-being of the Residents of the Debtor's facility in determining the highest and best bid.

l. The initial overbid for the Assets at auction shall be in the amount of $10,000.00 above the Starting Auction Overbid, with all other bids to be in increments of at least $25,000.00.  All bids will be made on an open basis and all material terms of each bid shall be fully disclosed to all bidders.  The Trustee retains the right to change the amount of the increments in his discretion. Arba shall have the right to credit bid, provided Arba shall pay all costs of the sale.

m. Unless the Court orders otherwise, or an extension occurs by agreement of the parties, closing must occur the by the dates set forth in the APA.  All due diligence and closing shall occur as set forth in the APA.

n. At the conclusion of the Auction, the Trustee shall (i) review each Qualified Bid (as may have been increased and/or modified at the Auction) on the basis of financial and contractual terms and the factors relevant to the Sale process, including those factors affecting the speed and certainty of consummating the Qualified Bid, and (ii) identify the best bid for the Assets (the "Successful Bid") and the bidder making such best bid (the "Successful Bidder").  The Qualified Bidder with the next best Qualified Bid as compared to the Successful Bid, as determined by the Trustee in his reasonable business judgment, may be required to act as Alternate Bidder (as defined below). Each Qualified Bidder shall agree and be deemed to agree to be the Alternate Bidder if so designated. As soon as is feasible following the conclusion of the Auction, the Trustee shall file on the docket of the Debtor's bankruptcy case a "Notice of Successful Bidder" identifying the Successful Bidder and the Assets proposed to be sold to such Successful Bidder, and the purchase price.  If applicable, the Notice shall also identify the Alternate Bidder. The Trustee shall not solicit any Bids submitted after conclusion of the Auction.

o. All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and to have waived any right to a jury trial in connection with any disputes related to the Auction, and the construction and enforcement of the Qualified Bidder's proposed purchase agreement.

p. It is intended that an auction of the Debtor's Real Property will be conducted at the same date and time as the auction for the Assets.  Nothing set forth

herein requires a bid for the Real Property.

4.      The Final Hearing on the Sale Motion is currently scheduled for May _____ **2026, at _____ a.m.** in the United States Bankruptcy Court, 1501 N 6th Street, Harrisburg, Pennsylvania. The Final Hearing shall be subject to such continuance as the Court may order. At such hearing, the Successful Bidder will be presented, as will the Trustee's request that the sale to the Successful Bidder be free and clear of all liens, claims and encumbrances.

5.      All Deposits, but excluding the Deposits of a Successful Bidder and Alternate Bidder (which, in the case of the Deposit of the Alternate Bidder, shall be returned within five (5) business days of the closing of the Sale to the Successful Bidder), shall be returned to Qualified Bidders within five (5) business days after the date of the Auction. The Trustee shall maintain Deposits in a non-interest bearing account. Deposits may only be used in accordance with the provisions of these Sale Procedures. The Trustee shall not have any liability with respect to any Deposits. If a Successful Bidder fails to consummate the Sale as a result of its own default or the terms of the relevant asset purchase agreement between the Trustee and such Successful Bidder would allow the Trustee to retain such Successful Bidder's Deposit, the Trustee will not have any obligation to return the Deposit of such Successful Bidder, and such Deposit will become property of the Estates. Following the closing of the Sale(s), the proceeds thereof shall be held by the Trustee pending further order of the Court.

6.      Following the Auction to be conducted by the Trustee and prior to the Final Hearing, the Trustee shall file a Report of Sale and such Motion as may be necessary to approve the Successful Bidder and the Trustee shall request all provisions required to

appropriately transfer the Assets free and clear of all liens, claims, encumbrances and other interests.

7. Arba's rights are hereby reserved with respect to any objection to the sale proposed hereunder until the time of the Final Hearing.

8. The Court shall retain jurisdiction over any and all disputes arising under this Order.

# EXHIBIT
# A

**AMENDED AND RESTATED OPERATIONS TRANSFER AGREEMENT**

among

**LEON P. HALLER,**

Chapter 11 Trustee, on behalf of

**CEDAR HAVEN ACQUISITION, LLC**

Old Operator

and

**CEDAR HAVEN HEALTHCARE CENTER LLC**

New Operator

March_____, 2026

Case 1:26-bk-00118-HWV    Doc 152-1    Filed 03/25/26    Entered 03/25/26 11:46:52
Desc Proposed Order    Page 11 of 68

# AMENDED AND RESTATED OPERATIONS TRANSFER AGREEMENT

This AMENDED AND RESTATED OPERATIONS TRANSFER AGREEMENT ("**Agreement**"), dated as of March _____, 2026 ("**Execution Date**"), is made between **Leon P. Haller, Chapter 11 Trustee** ("**Trustee**") on behalf of **Cedar Haven Acquisition, LLC**, a Delaware limited liability company) ("**Old Operator**") and **Cedar Haven Healthcare Center LLC**, a Pennsylvania limited liability company, or its designees and affiliates ("**New Operator**"). The Trustee and New Operator are sometimes individually referred to as a "**Party**" and collectively the "**Parties**".

WHEREAS:

A.      The Parties and Receiver (hereinafter defined) entered into that certain Operations Transfer Agreement dated March 11, 2026 ("Original OTA") for the transfer of operations of the Facility (hereinafter defined) and the Parties desire to amend and restate the Original OTA as set forth herein.

B.       Old Operator is currently the tenant and licensed operator of a 324-bed skilled nursing facility known as Cedar Haven Healthcare Center located at 590 South 5th Avenue, Lebanon, Pennsylvania 17042 ("**Facility**");

B.      The Facility is duly licensed by the applicable authorities of the Pennsylvania Department of Health ("**PDOH**") and duly certified under the Medicare and Medicaid Programs;

C.      The Facility is leased pursuant to a certain Lease Agreement ("**Existing Lease**") by and between 590 Fifth Avenue, LLC ("**Seller**"), as landlord, and Old Operator, as tenant;

D.      The Facility was operated by the Receiver pursuant to the Order of the Court of Common Pleas, Lebanon County Pennsylvania dated October 30, 2025, as modified by the Order of December 17. 2025 ("**Receiver Order**") which gave the Receiver the power and authority, among other things, to sell the Facility's tangible and intangible property;

E.      On January 16, 2026, Michael F. Flanagan ("**Receiver**") caused the Old Operator to file a voluntary petition for relief in the United States Bankruptcy Court for the Middle District of Pennsylvania ("**Bankruptcy Court**") under Chapter 11 of the Bankruptcy Code, Case No. 1:26-bk-00118-HWV, creating the Existing Operator's bankruptcy estate ("**Estate**"). Thereafter, the United States Trustee appointed Leon P. Haller as the Chapter 11 Trustee. The Receiver operated and maintained the business of the Old Operator until such time as the Trustee was appointed and thereafter the Trustee has operated the business of the Old Operator under the auspices of the Receiver;

F.      Concurrently with the execution of this Agreement, an affiliate of the New Operator ("**Purchaser**") is entering into that certain Purchase and Sale Agreement ("**Purchase Agreement**") pursuant to which, subject to the terms and conditions contained therein, the Seller will sell the Real Property, utilized by Old Operator for its business, as defined in the Purchase Agreement, and certain other property as set forth in the Purchase Agreement to the Purchaser, an affiliate of New Operator, and the Purchaser will purchase such property from the Seller,

G.      Upon the closing of this Agreement and the Purchase Agreement, the Existing Lease will be terminated;

H.      Prior to the Closing, the Bankruptcy Court is expected to issue an order permitting the transactions contemplated by this Agreement to take place free and clear of all liens, claims, encumbrances and other interests ("**Sale Order**"); and

I.     The Parties wish to enter into this transaction to transfer certain operational assets to the New Operator, and provide for the orderly transition of the Facility's operations to New Operator, subject to the terms and conditions of this Agreement; including such approval as required from the Bankruptcy Court and the licensing agency, PDOH.

NOW, THEREFORE, in consideration of the premises and the mutual obligations of the Parties contained in this Agreement, including payment of the sum of $100,000.00 (One Hundred Thousand Dollars), the receipt and legal sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree to incorporate the foregoing recitals as if fully rewritten in this Agreement and further agree as follows:

All capitalized terms used in this Agreement and not otherwise defined shall have the meanings ascribed to them on Exhibit 1.  All of the Old Operator obligations under this Agreement shall apply to the Trustee on behalf of the Old Operator whether or not explicitly stated.

**ARTICLE I**
**ASSETS, LIABILITIES, AND OTHER MATTERS**

**1.1**     Transferred Assets.

(a)     Subject to and in consideration of the terms and conditions of this Agreement, and in consideration of, among other things, the payment of the portion of the Purchase Price allocated to the Transferred Assets (as defined here) under Section 2 of the Purchase Agreement, at the Closing and pursuant to the Sale Order, Receiver will cause Old Operator to sell, assign and transfer to New Operator all of Old Operator's right, title and interest in and to the following assets (collectively, the "**Transferred Assets**"), free and clear of all Liens and liabilities, except (i) statutory liens not yet delinquent; (ii) as specifically set forth in Schedule 1.1, (iii) liens to be paid off from the proceeds at the Closing, or (iv) as otherwise specifically provided herein (such exceptions, collectively, "**Permitted Liens**"):

(i)     all inventory, supplies, medical supplies, linens, foodstuffs and other consumables and all other tangible assets used by Old Operator in the operation of the Facility, in such quantities as are necessary for no less than seven (7) days of operations;

(ii)     all patient and prospect lists, marketing information, telephone and fax numbers, telephone listings, email addresses and domain names used by the Facility;

(iii)     all transferable licenses, transferable permits and other transferable governmental approvals or authorizations which are used, or may be used, in connection with the Facility (including, without limitation, any authorizations to participate in any state or federal reimbursement program such as Medicaid or Medicare in accordance with Section 1.2 below), whether issued or granted by any Governmental Authority or by any other Person, and all operating, license and certification rights with respect to the Business (except as otherwise provided in Section 1.2 below);

(iv)     all furniture, fixtures, equipment, furnishings, appliances, tools, instruments, machinery, servers, iPads and tablets, desktop computers and monitors, office equipment, parts, and other tangible personal property located at the Facility (including, without limitation, all respiratory equipment and ventilators) (excluding such property to be sold to Purchaser under the Purchase Agreement);

(v)     all transferable third party warranties and claims for warranties relating to the Facility or the Transferred Assets (collectively, the "**Warranties**");

- 2 -

(vi) all of Old Operator's rights under the Assumed Operating Contracts that New Operator agrees to assume in accordance with Section 1.9;

(vii) any other trade names, trademarks, service marks, symbols, logos, know-how, copyrights and other proprietary materials or intellectual property rights used or held for use in connection with the operation of the Facility and all goodwill associated with the Facility or any of the foregoing including the Facility's name: Cedar Haven Healthcare Center;

(viii) subject to applicable law and the provisions hereof, all employee records, including all employee employment applications, W-4's, I-9's and any disciplinary reports;

(ix) all assignable or transferable goodwill relating to or arising in connection with the ownership or operation of the Business and Facility, including without limitation lists of residents and suppliers, correspondence, purchase orders, market surveys, and mailing lists;

(x) all deposits, trade accounts receivable, reimbursements, Third Party Payor funds and other amounts due with respect to the period after the Closing Date; and

(xi) all agreements with then current patients and residents of the Facility as of the Effective Time (including individuals temporarily not in occupancy) regarding admission and residency at the Facility.

(b) Notwithstanding anything to the contrary contained in Section 1.1(a) or elsewhere in this Agreement, the following items (collectively, the "**Excluded Assets**") are excluded from the Transferred Assets and shall remain the property of the Bankruptcy Estate of Old Operator after the Closing:

(i) all cash and cash equivalents and short term investments;

(ii) all rights of Old Operator relating to deposits and prepaid expenses and claims for refund (excluding Resident Trust Funds and Resident Deposits);

(iii) all rights of Old Operator under this Agreement and all Transaction Documents;

(iv) all rights of Old Operator in connection with, and assets of, Old Operator's employee benefit plans and all right to payment of monies that relate to the period prior to the Effective Time;

(v) all (i) minute books, charter documents, record books, and other similar books and records pertaining to the organization, existence or capitalization of Old Operator, including, for the avoidance of doubt, all financial, accounting and tax records of or relating to Old Operator, and (ii) records regarding pending or threatened litigation, proceedings or investigations by or before any Governmental Authority; provided that Trustee and Old Operator shall permit New Operator to copy all records described in this clause (ii) at New Operator's expense upon reasonable prior written notice to Trustee and Old Operator;

(vi) all rights in, claims to and payments of any and all amounts relating to the Transferred Assets, the Excluded Assets, the Facility and/or the ownership or operation thereof, including all accounts receivable, rebates, refunds or credits of whatever nature, including funds from Medicare and/or Medicaid rate adjustments and appeals, all claims for refund of Taxes, whether real, personal, tangible or intangible, and other governmental charges, whenever and however paid, issued or credited, in each case, to the extent the same relate to any period prior to the Effective Time; and

- 3 -

(vii)     all contracts to which Old Operator is a party, other than the Assumed Operating Contracts and resident admission agreements.

1.2     Provider Agreements; Interim Billing.

(a)     As of the Closing Date, New Operator (i) shall assume any and all of Old Operator's rights and interests in and to Old Operator's Medicare provider number and reimbursement agreement ("**Medicare Agreement**"), and (ii) may, at its sole discretion, assume Old Operator's rights and interests in and to Old Operator's Medicaid provider number and reimbursement agreement ("**Medicaid Agreement**" and together with the Medicare Agreement, the "**Provider Agreements**"), or secure a new Medicaid Agreement in its own name.  The Parties acknowledge and agree that New Operator is not expected to have received its "tie in" notice from CMS with respect to Old Operator's assumed Medicare Agreement as of the Closing Date.  New Operator agrees to diligently pursue receipt of its Medicare tie in notice.  Prior to New Operator's receipt of its Medicare tie in notice  has not been obtained by the Closing Date, New Operator shall be permitted to bill for services performed following the Closing under Old Operator's Medicare provider number to the extent permitted by applicable law.

(b)     The Parties acknowledge and agree that Old Operator's managed care provider plans are not expected to have been updated with New Operator's provider information and/or New Operator may not have obtained new managed care provider plans as of the Closing Date.  From and after the Closing Date until such managed care provider plans are updated with New Operator's provider information or new managed care provider plans are obtained, Old Operator agrees that New Operator shall be permitted to bill for services provided following the Closing under Old Operator's managed care provider plans using Old Operator's provider information.

(c)     The Parties understand that if New Operator assumes Old Operator's Medicare Provider Agreement  reimbursements from Medicare for items/services provided/rendered after the Closing Date may continue to be issued to Old Operator for a period of time. Old Operator shall promptly forward to New Operator any payments received with respect to services rendered by New Operator from and after Closing in accordance with Section 1.6 hereof.

(d)     Schedule 1.2 attached hereto lists all of the Facility's Third Party Payor contracts.

1.3     Excluded Liabilities. Except for those liabilities of Old Operator expressly and unambiguously assumed by New Operator (the "**Assumed Liabilities**"), New Operator shall not assume any claims, lawsuits, Liabilities, obligations, losses, contracts, agreements or debts of Old Operator, whether statutory, regulatory, or judicially created whatsoever ("**Excluded Liabilities**"), including without limitation: (a) malpractice or other tort claims, statutory or regulatory claims, professional liability claims, claims of state or federal agencies whether civil or criminal, fraud-based claims or claims for breach of contract to the extent any such claims are based on acts or omissions of Old Operator or events occurring or accruing at the Facility before the Effective Time, (b) any accounts payable, taxes, assessments (including any pursuant to 62 P.S. §§ 801-A;et seq.), fines, levies, penalties or other obligations or liabilities of Old Operator to pay money, (c) any collective bargaining agreements or other agreements or understandings with any labor union or collective bargaining unit or any employment or consulting agreements of any kind, (d) obligations related to ERISA, contributions to funds, pension plans or retirement plans, or withdrawal from multi-employer pension plans, and (e) any other obligations or liabilities of any nature arising in whole or in part from Old Operator's acts or omissions prior to the Effective Time or in any way related to the operations of the Facility prior to the Effective Time.

1.4     Transfer of Resident Trust Funds and Deposits.

(a)     At the Closing, Trustee on behalf of Old Operator shall deliver to New Operator a true, correct and complete schedule of all trust funds held by Old Operator as of the most recent date available

- 4 -

prior to the Effective Time for any resident of the Facility (collectively the "**Resident Trust Funds**") and deposits or prepayments paid by or for any resident of the Facility (collectively, the "**Resident Deposits**").

(b)	At the Closing, Trustee on behalf of Old Operator shall transfer the Resident Trust Funds and Resident Deposits to New Operator and New Operator shall accept the Resident Trust Funds and Resident Deposits in trust for the residents, in accordance with applicable statutory and regulatory requirements. Within ten (10) Business Days after the Closing Date, Trustee on behalf of Old Operator and New Operator shall prepare a final schedule of the Resident Trust Funds and Resident Deposits and thereafter reconcile the Resident Trust Funds and Resident Deposits transferred from Trustee on behalf of Old Operator to New Operator.

(c)	Subject to the limitations set forth in Section 9.5 below, Trustee on behalf of Old Operator shall indemnify, defend and hold harmless New Operator from any Losses which New Operator incurs as a result of: (i) discrepancies between the Resident Trust Funds, or Resident Deposits as delivered by Trustee on behalf of Old Operator to New Operator and the correct amount of the Resident Trust Funds, or Resident Deposits for such resident, as of the Effective Time as required under applicable law, including any shortfall in the amount of Resident Trust Funds or Resident Deposits delivered by Trustee on behalf Old Operator to New Operator, (ii) material inaccuracies in the accounting of Resident Trust Funds or Resident Deposits provided by Trustee on behalf of Old Operator, or (iii) claims which arise from actions or omissions of Old Operator with respect to the Resident Trust Funds or Resident Deposits prior to the Effective Time.

(d)	New Operator shall indemnify, defend and hold harmless Trustee on behalf of Old Operator from any Losses which Trustee on behalf of Old Operator incurs as a result of any claims made by residents against Old Operator for Resident Trust Funds and Resident Deposits transferred to New Operator by Old Operator.

**1.5**	Employees.

(a)	Attached as Schedule 1.5 is a list (the "**Employee Schedule**") which reflects, in all material respects as of the most recent available date all Old Operator employees providing services to the Facility, whether full time or part-time (the "**Facility Employees**").

(b)	Prior to the Closing, Trustee on behalf of Old Operator shall provide New Operator with reasonable access to the Facility and Facility Employees to permit New Operator to discuss potential employment of any Facility Employees by New Operator, pursuant to New Operator's standard employment policies and criteria. Trustee on behalf of Old Operator shall, as of the Effective Time, terminate the employment of all Facility Employees. Without Trustee on behalf of Old Operator's prior consent, New Operator shall not deliver any written communications to, or hold any group meetings with, any Facility Employee for the purpose of addressing or discussing the transactions contemplated herein.

(c)	New Operator may hire any of the Facility Employees, and New Operator shall offer to hire a sufficient number of Facility Employees in order that (taking into account the transactions contemplated by this Agreement) Trustee on behalf of Old Operator shall not be obligated to deliver notice relating to the termination of the employment of any of the Facility Employees, including, but not limited to, under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. 2101 *et. seq.* ("**WARN**"), and any similar local or state plant closing laws.  For the purposes of this Agreement, Facility Employees shall include any employees who are on medical disability or leaves of absence and who worked at the Facility immediately prior to such disability or leave who are able to perform the essential functions of the position with or without a reasonable accommodation, and who are qualified for the position.

(d)	New Operator shall hire at the Effective Time, and at least five (5) Business Days before the Closing shall provide Trustee on behalf of Old Operator with a schedule of, each Facility Employee

- 5 -

who receives an offer of employment and elects to accept employment with New Operator in accordance with the terms of Section 1.5(c) (all of such employees who accept employment with New Operator being herein called the "**Hired Employees**").

(e)	Except as set forth below in this Section 1.5(e), Trustee on behalf of Old Operator shall be responsible for the payment to Facility Employees of all salaries, wages, benefits or other amounts due and payable under applicable law and/or the policies and procedures of Old Operator for periods prior to the Effective Time and shall timely pay to all applicable Governmental Authorities all employment-related taxes due with respect to Facility Employees for periods before the Effective Time, including Old Operator's share of all FICA, state and federal unemployment taxes and workers' compensation insurance premiums. Old Operator shall provide at least two (2) days prior to the Closing a schedule setting forth, for each Hired Employee as of such date, the amount of all earned and accrued vacation, personal and sick pay and earned or accrued bonuses inclusive of all FICA, withholding, unemployment, worker's compensation or similar taxes and charges in connection with the foregoing ("**Hired Employees PTO Benefits**").  New Operator shall assume the obligation to provide and/or pay such Hired Employees PTO Benefits to all Hired Employees.

(f)	Nothing in this Agreement shall create any rights in favor of any Person not a party hereto other than those who have secured interests in Old Operator's receivables, including the Facility Employees, or constitute an employment agreement or condition of employment for any employee of Old Operator or New Operator or any Affiliate thereof, nor shall this Agreement be deemed the assignment to or assumption by New Operator of any collective bargaining agreement, employment agreement or terms or conditions of employment (except as set forth herein), and New Operator shall not assume any liabilities or obligations under any employee benefit plan or defined benefit plan of Old Operator or its Affiliates. New Operator will provide group health coverage for the Hired Employees who qualify for its coverage, as provided in Section 1.5(g).

(g)	As of the Effective Time, all Hired Employees who, immediately prior to the Effective Time, participated in group health insurance coverage sponsored by Old Operator, shall be eligible for participation in a group health plan (as defined for purposes of Internal Revenue Code Section 4980B) established and maintained by New Operator. To the extent permissible under the plan of New Operator, all such Hired Employees shall be eligible to be covered without a waiting period and without regard to any pre-existing condition unless they (i) are under a waiting period with Old Operator at the Effective Time, in which case they shall be required to complete their waiting period while under New Operator's plan or in accordance with the terms of New Operator's benefit plan, or (ii) were subject to a pre-existing condition exclusion while under Old Operator's group health plan, in which case they shall be subject to the same exclusion while in New Operator's group health plan or in accordance with the terms of New Operator's benefit plan, which exclusion shall, if applicable, be subject to the same time limitation while the Hired Employees are in New Operator's employ as was applicable thereto while the Hired Employees were in Old Operator's employ, with the time limit calculated from the date the same commenced while said employees were in Old Operator's employ.

1.6	Accounts Receivable.

(a)	Trustee on behalf of Old Operator shall retain its right, title and interest in and to all unpaid accounts receivable with respect to the Facility that relate to all periods on or prior to the Effective Time subject to the rights of non-parties with secured liens on the receivables as listed in Schedule 1.6 hereof. New Operator shall have all right, title and interest in and to accounts receivable that relate to periods after the Effective Time.  Nothing in this Agreement shall be construed to divest or limit the rights of any such lien holder  With respect to the post-Closing billing practice to be applied with respect to accounts receivable due to Old Operator from private pay, managed care and long term care insurance patients after the Effective Time, Trustee on behalf of Old Operator shall prepare and send to the appropriate responsible parties for such patients bills for all periods up to and including the Effective Time, with instructions to send payment directly to Trustee on behalf of Old Operator, with said payment payable to Trustee on behalf of Old Operator or such

- 6 -

other party as Trustee on behalf of Old Operator directs, including as application any secured lien holder. The Parties acknowledge that: (A) Trustee on behalf of Old Operator may contact its Medicaid intermediary, Medicare intermediary, the applicable state agency or any other Third Party Payor to remit payment directly to Trustee on behalf of Old Operator for services rendered prior to the Effective Time, and (B) New Operator may contact its Medicaid intermediary, Medicare intermediary, the applicable State agency or any other Third Party Payor to remit payment directly to New Operator for services rendered after the Effective Time; provided, however, that the Parties shall coordinate and cooperate with each other regarding such notification so as to avoid any conflicting or confusing payment instructions. Transferor shall be responsible for all arrangements for payments to any secured lien holder and nothing in this Agreement shall be construed to require New Operator to make or have any such arrangement.

(b)     To the extent that New Operator receives payment for accounts receivable to which Trustee on behalf of Old Operator is entitled pursuant to Section 1.6(a) above, New Operator shall hold the same in trust for Trustee on behalf of Old Operator and shall pay it to Trustee on behalf of Old Operator as more specifically described below. To the extent that Trustee on behalf of Old Operator receives payment for accounts receivable to which New Operator is entitled pursuant to Section 1.6(a) above, Trustee on behalf of Old Operator shall hold the same in trust for New Operator and shall pay it to New Operator as more specifically described below:

(c)     (i)     if payments received by New Operator are paid pursuant to a voucher, check or other negotiable instrument containing: (A) Old Operator's Medicaid provider number, (B) Old Operator's Medicare provider number, unless New Operator has assumed such number in accordance with the terms of this Agreement in which case the payment must also include specific indications that the delivery of services relating to such payment was prior to the Effective Time, (C) any other payor or provider number issued to Old Operator, and/or (D) specific reference to dates of service prior to the Effective Time, New Operator shall not cash or deposit such payments in any New Operator account and shall instead promptly forward such payments to Trustee on behalf of Old Operator within five (5) Business Days of receipt of same;

(ii)     if payments received by Trustee on behalf of Old Operator are paid pursuant to a voucher, check or other negotiable instrument containing: (A) New Operator's Medicaid provider number, (B) Old Operator's Medicare provider number, together with specific indications that the delivery of services relating to such payment was after the Effective Time, (C) any other payor or provider number issued to New Operator, and/or (D) specific reference to dates of service after the Effective Time, Trustee on behalf of Old Operator shall not cash or deposit such payments in any Old Operator's account and shall instead promptly forward such payments to New Operator within five (5) Business Days of receipt of same;

(iii)     if the accompanying remittance does not satisfy the requirements of Section 1.6(b)(i) or (ii) above but the Parties agree that the payments relate solely to services provided prior to the Effective Time: (A) in the event that such payments are received by New Operator, New Operator shall remit such payments to Trustee on behalf of Old Operator within five (5) Business Days of receipt of same, and until so forwarded, shall be held in trust for the benefit of Trustee on behalf of Old Operator, and (B) in the event that such payments are received by Trustee on behalf of Old Operator, Trustee on behalf of Old Operator shall retain the payments;

(iv)     if the accompanying remittance advice does not satisfy the requirements of Section 1.6(b)(i) or (ii) above but the Parties agree that the payments relate solely to services provided after the Effective Time: (A) in the event that such payments are received by New Operator, New Operator shall retain the payments, and (B) in the event that such payments are received by Trustee on behalf of Old Operator, Trustee on behalf of Old Operator shall promptly remit such payments to New Operator within five (5) Business Days of receipt of same, and until so forwarded, shall be held in trust for the benefit of New Operator;

Case 1:26-bk-00118-HWV    Doc 152-1    Filed 03/25/26    Entered 03/25/26 11:46:52    Desc Proposed Order    Page 18 of 68

(v) if the accompanying remittance advice, or if the Parties agree, that the payments relate to services provided both prior to and after the Effective Time: (A) in the event that such payments are received by New Operator, New Operator shall within five (5) Business Days of receipt of same forward to Trustee on behalf of Old Operator the amount of such payment relating to services provided prior to the Effective Time, and (B) in the event that such payments are received by Trustee on behalf of Old Operator, Trustee on behalf of Old Operator shall within five (5) Business Days of receipt of same forward to New Operator the amount of such payment relating to services provided following the Effective Time; and

(vi) if the accompanying remittance advice does not indicate the period to which a payment relates or if there is no accompanying remittance advice, the Parties shall in good faith attempt to agree on the disposition of such payment. If the Parties are unable to agree on the disposition of such payment, then: (1) all such payments which are received within the period of one hundred twenty (120) days from the Effective Time shall be applied, first, against the outstanding account receivable due from such payor to Trustee on behalf of Old Operator, and, second, against the outstanding account receivable due from such payor to New Operator, and (2) all such payments which are received after the date which is one hundred twenty (120) days from the Effective Time shall be applied, first, against the outstanding account receivable due from such payor to New Operator, and, second, against the outstanding account receivable due from such payor to Trustee on behalf of Old Operator.

(d) New Operator and Trustee on behalf of Old Operator shall promptly forward to the other Party any and all remittance advices, explanation of benefits, denial of payment notices and all other correspondence received by the Party that relate to services provided by the other Party. On the tenth day of each month during the first six (6) months following the Effective Time, New Operator shall provide to Trustee on behalf of Old Operator a monthly reconciliation (the "**Receipts Report**") for Trustee on behalf of Old Operator's review, together with a copy of the remittance advice received by New Operator from any third party intermediary, and other documentation as reasonably requested by Trustee on behalf of Old Operator, with respect to all of Old Operator's accounts receivable due to Old Operator from Medicare, Medicaid or other Third Party Payor (including amounts owed as a result of payor adjustments or cost report settlements). The Receipts Reports shall be sent by New Operator to Trustee on behalf of Old Operator on the tenth day of every month (in respect of the immediately prior month) until the first six (6) months period expires and thereafter as Old Operator may reasonably request, but not more often than quarterly. Trustee on behalf of Old Operator may, at its own cost, verify the Receipt Reports. Trustee on behalf of Old Operator shall reserve the right to contest or dispute with any Third Party Payor any statement of disallowance, denial or refusal to remit payment by such Third Party Payor relating to accounts receivable due to Trustee on behalf of Old Operator. To the extent applicable, Trustee on behalf of Old Operator shall provide New Operator with similar Receipts Reports in respect of New Operator's accounts receivable.

(e) New Operator shall provide written notice to Trustee on behalf of Old Operator promptly upon receipt of any information from a Third Party Payor regarding any disallowance, denial or refusal to remit payment, in whole or in part, regarding any account receivable due to Trustee on behalf of Old Operator. Trustee on behalf of Old Operator shall provide written notice to New Operator promptly upon receipt of any information from a Third Party Payor regarding any disallowance, denial or refusal to remit payment, in whole or in part, regarding any account receivable due to New Operator. Nothing herein shall be deemed to limit in any way either Party's rights and remedies to recover accounts receivable due and owing to such Party by Medicare, Medicaid, or third parties under applicable law; provided, however, that: (i) Trustee on behalf of Old Operator shall not, without the prior written consent of New Operator, settle or otherwise compromise its right, title and interest in and to unpaid accounts receivable in a manner that impacts, effects, diminishes or otherwise interferes with New Operator's right, title and interest in and to unpaid accounts receivable with respect to services provided at the Facility by New Operator after the Effective Time, and (ii) New Operator shall not, without the prior written consent of Trustee on behalf of Old Operator, settle or otherwise compromise its right, title and interest in and to unpaid accounts receivable in a manner that impacts, effects, diminishes or otherwise interferes with Old Operator's right, title and interest in and to unpaid accounts

receivable with respect to services provided at the Facility by Old Operator or Trustee on behalf of Old Operator prior to the Effective Time.

(f)　　　　If any payment hereunder was misapplied by the Parties, the Party which erroneously received said payment shall remit the same to the other within ten (10) Business Days after said determination is made.

(g)　　　　For a period of eighteen (18) months after the Effective Time, New Operator and Trustee on behalf of Old Operator shall, upon reasonable notice and during normal business hours, have the right to inspect, at its own cost and with reasonable staff assistance during normal business hours, that limited portion of the cash receipts and other books and records or copies thereof (including, without limitation, bank statements) of the other Party as the requesting Party may reasonably deem necessary to prepare the requesting Party's bills, verify balances of the other respective Party or confirm the other Party's compliance with the obligations imposed on it under this Section.

(h)　　　　If either Party fails to forward to the other Party any payment received by such Party in accordance with the terms of this Section 1.6 within five (5) Business Days of demand therefor, the other Party shall be entitled (among all other remedies allowed by law and this Agreement) to interest on the unpaid amount at the prime rate (as reported in *The Wall Street Journal* or other similar publication), plus three percent (3%) per annum from the date which is five (5) Business Days after the demand until the date paid, together with all reasonable attorney's fees and other costs of collection. The payment of any interest or fees imposed under this Section 1.6(h), if any, shall be made together with the underlying payment therefor.

(i)　　　　The obligations of the Parties to forward the accounts receivable payments pursuant to this Section 1.6 are absolute and unconditional and irrespective of any circumstances whatsoever which might constitute a legal or equitable discharge, offset, counterclaim or defense of the Parties.

1.7　　　Prorations.

(a)　　　　At the Closing and for the billing period in which the Effective Time occurs, all expenses and income arising from the conduct of the business of the Facility in the ordinary course, including, without limitation, patient care revenue, trade payables, telephone expenses and utility charges, real and personal property Taxes attributable to the Facility, including any such items held in escrow (all such income and expenses to be referred to herein as the "**Prorated Items**"), shall be apportioned between Old Operator and New Operator as of the Effective Time, it being the agreement of the Parties that Trustee on behalf of Old Operator shall be entitled to and responsible for all revenue, expenses and obligations arising from the operation of the Facility prior to the Effective Time and New Operator shall be entitled to and responsible for all revenue, expenses and obligations arising from the operation of the Facility after the Effective Time, except, in each case, as otherwise expressly set forth herein. This provision shall be implemented by New Operator or Trustee on behalf of Old Operator, as the case may be, remitting to the other any invoices for Prorated Items that it receives that reflect a service date for which the other Party is responsible and by Trustee on behalf of Old Operator or New Operator, as applicable, assuming responsibility for the payment of any invoices for Prorated Items that reflect a service date for which it is responsible with any overage or shortage in payments by either Party to be adjusted and paid as provided in Sections 1.7(b) and (c).

(b)　　　　All such prorations shall be made on the basis of actual days elapsed in the relevant accounting, billing or revenue period and shall be based on the most recent information available to Trustee on behalf of Old Operator. Utility charges which are not metered and read for the Closing shall be estimated based on prior charges, and shall be re-prorated upon receipt of statements therefor.

(c)　　　　To the extent possible and based on reasonable estimates, the Parties shall make all prorations at the Closing. All amounts owing from one Party hereto to the other Party hereto that require

- 9 -

adjustment after the Closing shall be settled within thirty (30) days after the Closing Date or, in the event the information necessary for such adjustment is not available within said thirty (30) day period, then as soon thereafter as practicable.

(d)     All prorations to be made at Closing shall be effected through adjustment of the Purchase Price under the Purchase Agreement.

**1.8**     Access to Records.

(a)     All: (i) resident records, minimum data sets, care plans, therapy records, pharmacy records, clinical patient trust account records and admission agreements ("**Patient Care Records**") for the period prior to the Effective Time; and (ii) business records relating to the operation of the Facility, including maintenance records, employment records for Hired Employees, including employment applications, W-9 Forms and performance evaluations; and Governmental Authority compliance records (including surveys and plans of correction) for the period prior to the Effective Time ("**Operations Records**") shall be delivered by Trustee on behalf of Old Operator to New Operator on the Closing Date (by leaving such Patient Care Records and Operations Records at the Facility); provided, however, that Trustee on behalf of Old Operator may retain copies of such Operations Records and Patient Care Records as Trustee on behalf of Old Operator may deem reasonably necessary.  To the extent Patient Care Records or Operations Records are maintained through licenses software such as PointClickCare Trustee on behalf of Old Operator shall arrange for New Operator to gain access to all such records until New Operator obtains its own licensed software.

(b)     Subsequent to the Effective Time, New Operator shall allow Trustee on behalf of Old Operator and its agents and representatives to have reasonable access to (upon reasonable prior notice, during normal business hours), and to make copies of, at Trustee on behalf of Old Operator's expense, the Patient Care Records and Operations Records and supporting material, to the extent reasonably necessary to enable Trustee on behalf of Old Operator to investigate and defend any claim (to include, without limitation, employee and patient claims), to file or defend tax returns and to verify payments, adjustments or allocations provided by this Agreement.

(c)     Each of New Operator and Trustee on behalf of Old Operator shall, upon reasonable notice to the other, be entitled to remove the originals of any Patient Care Records and Operations Records and supporting material of the Facility relating to any period prior to or after the Effective Time in the possession of the other, for purposes of litigation involving a resident or employee to whom such record relates, if an officer of a court of competent jurisdiction or agency official certifies that such original must be produced in order to comply with applicable law or the order of a court of competent jurisdiction in connection with such litigation, and the requesting Party shall provide the requested Party with a complete copy of such records prior to its removal at the requesting Party's cost and expense and as a condition precedent to receiving such original record. Any record so removed shall promptly be returned to the requested Party following its use. The Parties agree that Trustee on behalf of Old Operator shall be deemed the custodian of all Patient Care Records and Operations Records for the period prior to the Effective Time, and New Operator shall be deemed the custodian of all Patient Care Records and Operations Records for the period following the Effective Time. If New Operator shall receive any request or demand from any third party or Governmental Authority for Patient Care Records and/or Operations Records for the period preceding the Effective Time, New Operator shall, to the extent permitted by law, promptly forward such request or demand to Trustee on behalf of Old Operator and shall not release any Patient Care Records and/or Operations Records for the period preceding the Effective Time without Trustee on behalf of Old Operator's prior written consent.

(d)     Each of New Operator and Trustee on behalf of Old Operator shall maintain such books, records and other material comprising records of its operations of the Facility, including, but not limited to, resident records and records of Resident Trust Funds, to the extent required by law, but in no event for less

- 10 -

than seven years, and thereafter each Party may request that such records be retained by it upon a showing to the requested Party of the requesting Party's reasonable need for such records.

(e)	This Section 1.8(e) is included herein because of the possible application of Section 1861(v)(1)(I) of the Social Security Act to this Agreement. If such Section 1861(v)(1)(I) should not be found applicable to this Agreement, then this Section will be deemed not to be a part of this Agreement and shall be conclusively deemed by the Parties to be null and void. Until the expiration of four (4) years after the furnishing of services pursuant to this Agreement, New Operator shall, as provided in Section 1861(v)(1)(I) of the Social Security Act and regulations promulgated thereunder, make available, upon written request, to the Secretary of Health and Human Services or to the Comptroller General of the United States or any of their duly authorized representatives, this Agreement and all books, documents and records of New Operator that are necessary to verify the nature and extent of the costs of any services furnished pursuant to this Agreement for which payment may be made under the Medicare program. Any Party receiving a request for documents or information under this provision shall promptly notify the other Party.

**1.9**	Assumed Operating Contracts and Patient Agreements.

(a)	Attached hereto as Schedule 1.9, (the "**Operating Contracts Schedule**") are true, correct and complete copies of, all vendor, service, maintenance, laundry, hospital transfer, hospice, pharmacy and other agreements relating to the ownership and operation of the Facility, including, if applicable, copier, telecommunications and other equipment leases, but excluding contracts that cover both the Facility and other affiliated facilities (said excluded contracts being hereinafter referred to as "**Global Contracts**") (said contracts, other than the Global Contracts, being referred to as the "**Operating Contracts**"). Within five (5) Business Days after execution of this Agreement, New Operator shall notify Old Operator of any Operating Contracts which it desires to assume at the Closing (all of the Operating Contracts to be assumed by New Operator hereunder being collectively referred to as the "**Assumed Operating Contracts**"). Trustee on behalf of Old Operator shall provide commercially reasonable cooperation to New Operator in connection with the assignment and assumption of all Operating Contracts to be assumed by New Operator hereunder. New Operator shall assume and perform any and all obligations under the Assumed Operating Contracts accruing from and after the Effective Time, and Trustee on behalf of Old Operator shall remain responsible, and indemnify (subject to the limitations set forth in Section 9.5 below) and hold harmless New Operator, for any and all obligations under the Assumed Operating Contracts related to periods prior to the Effective Time.

(b)	To the extent that any third party consent necessary for the assignment and assumption of any of the Assumed Operating Contracts has not been obtained by Trustee on behalf of Old Operator as of the Closing, Trustee on behalf of Old Operator and New Operator shall, during the remaining term of such Assumed Operating Contract (the "**Non-Assignable Contract**"), each use their respective commercially reasonable efforts to obtain the consent of the applicable third party. With respect to any such Non-Assignable Contract as to which the necessary approval or consent for the assignment or transfer to New Operator is obtained following the Closing, Trustee on behalf of Old Operator shall assign, and New Operator shall assume, such Non-Assignable Contract by execution and delivery of an assignment and assumption agreement, in form and substance reasonably acceptable to New Operator, promptly following receipt of such approval or consent.

(c)	Trustee on behalf of Old Operator shall provide New Operator with true, complete and correct copies of the forms (and any material amendments or modifications thereof) of all patient agreements, occupancy agreements, residency agreements and similar agreements relating to the occupancy of the Facility by the patients and residents thereof (the "**Patient Agreements**"). New Operator shall assume and perform any and all obligations under the Patient Agreements accruing from and after the Effective Time for all current patients and residents of the Facility as of the Effective Time (including individuals temporarily not in occupancy), and Trustee on behalf of Old Operator shall remain responsible, and indemnify and hold

Case 1:26-bk-00118-HWV    Doc 152-1    Filed 03/25/26    Entered 03/25/26 11:46:52    Desc Proposed Order    Page 22 of 68

harmless New Operator, for any and all obligations under the Patient Agreements related to periods prior to the Effective Time (subject to the limitations set forth in Section 9.5 below).

**1.10** Operating Procedures Manual. Trustee on behalf of Old Operator shall leave one (1) set of its operating procedures manual at the Facility. New Operator shall: (i) keep the operating procedures manual strictly confidential and shall not copy nor reproduce the information set forth therein, (ii) maintain control over and restrict access to the operating procedures manual to the same standard that New Operator maintains and controls access to its highly sensitive proprietary information, and (iii) not use the operating procedures manual or the information set forth therein for any reason other than to facilitate and respond to inspections or surveys of the Facility conducted by governmental or regulatory authorities. Trustee on behalf of Old Operator makes no representation or warranty regarding its operating procedures manual or its related forms.

**1.11** Cost Reports. Trustee on behalf of Old Operator shall timely prepare and file, in a manner reasonably consistent with past practice, with the appropriate Medicare and Medicaid agencies, any final cost reports with respect to its operation of the Facility that are required to be filed by law under the terms of the Medicare and Medicaid Programs. Trustee on behalf of Old Operator shall permit New Operator to review and comment upon all such cost reports prior to filing, and provide New Operator with copies of such cost reports, together with copies of any amendments thereto.

## ARTICLE II
## THE CLOSING

**2.1** Time and Place of Closing. The actions contemplated to consummate the transactions under this Agreement (the "**Closing**") shall occur on the last day of the month during which all of the conditions to Closing set forth in Articles VI and VII herein are satisfied but in any event concurrent with, and no later than, the Closing under the Purchase Agreement (the "**Closing Date**"). The Closing shall occur concurrently with the Closing under the Purchase Agreement and shall commence at 10:00 a.m. at a location agreed by the Parties or by such remote methodology as the Parties may agree. Notwithstanding the actual time at which the Closing occurs, the time (the "**Effective Time**") at which the Closing shall be deemed to be effective and the risk of loss shall pass from Old Operator to New Operator shall be 12:01 a.m. on the Closing Date (which shall in all cases be the first day of a month). Nonetheless, Closing may not occur until such time as the Bankruptcy Court has approved the transactions set forth herein.

## ARTICLE III
## OLD OPERATOR'S REPRESENTATIONS AND WARRANTIES

**3.1** Old Operator's Representations and Warranties. The Receiver and Trustee, as applicable, on behalf of Old Operator, represents and warrants, as of the date hereof and the Closing Date (or, in the case of representations and warranties which are expressly made as of a specific date, as of such specific date), to New Operator, subject to such limitations and approvals as may be required by bankruptcy law, as follows:

(a) Organization and Standing of Old Operator. Old Operator is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware. Old Operator has the power and authority and possesses all governmental approvals necessary to own and to operate the Transferred Assets and to conduct the Business.

(b) Authority. Old Operator has the full power and authority to make, execute, deliver and perform this Agreement and the other instruments, documents and agreements to be executed and delivered by it pursuant hereto (the "**Old Operator's Transaction Documents**"), subject to the approval of the Bankruptcy Court. Trustee on behalf of Old Operator also has the full right, power and authority to consummate the sale of the Transferred Assets and the other transactions contemplated by this Agreement. Each Person executing this Agreement on behalf of Old Operator is authorized to do so. This Agreement and,

Case 1:26-bk-00118-HWV    Doc 152-1    Filed 03/25/26    Entered 03/25/26 11:46:52
Desc Proposed Order    Page 23 of 68

upon the execution and delivery thereof in accordance with this Agreement, each of the other Transaction Documents, have been duly executed and delivered by Old Operator.

(c) _Binding Effect_. The Transaction Documents constitute the legal, valid and binding obligations of Trustee on behalf of Old Operator, enforceable in accordance with their respective terms, except as limited by bankruptcy, insolvency, reorganization and other laws now or hereafter in effect affecting creditors' rights and remedies or by equitable principles.

(d) _Validity of Contemplated Transactions_. Except for such authorization from the U.S. Bankruptcy Court as may be required by law, the authorization, execution and delivery of this Agreement and Transaction Documents and the consummation of the transactions contemplated hereby and thereby by Trustee on behalf of Old Operator, do not and will not, with or without the giving of notice or passage of time or both: (A) violate, conflict with or result in the breach of any term or provision of or require any notice, filing or consent under (i) the certificate of formation or operating agreement of Old Operator, or (ii) any statutes, laws, rules, regulations, ordinances, licenses or permits of any governmental body, authority or agency applicable to Old Operator (except for such notices to, and consents and approvals of, State and federal governmental and regulatory authorities applicable to the change of ownership of healthcare facilities), or (iii) any judgment, decree, writ, injunction, order or award of any arbitrator, court or governmental body, authority or agency binding upon Old Operator, (B) conflict with, result in the breach of any term or provision of, require any notice or consent under, give rise to a right of termination of, constitute a default under, result in the acceleration of, or give rise to a right to accelerate any obligation under any loan agreement, mortgage, indenture, financing agreement, lease or any agreement or instrument of any kind to which Old Operator is a party or by which Old Operator may be bound (except as shall be paid in full at the Closing or addressed by Bankruptcy Court Order), or (C) result in any lien, claim, encumbrance or restriction on any of the Transferred Assets.

### ARTICLE IV
### NEW OPERATOR'S REPRESENTATIONS AND WARRANTIES

**4.1** _New Operator's Representations and Warranties_. New Operator represents and warrants, as of the date hereof and the Closing Date, to Old Operator as follows:

(a) _Organization and Standing of New Operator_. New Operator is a limited liability company, duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania. New Operator has the power and authority to own the property and assets now owned by it and to conduct the business presently being conducted by it.

(b) _Authority_. New Operator has the full power and authority to make, execute, deliver and perform this Agreement including the instruments executed and delivered by it pursuant hereto (the "**New Operator's Transaction Documents**"). Such execution, delivery, performance and consummation have been duly authorized by all necessary action, corporate or otherwise, on the part of New Operator.

(c) _Binding Effect_. New Operator's Transaction Documents, when executed by New Operator, constitute the valid and binding obligations of New Operator, enforceable against New Operator in accordance with their respective terms, except as limited by bankruptcy, insolvency, reorganization and other laws now or hereafter in effect affecting creditors' rights and remedies or by equitable principles.

(d) _Validity of Contemplated Transactions_. The authorization, execution and delivery of this Agreement and New Operator's Transaction Documents and the consummation of the transactions contemplated hereby and thereby by New Operator, do not and will not, with or without the giving of notice or passage of time or both: (A) violate, conflict with or result in the breach of any term or provision of or

- 13 -

require any notice, filing or consent under: (i) the organizational documents of New Operator, or (ii) any statutes, laws, rules, regulations, ordinances, licenses or permits of any governmental body, authority or agency applicable to New Operator (except for such notices to, and consents and approvals of, state and federal governmental and regulatory authorities applicable to the change of ownership of healthcare facilities), or (iii) any judgment, decree, writ, injunction, order or award of any arbitrator, court or governmental body, authority or agency binding upon New Operator, (B) conflict with, result in the breach of any term or provision of, require any notice or consent under, give rise to a right of termination of, constitute a default under, result in the acceleration of, or give rise to a right to accelerate any obligation under any loan agreement, mortgage, indenture, financing agreement, lease or any agreement or instrument of any kind to which New Operator is a party or by which New Operator may be bound, or (C) result in any lien, claim, encumbrance or restriction on any of the Transferred Assets.

**ARTICLE V**
**OBLIGATIONS OF THE PARTIES PRIOR TO CLOSING**

**5.1**     Federal and State Regulatory Approvals. Within thirty (30) days following the Execution Date, New Operator shall file all applications with the appropriate state agency or department in order to obtain approval from the PDOH and its divisions for the change of ownership of the Business to New Operator and issuance of a new operating license to New Operator ("**New Operator License**") effective as of the Closing Date ("**License Approval**"). New Operator shall diligently pursue the issuance of the License Approval and Old Operator shall cooperate with New Operator in connection with the obtaining of the License Approval. As soon as practicable after receipt of the License Approval, but in any event prior to the Closing, Old Operator shall sign and New Operator shall file CMS Form 855A Medicare Enrollment Application. Old Operator shall provide such information and cooperate with New Operator as necessary in the preparation of the Form 855A and all other provider agreement applications.

**5.2**     Provider Agreement Cooperation.   Old Operator shall use their best efforts to insure, and shall provide all necessary assistance and cooperation as requested and required by New Operator, including but not limited to making payments for all Liabilities, obligations, costs, expenses, assessments. fines, levies and penalties owed to the federal government and any of its agencies, departments and divisions, Commonwealth of Pennsylvania and any of its agencies and subdivisions including the PDOH, in arranging meetings and conferences with the Pennsylvania Medicaid Program, that at Closing New Operator shall be issued a new Medicaid provider agreement in its own name, free and clear of any and all private, third party, governmental and regulatory claims, liabilities, obligations, costs, expenses, assessments. fines, levies and penalties associated with the Old Operator's operation of the Business and the Facility prior to the Closing (which  shall be referred to as "**Provider Agreement Condition**").  The Parties acknowledge that payment may not be necessary if a final and unappealable Order is entered by the Bankruptcy Court approving the sale of the Transferred Assets free and clear of any and all  Liens, claims, encumbrances and other interests.

**5.2**     Condition of Facility. Between the Execution Date and the Closing, except as otherwise permitted under this Agreement, Old Operator shall: (a) maintain the Facility in substantially the same condition as the Facility are in as of the Execution Date, ordinary wear and tear excepted, (b) operate the Facility in material compliance with all applicable laws, rules and regulations and in the ordinary course and in substantially the same manner as the Facility was operated before the Execution Date, including all marketing, advertising and other efforts to attract and retain patients and residents, (c) maintain not less than the minimum amount of supplies as may be required under applicable law and as shall be necessary for the proper operation of the Facility, (d) take no actions to close the Facility, change the number of licensed beds, or change the Medicare or Medicaid certification status of the Facility, (e) promptly notify New Operator upon becoming aware of any third party claims or action that will give rise to any filings with any regulatory or government agencies that materially adversely affect Old Operator or the Facility, (f) maintain in force the existing hazard and liability insurance policies, or comparable coverage, for the Facility as now in effect, (g) not enter into any new leases or contracts or change any lease or contract or perform any action that materially adversely affect the value of the Transferred

Assets or the Facility, (h) maintain all of its books and records in accordance with past practice, (i) keep in full force all Licenses and Permits, (j) satisfy and discharge all claims, liens, security interests, tenancies, liabilities or other financial obligations which constitute a lien or encumbrance on any of the Transferred Assets (other than Permitted Liens), (k) file all returns, reports and filings of any kind or nature, including but not limited to, cost reports, required to be filed by Old Operator on a timely basis, and (l) pay when due (or withhold and pay over, as required) all taxes, assessments, charges, and levies imposed upon Old Operator, the Transferred Assets, the Facility or the Real Property (or any portion thereof), but shall have the right to challenge any such taxes, assessments, charges and levies following payment thereof and procedures established by the taxing authority.

**5.3**     Access. Old Operator shall afford to officers, equity holders, managers, directors, employees, accountants, counsel, lenders and other representatives of New Operator reasonable access to all of the assets, properties, personnel, books and records of Old Operator, subject to arrangements mutually acceptable to Old Operator and New Operator.

**5.4**     Prohibited Actions Pending the Closing. Between the Execution Date and the Closing Date or the earlier termination of this Agreement, Old Operator shall not, unless consented to by New Operator in writing: (1) increase in any manner the rate or terms of compensation or benefits of any Facility Employees, except as may be required under existing employment agreements, (2) hire any new employees, (3) pay or agree to pay any pension, retirement allowance or other employee benefit not required or permitted by any existing benefit plan or other agreement or arrangement to any such director, officer or employee, whether past or present, (4) enter into or amend any employment, bonus, severance or retirement contract or adopt or amend any benefit plan, or (5) terminate the employment of any employees (other than pursuant to Section 1.5), (b) enter into any contract with any Governmental Authority, (c) cease using the current name of the Facility; (d) take any action which would prevent performance of its obligations under this Agreement, (e) knowingly take or agree or commit to take any action that would make any representation and warranty of Old Operator hereunder inaccurate in any material respect, or (f) agree or commit to do any of the foregoing.

### ARTICLE VI
### CONDITIONS PRECEDENT TO NEW OPERATOR'S OBLIGATIONS

Unless waived by New Operator, its obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction, prior to or at the Closing, of each of the following conditions. Upon failure of any of the following conditions, New Operator may terminate this Agreement pursuant to and in accordance with Article VIII.

**6.1**     Representations and Warranties. The representations and warranties of Trustee and Receiver on behalf of Old Operator contained in this Agreement or on any Schedule or in any Transaction Document: (a) that are not qualified by materiality shall be true and correct in all material respects at and as of the Closing Date as though such representations and warranties were made at and as of such time, and (b) that are qualified by materiality shall be true and correct in all respects at and as of the Closing Date as though such representations and warranties were made at and as of such time.

**6.2**     Performance of Covenants. Trustee on behalf of Old Operator shall have performed or complied in all material respects with each of its agreements and covenants required by this Agreement to be performed or complied with by it prior to or at the Effective Time.

**6.3**     Delivery of Closing Certificate and Good Standing. Trustee on behalf of Old Operator shall have executed and delivered to New Operator a certificate in the form and substance of Exhibit 6.3, attached hereto and made a part hereof, together with a subsistence certificate or certificate of good standing of Old

- 15 -

Operator, issued by the Secretary of State of the State of Delaware, dated no earlier than thirty (30) calendar days prior to the Closing Date.

     **6.4**     <u>Transferred Assets at the Closing</u>. Trustee on behalf of Old Operator shall have executed and delivered the Bill of Sale substantially in the form and substance of <u>Exhibit 6.4</u> ("**Bill of Sale**") attached hereto and made a part hereof.

     **6.5**     <u>Assignment and Assumption of Contracts</u>. Trustee on behalf of Old Operator shall have executed and delivered an assignment and assumption of the Assumed Operating Contracts substantially in the form and substance of <u>Exhibit 6.5</u> ("**Assignment and Assumption of Contracts**"), attached hereto and made a part hereof.

     **6.6**     <u>Resident Trust Funds and Patient Deposits</u>. Trustee on behalf of Old Operator shall have executed and delivered an assignment and assumption of Resident Trust Funds and Patient Deposits substantially in the form and substance of <u>Exhibit 6.6</u> ("**Assignment and Assumption of Resident Trust Funds**"), attached hereto and made a part hereof.

     **6.7**     <u>General Assignment</u>.  Trustee on behalf of Old Operator shall have executed and delivered a general assignment substantially in the form and substance of <u>Exhibit 6.7</u> ("**General Assignment**"), attached hereto and made a part hereof.

     **6.8**     <u>Regulatory Approvals</u>. New Operator shall have received the License Approval, which shall provide for the non-contingent issuance of the New Operator License upon the consummation of the Closing and the delivery of all applicable notices and filings with the applicable state agencies.

     **6.9**     <u>Provider Agreement Condition</u>.  The Provider Agreement Condition shall be satisfied in New Operator's sole and absolute discretion.

     **6.10**     <u>Tail Insurance</u>.  At the Closing, if required by The Medical Care Availability and Reduction of Error Fund ("**Mcare**"), or by PDOH or any other agency as a condition of license transfer or as a condition precedent to Closing under this Agreement, then as mandated by Mcare or the PDOH, Trustee on behalf of Old Operator at the sole cost and expense of the bankruptcy estate shall procure "tail" coverage insurance for claims made against any Old Operator which took place, accrued or arose prior to the date of Closing, and provide evidence at Closing to New Operators that such tail coverage has been procured.  Trustee on behalf of Old Operator shall cause such tail coverage insurance to remain in place for the period required by Mcare, PDOH or any other agency or department with jurisdiction..

     **6.11**     <u>Purchase Agreement</u>. The closing under the Purchase Agreement shall have occurred simultaneously with the Closing.

     **6.12**     <u>Compliance</u>.  The Facility shall not be Out of Compliance with survey requirements on the Closing Date.  All deficiencies and violations of the severity level of "IJ" or worse noted in any pre-Closing Date survey for the Facility shall have been corrected as of the Closing Date, and there shall be no material bans, remedies, sanctions, prohibitions on payment, or limitations in effect, pending, or to Trustee on behalf of Old Operator's Knowledge, threatened with respect to admissions to the Facility, or any material licensure curtailments in effect, pending or to Trustee on behalf of Old Operator's Knowledge, threatened with respect to the Facility, and no Governmental Authority shall have advised, given notice of or otherwise indicated that the Facility will be subject to the imposition of a Corporate Integrity Agreement in the future.

     **6.13**     <u>Court Approvals/Sale Order</u>.

(a) The Sale Order, in a form and substance acceptable to the New Operator, in its sole discretion, shall be entered by the Bankruptcy Court and become a final order. For the avoidance of doubt, the Sale Order shall, among other things, (i) permit the sale of the Transferred Assets to the New Operator free and clear of any and all Liens, claims, causes of action or other interests, and permit the Trustee on behalf of Old Operator's assignment of the Transferred Assets to the New Operator pursuant to Sections 363(b) and 365(a) of the Bankruptcy Code, (ii) include a finding of the New Operator's good faith and provide for finality under Section 363(m) of the Bankruptcy Code and a waiver of the stays set forth in Bankruptcy Rules 6004(h) and 6006(d), (iii) provide that, except for the Assumed Liabilities, the New Operator is not assuming and shall not be deemed to have assumed, any other Liability of the Old Operator, or any of its Affiliates, fixed or contingent, disclosed or undisclosed, recorded or unrecorded, currently existing or hereafter arising, or otherwise (including any "successor liability" or any Liability under any Health Care Laws, including 62 P.S. Article XVIII-A (the Nursing Facility Assessment Law); and (iv) provide for the retention of jurisdiction by the Bankruptcy Court to resolve any and all disputes that may arise under this Agreement, in the Bankruptcy Case as between Old Operator and New Operator.

(b) The Sale Order shall not have been stayed, modified, reversed or amended in any manner adverse to the New Operator, and the Old Operator shall have received from the Bankruptcy Court all other orders, approvals and consents required to transfer the Assets free and clear of all Liens, claims, causes of action or other interests (other than the Permitted Liens) and Liabilities, assign the Transferred Contracts for assumption by the New Operator, and consummate the transactions contemplated by this Agreement.

(c) Coordinated Closing. The Parties acknowledge that the transactions contemplated by this Agreement are part of an integrated transaction along with the sale of the real property located at and known as 590 South 5th Avenue, Lebanon, Lebanon County, Pennsylvania, on which the Facility operates (the "Property Sale"), and that the closing of each transaction is contingent upon the closing of the other.

(d) Stalking Horse Protections Paid by Property Owner. New Operator's affiliate has entered into the Purchase Agreement with the owner of the Property that provides for payment of a break-up fee by the property owner under specified circumstances. The parties acknowledge and agree that: the Old Operator is not a party to such agreement; the Old Operator has no obligation with respect to such break-up fee; and such break-up fee shall not constitute an administrative expense or claim against the Old Operator or its estate.

(e) No Bid Chilling Intent The Parties agree that the existence of the break-up fee is intended solely to compensate New Operator's purchaser affiliate for establishing a floor transaction and facilitating a competitive process, and is not intended to, and shall not, chill bidding for the Old Operator's or Estate's assets.

(f) Disclosure for Court Approval. Old Operator and Trustee are authorized to disclose the existence and terms of the break-up fee to the Bankruptcy Court, creditors, and other parties in interest.

**6.14** <u>No Legal Action</u>. No action, suit, investigation, other proceeding or claim shall have been instituted before any court or before or by any government or governmental agency or instrumentality seeking either to (1) impose any restriction, limitations or conditions with respect to the transactions contemplated by this Agreement which will prevent or enjoin the consummation of the transactions contemplated herein, or (2) obtain damages or other relief against New Operator in connection with such transactions.

**6.15** <u>Other Documents</u>. Trustee on behalf of Old Operator shall have furnished New Operator with all other documents, certificates and other instruments required to be furnished to New Operator by Old Operator pursuant to the terms hereof.

**ARTICLE VII**
**CONDITIONS PRECEDENT TO TRUSTEE'S OBLIGATIONS**

Unless waived by Trustee on behalf of Old Operator, its obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction, prior to or at the Closing, of each of the following conditions. Upon failure of any of the following conditions, Trustee on behalf of Old Operator may terminate this Agreement pursuant to and in accordance with Article VIII:

**7.1** Representations and Warranties. The representations and warranties of New Operator contained in this Agreement or any other Transaction Document: (a) that are not qualified by materiality shall be true and correct in all material respects at and as of the Closing Date as though such representations and warranties were made at and as of such time, and (b) that are qualified by materiality shall be true and correct in all respects at and as of the Effective Time as though such representations and warranties were made at and as of such time.

**7.2** Performance of Covenants. New Operator shall have performed or complied in all material respects with each of its agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Effective Time.

**7.3** Delivery of Closing Certificate and Good Standing. New Operator shall have delivered to Trustee on behalf of Old Operator a certificate in the form and substance of Exhibit 7.3, attached hereto and made a part hereof, together with a subsistence certificate or certificate of good standing of New Operator, issued by the Secretary of the Commonwealth of Pennsylvania, dated no earlier than thirty (30) calendar days prior to the Closing Date.

**7.4** Countersigned Closing Documents. New Operator shall have executed and delivered each of (i) the Bill of Sale, (ii) the Assignment and Assumption of Contracts, (iii) the General Assignment, and (iv) the Assignment and Assumption of Resident Trust Funds.

**7.5** Regulatory Approvals. New Operator shall have received the License Approval.

**7.6** Purchase Agreement. The closing under the Purchase Agreement shall have occurred simultaneously with the Closing.

**7.7** No Legal Action. No action, suit, investigation, other proceeding or claim shall have been instituted before any court or before or by any government or governmental agency or instrumentality seeking either: (1) to impose any restriction, limitations or conditions with respect to the transactions: contemplated by this Agreement which will prevent or enjoin the consummation of the transactions contemplated herein, or (2) to obtain damages or other relief against Old Operator in connection with such transactions.

**7.8** Indemnification Escrow. New Operator shall have executed and delivered a counterpart of the Indemnification Escrow Agreement.

**7.9** Other Documents. New Operator shall have furnished Trustee on behalf of Old Operator with all other documents, certificates and other instruments required to be furnished to Trustee on behalf of Old Operator by New Operator pursuant to the terms hereof including payment of the $100,000 cash consideration.

**ARTICLE VIII**
**TERMINATION**

**8.1** Termination. In addition to the express provisions contained herein regarding termination of this Agreement, this Agreement: (i) shall terminate, without further notice or action by either party, upon any

- 18 -

termination of the Purchase Agreement and (ii) may be terminated at any time at or prior to the Closing Date by:

(a) Trustee on behalf of Old Operator, if the representations and warranties of New Operator that are not qualified as to "materiality" are not true and correct in all material respects on and as of the Closing Date, and all representations and warranties that are qualified as to "materiality" are not true, correct and complete in all respects, at and as of the Closing with the same force and effect as if made as of the Closing Date, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which shall be true and correct as of such specified date or time; provided, however, if any inaccuracy in a representation or warranty of New Operator is capable of being cured, then New Operator shall have sixty (60) calendar days to cure the inaccuracy after written notice from Trustee on behalf of Old Operator specifying, in reasonable detail, such claimed inaccuracy. If New Operator cures the inaccuracy within such sixty (60) calendar day period, then Trustee on behalf of Old Operator shall not be entitled to terminate this Agreement pursuant to this subsection;

(b) Trustee on behalf of Old Operator, if New Operator fails to perform and comply in all material respects with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied with by it at or prior to the Closing; provided, however, if any of such failure by New Operator is capable of being cured, then New Operator shall have sixty (60) calendar days to cure the breach after written notice from Trustee on behalf of Old Operator to New Operator specifying, in reasonable detail, such failure. If New Operator cures the breach within such sixty (60) calendar day period, then Trustee on behalf of Old Operator shall not be entitled to terminate this Agreement pursuant to this subsection;

(c) Trustee on behalf of Old Operator, if any condition precedent to Trustee's obligations on behalf of Old Operator hereunder have not been satisfied by the Closing Date and Trustee on behalf of Old Operator has not waived the conditions that were not satisfied on or before the Closing Date; provided Trustee on behalf of Old Operator has not defaulted under any covenant or obligation of Trustee on behalf of Old Operator or breached any representation or warranty of Trustee on behalf of Old Operator set forth herein;

(d) New Operator at any time up to the last day of the Due Diligence Period upon timely delivery of a Termination Notice;

(e) New Operator, if the representations and warranties of Trustee or Receiver on behalf of Old Operator that are not qualified as to "materiality" are not true and correct in all material respects on and as of the Closing Date, and all representations and warranties that are qualified as to "materiality" are not true, correct and complete in all respects, at and as of the Closing with the same force and effect as if made as of the Closing Date, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which shall be true and correct as of such specified date or time; provided, however, if any inaccuracy in a representation or warranty of Trustee or Receiver on behalf of Old Operator is capable of being cured, then Trustee on behalf of Old Operator shall have thirty (30) calendar days to cure the inaccuracy after written notice from New Operator specifying, in reasonable detail, the claimed inaccuracy. If Trustee on behalf of Old Operator cures the inaccuracy within such thirty (30) calendar day period, then New Operator shall not be entitled to terminate this Agreement pursuant to this subsection;

(f) New Operator, if Trustee on behalf of Old Operator fails to perform and comply in all material respects with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied with by it at or prior to the Closing; provided, however, if any of such failure by Trustee on behalf of Old Operator are capable of being cured, then Trustee on behalf of Old Operator shall have sixty (60) calendar days to cure the breach after written notice from New Operator to Trustee on behalf of Old Operator specifying, in reasonable detail, such failure. If Trustee on behalf of Old

- 19 -

Operator cures the breach within such sixty (60) calendar day period, then New Operator shall not be entitled to terminate this Agreement pursuant to this subsection; or

(g)        New Operator, if any condition precedent to New Operator's obligations hereunder have not been satisfied by the Closing Date, including but not limited to the closing under the Purchase Agreement, and New Operator has not waived the conditions that were not satisfied on or before the Closing Date; provided Trustee on behalf of Old Operator has not defaulted under any covenant or obligation of New Operator or breached any representation or warranty of New Operator set forth herein.

**8.2**        Effect of Termination. If this Agreement is terminated by New Operator pursuant to Section 8.1(d), (e), (f), or (g) above, Purchaser shall be entitled to the return of the Deposit under the Purchase Agreement and all other remedies, fees and damages as provided under the Purchase Agreement, including but not limited to payment of the Break-Up Fee, whereupon this Agreement shall terminate and be of no further force or effect, except as otherwise set forth herein.  In the case of a Trustee on behalf of Old Operator default which would give New Operator the right to terminate this Agreement pursuant to Section 8.1(e) or (f) above, New Operator shall be entitled to either (x) terminate this Agreement pursuant to Section 8.1(e) or (f) above, whereupon Purchaser shall be entitled to the return of the Deposit under the Purchase Agreement and reimbursement for its direct, actual and reasonable out-of-pocket costs in accordance with Section 15(b) of the Purchase Agreement, and upon payment of such amounts, this Agreement shall terminate and be of no further force or effect, except as otherwise set forth herein, or (y) seek specific performance and/or injunctive relief through an action to be instituted within one year of the date of the scheduled Closing so long as Purchaser is simultaneously bringing an action for specific performance pursuant to the Purchase Agreement.  If this Agreement is terminated by pursuant to Section 8.1(a) or (b) above, the Seller shall be entitled to retain the Deposit under the Purchase Agreement which shall be paid to Seller by the Escrow Agent as liquidated damages for New Operator's default and as Trustee on behalf of Old Operator's exclusive remedy. Notwithstanding anything contained herein to the contrary, under no circumstances shall Trustee on behalf of Old Operator or New Operator be entitled to consequential, special, or punitive damages for a default by either Trustee on behalf of Old Operator or New Operator hereunder. The provisions of this Article VIII shall survive the Closing or the earlier termination of this Agreement.

**8.3**        Termination of the Purchase Agreement.  This Agreement shall terminate automatically, without further notice or action by either party, upon any termination of the Purchase Agreement.  Upon such termination of the Purchase Agreement, the Deposit shall be paid to Seller or Purchaser in accordance with the terms of the Purchase Agreement.

**ARTICLE IX**
**INDEMNIFICATION**

**9.1**        Indemnification by Old Operator. Subject to the other terms and conditions of this Article IX, Trustee on behalf of Old Operator shall indemnify and defend New Operator and New Operator's officers, agents, representatives, employees, heirs, successors and assigns (collectively, the "**New Operator Indemnified Parties**") and hold them harmless against and with respect to any and all Losses resulting from: (i) any third party, including governmental, claim arising from or relating to the operation of the Business and the Facility prior to and ending on the Effective Time, including but not limited to Recoupment Claims, (ii) Old Operator's failure to pay, discharge or perform any of the Excluded Liabilities, (iii) the failure of any representation or warranty of Trustee or Receiver on behalf of Old Operator set forth in this Agreement to be true and correct at and as of the Closing Date as though such representations and warranties were made at and as of such date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date), (iv) the failure of Trustee on behalf of Old Operator to comply with any covenant or obligation set forth herein, (v) fraud of Trustee on behalf of Old Operator, and (vi) any out-of-pocket expenses incurred by New Operator to any third-party consultants or professionals that New Operator deems reasonably necessary or appropriate to restore the Facility into

- 20 -

substantial compliance to the extent the Facility was Out of Compliance as of the Closing Date (including as a result of the Facility being Out of Compliance after the Closing Date as a result of acts, omissions or occurrences occurring prior to the Closing Date).

**9.2** <u>Indemnification by New Operator</u>. Subject to the other terms and conditions of this <u>Article IX,</u> New Operator shall indemnify and defend Old Operator and its officers, agents, representatives, employees, heirs, successors and assigns (collectively, the "**Old Operator Indemnified Parties**") and hold them harmless against and with respect to any and all Losses resulting from: (i) any third party, including governmental, claim arising from or relating to the operation of the Facility from and after the Effective Time, (ii) New Operator's failure to pay, satisfy, discharge or perform the Assumed Liabilities or Assumed Operating Contracts from and after the Effective Time, (iii) the failure of any representation or warranty of New Operator set forth in this Agreement to be true and correct at and as of the Closing Date as though such representations and warranties were made at and as of such date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date), (iv) the failure of New Operator to comply with any covenant or obligation set forth herein, and (v) fraud of New Operator.

**9.3** <u>Indemnity Claims</u>. If any claim ("**Claim**") is asserted by a Party entitled to indemnification hereunder, such Party (an "**Indemnified Party**") shall notify (a "**Claims Notice**") the Party (an "**Indemnifying Party**") required by the terms of this Agreement to indemnify the Indemnified Party within ten (10) Business Days; <u>provided</u>, <u>however</u>, the failure or delay by an Indemnified Party to give prompt notice of any Claim (if given prior to the expiration of any applicable survival periods) shall not release, waive or otherwise affect an Indemnifying Party's obligations with respect to the Claim, except to the extent that the Indemnifying Party can demonstrate actual material loss or prejudice as a result of such failure or delay.

(a) The Claims Notice shall describe the Claim and the specific facts and circumstances in reasonable detail, shall include copies of any notices received by Indemnified Party relating to such Claim, and shall indicate the amount, if known, or an estimate, if possible, of Losses that have been or may be incurred or suffered.

(b) The Indemnifying Party shall defend and may compromise (subject to the limitations set forth below) any claim by a third party ("**Third Party Claim**"), at its own expense and by its own counsel, who shall be reasonably acceptable to the Indemnified Party. The Indemnified Party may participate, at its own expense, in the defense of any Third Party Claim assumed by the Indemnifying Party. Without the approval of the Indemnified Party, which approval shall not be unreasonably withheld or delayed, the Indemnified Party shall not compromise a Third Party Claim defended by the Indemnifying Party which would require the Indemnified Party to perform or take any action or to refrain from performing or taking any action or to pay any amount not paid upon settlement by the Indemnifying Party.

(c) If, within ten (10) Business Days of the Indemnifying Party's receipt of a claim notice involving a Third Party Claim, the Indemnifying Party has not notified the Indemnified Party that the Indemnifying Party will assume the defense, the Indemnified Party may assume control of the defense or compromise of such Claim, and the costs and expenses of such defense, including costs of investigation and reasonable attorneys' fees, shall be added to the Losses associated with the Claim. The Indemnified Party shall have the right to compromise such Claim without the consent of the Indemnifying Party.

(d) The Party assuming the defense of any Claim shall keep the other Party reasonably informed at all times of the progress and development of the Party's defense of and compromise efforts related to such Claim and shall furnish the other Party with copies of all relevant pleadings, correspondence and other papers. In addition, the Parties shall cooperate with each other, and make available to each other and their representatives all available relevant records or other materials required by them for their use in defending, compromising or contesting any Claim.

Case 1:26-bk-00118-HWV    Doc 152-1    Filed 03/25/26    Entered 03/25/26 11:46:52
Desc Proposed Order    Page 32 of 68

**9.4**     Survival; Limitations on Indemnification.

(a)     Unless expressly set forth otherwise herein, indemnification obligations of each of the Parties contained in this Agreement shall survive the Closing until expiration of the applicable statute of limitations period.  Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

(b)     Except in the case of fraud or intentional misrepresentation, the rights of indemnity provided by this Agreement, including this Article IX, shall be the sole and exclusive remedy of the Parties notwithstanding any other rights and claims, whether created by law or otherwise, the Parties may have relating in any way to the subject matter of this Agreement.

(c)     For purposes of this Article IX, in determining the amount of any Losses incurred by an Indemnified Party in respect of the failure of any representation or warranty in this Agreement to be true and correct as of any particular date, any qualification or limitation as to materiality (whether by reference to material, material adverse effect or otherwise) contained in such representation or warranty shall be disregarded, other than any dollar thresholds which shall not be so disregarded.

**9.5**     Indemnification Escrow.  As security for Old Operator's indemnification obligations under this Article IX and Seller's indemnification obligations under Section 16 of the Purchase Agreement, the Indemnification Escrow shall be deposited in escrow at Closing with the Seller's Escrow Agent to be held in accordance with Section 16(i) of the Purchase Agreement and pursuant to the Indemnification Escrow Agreement.  All Losses payable to any New Operator's Indemnitee or Purchaser's Indemnitee pursuant to this Article IX and under Section 16 of the Purchase Agreement shall be paid solely from the Indemnification Escrow in accordance with the terms of the Indemnification Escrow Agreement, it being understood that New Operator shall have no right to recover any Claim whatsoever from Trustee, Receiver or Old Operator in excess of the Indemnification Escrow.  It is further noted that the Indemnification Escrow is to be solely funded from the proceeds under the Purchase Agreement and no assets from the Bankruptcy Estate shall be used to fund the Indemnification Escrow.

**ARTICLE X**
**FURTHER ASSURANCES; COVENANTS**

**10.1**     Further Assurances. From and after the Closing Date, Trustee on behalf of Old Operator, on the one hand, and New Operator, on the other hand, agree to execute and deliver such further documents and instruments and to do such other acts and things (including the making of filings), as New Operator or Old Operator, as the case may be, may reasonably request in order to effectuate the transactions contemplated by this Agreement. In the event that following the Closing Date any party shall be involved in litigation with a third party, threatened litigation with a third party or government inquiries with respect to a matter involving the Transferred Assets or the Business, the other party shall also make available to such first party, at reasonable times and subject to the reasonable requirements of their or its own business, such of their or its personnel as may have information relevant to the matters.

**10.2**     Covenants. New Operator covenants and agrees that from and after the Closing Date it shall: pay all amounts due for periods after the Closing Date, and otherwise discharge its duties, under the Assumed Operating Contracts and shall pay all amounts due vendors, suppliers and service providers for items and services provided after the Closing Date. Old Operator covenants and agrees that from and after the Closing Date, with respect to Assumed Operating Contracts, it shall pay all amounts due for periods ending on and prior to the Closing Date.

Case 1:26-bk-00118-HWV    Doc 152-1    Filed 03/25/26    Entered 03/25/26 11:46:52    Desc Proposed Order    Page 33 of 68

**10.3** <u>Intentionally Omitted.</u>

### ARTICLE XI
### <u>MISCELLANEOUS PROVISIONS</u>

**11.1** <u>Drafting</u>. The Parties hereto have carefully reviewed and negotiated the terms of this Agreement and the Transaction Documents, and Trustee on behalf of Old Operator and New Operator hereby acknowledge and agree that they have had a full and fair opportunity to review and negotiate the Agreement and the Transaction Documents with the advice of its counsel. Therefore, there shall be no presumption in favor of the non-drafting Party.

**11.2** <u>Costs and Expenses</u>. Except as expressly otherwise provided in this Agreement, each Party hereto shall bear its own costs and expenses in connection with this Agreement and the transactions contemplated hereby.

**11.3** <u>Performance</u>. In the event of a breach by either Party of its obligations hereunder, the other Party shall have the right, in addition to any other remedies which may be available, to obtain specific performance of the terms of this Agreement and injunctive relief, and the breaching Party hereby waives the defense that there may be an adequate remedy at law.

**11.4** <u>Benefit and Assignment</u>. This Agreement binds and inures to the benefit of each Party and its successors and proper assigns. Neither Party shall be permitted to assign its rights or obligations under this Agreement without the prior consent of the other Party; provided, however, that, effective as of the Closing, New Operator may assign all of its rights, obligations and interests hereunder to any of its Affiliates.

**11.5** <u>Effect and Construction of this Agreement</u>. The Article and Section headings used herein are for convenience only and shall not control or affect the meaning or construction of the provisions of this Agreement. This Agreement may be executed in one or more counterparts, and all such counterparts shall constitute one and the same instrument. Copies of original signatures sent by facsimile transmission shall be deemed to be originals for all purposes of this Agreement. All gender employed in this Agreement shall include all genders, and the singular shall include the plural and the plural shall include the singular whenever and as often as may be appropriate. When used in this Agreement, the term "including" shall mean "including but not limited to."

**11.6** <u>Notice</u>s.  All notices provided for herein shall be made in writing (a)(i) by hand delivery or (ii) by reputable overnight delivery service making delivery against a signed receipt, *and* (b) by email to the following addresses:

To Old Operator:                                Cedar Haven Acquisition, LLC
                                                Leon P. Haller, Chapter 11 Trustee
                                                Purcell, Krug and Haller
                                                1719 North Front Street
                                                Harrisburg, PA 17102
                                                717 234-4178
                                                lhaller@pkh.com

                                                with a copy to:

                                                Robert E. Chernicoff, Esquire
                                                Cunningham, Chernicoff & Warshawsky, P.C.

- 23 -

2320 North Second Street
Harrisburg, PA 17110
(717) 238-6570
rec@cclawpc.com

To New Operator:            Cedar Haven Healthcare Center LLC
                            111 S Franklin Avenue, Unit 1360
                            Valley Stream, NY 11582
                            Att'n: Joseph Glatzer
                            Email: jglatzer@phg-us.com

                            with a copy to:

                            NBC Law LLP
                            The Chrysler Building
                            430 Lexington Avenue
                            New York, New York 10017
                            Att'n: Brett J. Burnbaum, Esq.
                            Email: bburnbaum@nbclaw.com

Either Party may upon notice to the other change its address for the receipt of notices. Any notices sent as provided herein shall be deemed delivered when actually received, when delivery is refused by the intended recipient, or when delivery is first attempted but cannot be completed due to the intended recipient's failure to provide notice of a change in address.

   **11.7** <u>Waiver, Discharge, etc</u>. This Agreement shall not be released, discharged, abandoned, changed or modified in any manner, except by an instrument in writing executed by or on behalf of each of the Parties by their duly authorized officer or representative. The failure of any Party to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

   **11.8** <u>Rights of Persons Not Parties</u>. Nothing contained in this Agreement shall be deemed to create rights in Persons not parties hereto, other than the successors and proper assigns of the Parties.

   **11.9** <u>Governing Law; Disputes</u>. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania and the federal Bankruptcy Code, without regard to any contrary rules relating to the choice or conflict of laws. Each of the Parties hereby irrevocably and unconditionally submits, for itself and/or its property, to the exclusive jurisdiction of the Bankruptcy Court, the U.S. District Court and U.S. appellate court, as applicable, in any action or proceeding arising out of or relating to this Agreement or for recognition or enforcement of any judgment, and each of the Parties hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court, any U.S. District Court or U.S appellate court, as applicable. A final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the Parties irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to the Agreement in the courts set forth in this <u>Section 11.9</u>. Each of the Parties irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

**11.10**    Severability. Any provision, or distinguishable portion of any provision, of the Agreement which is determined in any judicial or administrative proceeding to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the Parties waive any provision of law which renders a provision hereof prohibited or unenforceable in any respect.

**11.11**    Entire Agreement. This Agreement including the schedules, exhibits and the other Transaction Documents, including the agreements and instruments referenced therein, constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof, and there are no agreements, understandings, restrictions, warranties, or representations between the Parties with respect to the subject matter hereof other than as set forth herein or therein.

**11.12**    Schedules. Any fact or item disclosed on any Schedule to this Agreement shall be deemed disclosed on all other Schedules to this Agreement to which such fact or item may reasonably apply so long as such disclosure is in sufficient detail to enable a Party hereto to identify the facts or items to which it applies. Any fact or item disclosed on any Schedule hereto shall not by reason only of such inclusion be deemed to be material and shall not be employed as a point of reference in determining any standard of materiality under this Agreement.

**11.13**    Reliance. The Parties hereto in executing, and in carrying out the provision of, this Agreement are relying solely on the representations, warranties and agreements contained in this Agreement or in any writing delivered pursuant to provisions of this Agreement or at the Closing of the transactions herein provided for and not upon any representation, warranty, agreement, promise or information, written or oral, made by any Person other than as specifically set forth herein or therein.

**11.14**    Waiver of Jury Trial. EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT, INCLUDING TO ENFORCE OR DEFEND ANY RIGHTS HEREUNDER, AND AGREES THAT ANY SUCH ACTION SHALL BE TRIED BEFORE A COURT AS STATED IN THIS AGREEMENT AND NOT BEFORE A JURY.

**11.15**    Post-Closing Assistance. After the Closing, each Party (a "**Requesting Party**") shall, from time to time, upon written request, execute and deliver to any other party, any confirmatory instruments which such Requesting Party may reasonably request in order to consummate the transactions contemplated under this Agreement and/or under the Transaction Documents.

**11.16**    Confidentiality.

(a)    Each of the Parties hereto recognizes and acknowledges that, during the course of negotiations in connection with this Agreement and in preparation for the Closing hereunder, each Party has disclosed and will disclose to the other Party and its representatives, confidential and proprietary information, including, without limitation, books and records, documents and information concerning its and its affiliates' business activities, owners, finances, plans, and practices (collectively, the "**Confidential Information**"), all of which constitute and will constitute valuable, special and unique assets of the disclosing Party.  Each Party agrees not to disclose any Confidential Information of the other to any third party, except as provided herein or as required by law.  In addition, each Party agrees to disclose Confidential Information of the other only to its agents, consultants and representatives who have a legitimate need to know such information and who shall: (i) be advised of the confidentiality provisions of this Agreement; and (ii) agree to be bound by the confidentiality provisions hereof.

(b)      Each Party hereby acknowledges that if any breach of this section occurs, the other Party would be irreparably and immediately harmed and could not be made whole by monetary damages. Accordingly, in addition to any other remedy to which it may be entitled in law or in equity, each Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and/or to compel specific performance of this Section, and the other Party shall not oppose the granting of such relief on the basis that monetary damages are adequate.  Each Party also agrees to reimburse the other Party for all reasonable costs and expenses, including reasonable attorney's fees, incurred by such Party in enforcing obligations under this Section.

(c)      Confidential Information does not include all or any portion of information which (i) becomes generally available to the public other than as a result of a breach of this Section by the receiving Party, or (ii) was or becomes rightfully available to on the receiving Party a non-confidential basis from a source other than the disclosing Party or its representatives; provided, that such source is not prohibited from disclosing such information to the receiving Party by a contractual, legal or fiduciary obligation to the disclosing Party or its representatives.

(d)      Notwithstanding any other provision of this Agreement, the terms of this Section 11.15 shall survive the termination of this Agreement.

**11.17**     Publicity. Except as and to the extent required by Law, without the prior written consent of the other party, which shall not be unreasonably withheld, neither New Operator nor Old Operator (or any of their respective Affiliates) shall, and each shall direct its agents and representatives not to, directly or indirectly, make any public comment, statement or communication with respect to, or otherwise disclose or permit the disclosure of, the existence of discussions regarding a possible transaction between the parties hereto or any of the terms, conditions or other aspects of the transactions contemplated by this Agreement or any confidential information of the other party, except that such comments, statements, communications and disclosures may be made by each of New Operator and Old Operator (a) to such of their agents, accountants, financial advisors, lenders and representatives as need to know such information for the purpose of evaluating or otherwise effecting the transactions contemplated by this Agreement, (b) if it is required to do so by applicable securities Laws, provided that one party shall notify the other parties in advance of any such disclosure, (c) to Governmental Authorities and their agents as appropriate, and (d) for the purposes of obtaining Consents. Except with respect to subparagraph (c) above, if a party is required by Law to make any such disclosure, it shall provide the other party the contents of the proposed disclosure, the reasons such disclosure is required by Law, and the time and place that any such disclosure will be made.

**11.18**     Notice of Investigations and Default. Between the date of this Agreement and the Closing Date, Trustee on behalf of Old Operator shall provide prompt written notice to New Operator of any actions, investigations, surveys and legal proceedings affecting the Facility and a copy of any notices or other writings received by Trustee on behalf of Old Operator with respect thereto. Each party shall provide prompt written notice to the other party of any default by the notifying party under this Agreement.

[***Remainder of page intentionally left blank.***]

- 26 -

Case 1:26-bk-00118-HWV    Doc 152-1    Filed 03/25/26    Entered 03/25/26 11:46:52
Desc Proposed Order    Page 37 of 68

IN WITNESS WHEREOF, the Parties have caused this Operations Transfer Agreement to be executed on the date first above written.

**OLD OPERATOR:**

Cedar Haven Acquisition, LLC

By: _____

     Name: Leon P. Haller
     Title: Chapter 11 Trustee

**RECEIVER**:

_____

Michael F. Flanagan

**NEW OPERATOR:**

Cedar Haven Healthcare Center, LLC

By: _____

     Name:
     Title:

27

<u>**EXHIBIT 1**</u>

**Defined Terms**

This <u>Exhibit 1</u> is made an integral part of the Operations Transfer Agreement dated [March_____, 20__] by and between Leon P. Haller, Chapter 11 Trustee for Cedar Haven Acquisition, LLC, as Old Operator, and Cedar Haven Healthcare Center LLC, as New Operator, and is incorporated therein as if set out therein in full. Unless the context requires otherwise, any capitalized term used in this Agreement but not defined in this Agreement shall have its respective meaning as set forth in the Purchase Agreement.

As used herein, the following terms have the respective meanings set forth below or set forth in the section hereof following such term:

"**Affiliate**" means, with respect to any Person, any other Person controlling, controlled by or under common control with such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. For purposes of this definition, "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"**Agreement**" shall mean this Operations Transfer Agreement, including all Exhibits and Schedules attached hereto, as modified, amended, supplemented and in effect from time to time.

"**Assignment and Assumption of Contracts**" shall have the meaning set forth in Section 6.5.

"**Assignment and Assumption of Resident Trust Funds**" shall have the meaning set forth in Section 6.6.

"**Assumed Liabilities**" shall have the meaning set forth in Section 1.3.

"**Assumed Operating Contracts**" shall have the meaning set forth in Section 1.9(a).

"**Bill of Sale**" shall have the meaning set forth in Section 6.4.

"**Business**" means the operation of the skilled nursing business and services by Old Operator at the Facility and all ancillary business and services conducted by Old Operator at the Facility.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in the state are authorized or required by law to be closed for business.

"**Claim**" shall have the meaning set forth in Section 9.3.

"**Claims Notice**" shall have the meaning set forth in Section 9.3.

"**Closing**" shall have the meaning set forth in Section 2.1.

"**Closing Date**" shall have the meaning set forth in Section 2.1.

"**Confidential Information**" shall have the meaning set forth in Section 11.15.

"**Due Diligence Period**" shall have the meaning set forth in the Purchase Agreement.

"**Effective Time**" shall have the meaning set forth in Section 2.1.

"**Employee Schedule**" shall have the meaning set forth in Section 1.5(a).

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Excluded Assets**" shall have the meaning set forth in Section 1.1(b).

"**Excluded Liabilities**" shall have the meaning set forth in Section 1.3.

"**Execution Date"** shall have the meaning set forth in the Recitals.

"**Existing Lease**" shall have the meaning set forth in the Recitals.

"**Facility**" shall have the meaning set forth in the Recitals.

"**Facility Employees**" shall have the meaning set forth in Section 1.5(a).

"**Financial Statements**" shall have the meaning set forth in Section 3.1(w)(i).

"**GAAP**" means United States generally accepted accounting principles, consistently applied, as in effect from time to time.

"**Global Contracts**" shall have the meaning set forth in Section 1.9(a).

"**Governmental Authority**" means any foreign, domestic, federal, territorial, state or local governmental authority, or any instrumentality, court, legislative body, commission, tribunal or organization of any such governmental authority, or any regulatory, administrative or other agency of any such governmental authority, or any political or other subdivision, department or branch of any of the foregoing.

"**Health Care Law**" means any one or more applicable laws pertaining to or concerned with the establishment, construction, ownership, operation, maintenance, management, use, regulation, development, expansion, construction, and operation of the Facility or any part thereof as it relates to the provision of health care services thereon, and/or the reimbursement of healthcare costs relating thereto, in each case as the same may have been and hereafter may be supplemented, modified, amended, restated or replaced from time to time.

"**Hired Employees**" shall have the meaning set forth in Section 1.5(d).

"**Hired Employees PTO Benefits**" shall have the meaning set forth in Section 1.5(d).

"**Indemnified Party**" shall have the meaning set forth in Section 9.3.

"**Indemnifying Party**" shall have the meaning set forth in Section 9.3.

"**Knowledge**" means the actual knowledge that any Person should have following a reasonable investigation.

"**Liability**" or "**Liabilities**" means any indebtedness, Claims, damages, lawsuits, liabilities, obligations, losses, fines or other penalties, royalties, proceedings, deficiencies, duties, obligations, contracts, agreements, debts, obligations, interests or other liabilities, whether statutory, regulatory or judicially created, including, without limitation, liabilities under the Provider Agreements and liabilities as a result of violations of Healthcare Laws (whether absolute, accrued, contingent, fixed, liquidated or unliquidated, or otherwise, or whether known or unknown, or whether due or to become due, and whether in Contract, tort, strict liability or otherwise, and whether or not resulting from third-party claims).

"**License Approval**" shall have the meaning set forth in Section 5.1.

"**Lien**" shall have the meaning set forth in Section 3.1(e).

"**Losses**" means any loss, damages of any nature, Liability, claim, cause of action, obligation, deficiency, and cost and expense (including, without limitation, reasonable attorneys' fees and expenses).

"**Material Adverse Effect**" means any circumstance, event, effect or change that, individually or in the aggregate, is or would reasonably be expected to be materially adverse to (1) the Business, or the results of operations, prospects or condition (financial or otherwise) of the Facility, (2) the Property or the Transferred Assets; or (3) the ability of Seller or Trustee on behalf of Old Operator to perform their respective obligations under the Purchase Agreement or this Agreement or to consummate the Transactions; provided, that no circumstance, event, effect or change arising out of any of the following shall be deemed to constitute a Material Adverse Effect: (i) the economy in general, (ii) the economic, business, financial or regulatory environment generally affecting the industries in which Seller or Old Operator operate, or (iii) an act of terrorism or an outbreak or escalation of hostilities or war (whether declared or not declared) or any natural disasters or any national or international calamity or crisis, except to the extent involving the Facility; in each case other than any circumstance, event, effect or change to the extent that such any circumstance, event, effect or change, individually or in the aggregate, has or would reasonably be expected to have a disproportionately adverse effect on Seller or Old Operator as compared to other participants in the industry in which Seller or Old Operator operate. A decrease in the average daily rate census for the thirty (30) day period prior to the Closing, of ten percent (10%) or more shall constitute a Material Adverse Effect.

"**Medicaid Agreement**" shall have the meaning set forth in Section 1.2(a).

"**Medicare Agreement**" shall have the meaning set forth in Section 1.2(a).

"**New Operator**" shall have the meaning set forth in the Recitals.

"**New Operator Indemnified Parties**" shall have the meaning set forth in Section 9.1.

"**New Operator License**" shall have the meaning set forth in Section 5.1.

"**New Operator's Transaction Documents**" shall have the meaning set forth in Section 4.1(b).

"**Non-Assignable Contract**" shall have the meaning set forth in Section 1.9(b).

"**Operating Contracts**" shall have the meaning set forth in Section 1.9(a).

"**Operating Contracts Schedule**" shall have the meaning set forth in Section 1.9(a).

"**Operations Records**" shall have the meaning set forth in Section 1.8(a).

"**Out of Compliance**" means any of the following (A) a finding by a Governmental Authority of one or more deficiencies at the Facility at a "level II" or above in either (x) its most recent standard or complaint survey that has not found to have been corrected such that the Facility is found to be in substantial compliance with applicable Health Care Laws by the applicable Governmental Authority or (y) any prior survey that includes a finding which requires a resurvey which resurvey has not taken place with a finding that the Facility were in substantial compliance; (B) a finding by a Governmental Authority that the Facility has deficiencies that have caused or are likely to cause serious harm, injury, impairment or death if not immediately rectified to resident health and safety that has not found to have been corrected by the applicable Governmental Authority; (C) a recommendation by a Governmental Authority to the Centers for Medicare and Medicaid Services ("CMS") or

other Governmental Authority for the imposition against the Facility of civil monetary penalties, or the imposition of same by CMS; and (D) a denial of any Facility's right to admit patients or to receive Medicare or Medicaid payments or reimbursements for existing patients or for new admissions, at the Facility.

"**Party**" shall have the meaning set forth in the Recitals.

"**Parties**" shall have the meaning set forth in the Recitals.

"**Patient Agreements**" shall have the meaning set forth in Section 1.9(c).

"**Patient Care Records**" shall have the meaning set forth in Section 1.8(a).

"**Payment Programs**" shall have the meaning set forth in Section 3.1(l).

"**Permits**" shall have the meaning set forth in Section 3.1(g).

"**Permitted Liens**" shall have the meaning set forth in Section 1.1(a).

"**Person**" means any individual, sole proprietorship, partnership, corporation, limited liability company, unincorporated society or association, Governmental Authority, estate, trust or other entity or organization.

"**Plan**" shall have the meaning set forth in Section 3.1(g).

"**Plans**" shall have the meaning set forth in Section 3.1(g).

"**Prorated Items**" shall have the meaning set forth in Section 1.7(a).

"**Provider Agreement**" shall have the meaning set forth in Section 1.2(a).

"**Provider Agreements**" shall have the meaning set forth in Section 1.2(a).

"**Provider Agreements Condition**" shall have the meaning set forth in Section 5.2.

"**Purchase Agreement**" shall have the meaning set forth in the Recitals.

"**Purchaser**" shall have the meaning set forth in the Recitals.

"**Real Property**" shall have the meaning set forth in the Recitals.

"**Receipts Report**" shall have the meaning set forth in Section 1.6(d).

"**Recoupment Claims**" shall mean any recoupments, recapture, overpayments, fines, set offs, audit liabilities, penalties or assessments sought or claimed by any Third Party Payor or Regulatory Authority for amounts arising from or related to payments to the Facility for services rendered at the Facility prior to the Effective Time, whether arising as a result of cost report or rate audits, utilization reviews, program integrity activities or otherwise.

"**Requesting Party**" shall have the meaning set forth in Section 11.14.

"**Resident Trust Funds**" shall have the meaning set forth in Section 1.4(a).

"**Resident Deposits**" shall have the meaning set forth in Section 1.4(a).

"**Seller**" shall have the meaning set forth in the Recitals.

"**Taxes**" means all federal, state, local and foreign taxes, assessments or governmental charges (including net income, gross income, payroll, ad valorem, excise, franchise, occupancy, real property, personal property, sales, use and value-added taxes, taxes withheld from employees' salaries and other withholding taxes and obligations and all deposits required to be made with respect thereto), levies, assessments, deficiencies, import duties, licenses and registration fees and charges of any nature whatsoever, including any interest, penalties, additions to tax or additional amounts with respect thereto.

"**Third Party Claim**" shall have the meaning set forth in Section 9.3(b).

"**Third Party Payor**" means Medicare, Medicaid, Tricare, Veteran's Administration, commercial and private insurers, managed care company, employee assistance programs, HMOs, preferred provider organizations and any other governmental, commercial, or other organization which maintains a healthcare reimbursement program or policy.

"**Transaction Documents**" collectively, Old Operator's Transaction Documents and New Operator's Transaction Documents.

"**Old Operator**" shall have the meaning set forth in the Recitals.

"**Old Operator Group**" shall have the meaning set forth in Section 10.3(a).

"**Old Operator Guarantor**" shall have the meaning set forth in Section 6.9.

"**Old Operator Indemnified Parties**" shall have the meaning set forth in Section 9.2.

"**Old Operator's Transaction Documents**" shall have the meaning set forth in Section 3.1(b).

"**Transferred Assets**" shall have the meaning set forth in Section 1.1(a).

"**WARN**" shall have the meaning set forth in Section 1.5(c).

"**Warranties**" shall have the meaning set forth in Section 1.1(a)(v).

**EXHIBIT 6.3**

**OLD OPERATOR OFFICER'S CERTIFICATE**

Pursuant to <u>Section 6.3</u> of the Operations Transfer Agreement (the "**Agreement**"), dated as of _____, 2026 between [_____] ("**Old Operator**") and [_____], ("**New Operator**"), the undersigned, being a duly authorized executive officer of Old Operator, does hereby certify that the representations and warranties made by Old Operator in the Agreement are true and correct in all material respects as of the Closing Date (as defined in the Agreement) and the covenants to be performed by Old Operator pursuant to the Agreement have been performed in all material respects as of the Closing Date, except with respect to representations and warranties made in the Agreement that relate to a specific point in time or timeframes within the terms of such representation and warranty which are true and correct in all material respects as of such time or times.

Date: _____, 2026

[_____]

By: _____
       Name:
       Title:

**EXHIBIT 6.4**

**BILL OF SALE**

This BILL OF SALE (this "Instrument") dated as of _____, is made and delivered pursuant to, and subject to the terms of, that certain Operations Transfer Agreement dated as of _____, 202__ (as amended and restated from time to time, the "OTA"), by and among [_____], a [_____] ("Old Operator") and [_____], a [_____] ("New Operator") relating to the transfer of certain assets set forth in the OTA and the business and operations of the Facility. Capitalized terms used but not defined herein shall have the meaning provided in the OTA.

WITNESSETH:

WHEREAS, the New Operator has the right to acquire certain personal property related to the Facility from Old Operator under the OTA as more specifically described therein (the "Personal Property"); and

WHEREAS, New Operator and Old Operator desire to evidence and effectuate the transfer and conveyance of the Personal Property to New Operator.

NOW THEREFORE, subject to the terms and conditions of the OTA and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, New Operator and Old Operator hereby agree as follows:

1. Old Operator does hereby convey, transfer, assign and deliver to New Operator all of Old Operator's right, title and interest in and to the Personal Property, free of all liens, encumbrances and security interests, and the New Operator hereby accepts from Old Operator all of the Personal Property.

2. Subject to the terms of the OTA, New Operator hereby assumes all liabilities and obligations related to the Personal Property with respect to periods from and after the date hereof.

3. This Instrument shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

4. This Instrument may not be amended, modified or changed nor shall any waiver of any provision hereof be effective, except only by an instrument in writing and signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought.

5. This Instrument will be construed, performed and enforced in accordance with the laws of the [_____] without regard to the conflict of laws rules of such State.

6. This Instrument may be executed in any number of counterparts, whether original or by facsimile or portable document format (.pdf), each of which shall deemed an original, but all of which shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Instrument as of the date set forth above.

**OLD OPERATOR:**

[_____]

13760749.2

By: _____
       Name:
       Title:


**NEW OPERATOR:**

[_____]


By: _____
       Name:
       Title:

13760749.2

**EXHIBIT 6.5**

**ASSIGNMENT AND ASSUMPTION OF CONTRACTS**

This Assignment and Assumption Agreement (the "**Assignment**") is effective as of _____, 2016 and is between [_____] ("**Old Operator**"), and [_____] ("**New Operator**").

**Background**

A.    Old Operator and New Operator are parties to an Operations Transfer Agreement (the "**Agreement**") dated as of _____, 2026, which Agreement is incorporated into this Assignment as if fully rewritten in this Assignment (defined terms therein having the same meaning when used herein).

B.    It is a condition to the Closing under the Agreement that Old Operator assign to New Operator all of Old Operator's right, title and interest in, to, and under (i) those contracts identified on Exhibit A (the "**Assumed Operating Contracts**") and (ii) all Patient Agreements, and that New Operator assume Old Operator's obligations with respect to such Assumed Operating Contracts and Patient Agreements from and after the Effective Time, as defined, and in accordance with Section 1.9 of the Agreement.

NOW, THEREFORE, in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, such Parties, intending to be bound, hereby agree to incorporate the foregoing recitals as if fully rewritten in this Assignment and further agree as follows:

1.    Old Operator hereby assigns, transfers and conveys all of their right, title and interest in, to, and under the Assumed Operating Contracts and Patient Agreements to New Operator.

2.    New Operator shall assume, discharge and satisfy, in accordance with their respective terms, all liabilities of Old Operator set forth in the Assumed Operating Contracts and Patient Agreements, to the extent arising or accruing after the Effective Time.

3.    Notwithstanding anything contained herein to the contrary, New Operator does not assume or agree to discharge or satisfy any of the Excluded Liabilities or any liabilities or obligations under the Assumed Operating Contracts related to periods prior to the Effective Time.

[*next page is signature page*]

13760749.2

IN WITNESS WHEREOF, the undersigned, being duly authorized, have executed and delivered this Assignment as of the date set forth above.

[_____]

By: _____
    Name:
    Title:

[_____]

By: _____
    Name:
    Title:

13760749.2

**EXHIBIT A**

**ASSUMED OPERATING CONTRACTS**

[TBD]

13760749.2

**EXHIBIT 6.6**

**ASSIGNMENT AND ASSUMPTION OF RESIDENT TRUST FUNDS AND DEPOSITS**

This Assignment and Assumption Agreement (the "**Assignment**") is effective as of _____, 2026 and is between [_____] ("**Old Operator**"), and [_____] ("**New Operator**").

**Background**

A.      Old Operator and New Operator are parties to an Operations Transfer Agreement (the "**Agreement**") dated as of _____, 2026, which is incorporated into this Assignment as if fully rewritten in this Assignment (terms defined therein having the same meaning when used herein).

B.      It is a condition to the Closing under the Agreement that Old Operator assigns all of its right, title and interest in, to, and under the Resident Trust Funds and Resident Deposits (as such terms are defined in the Agreement) to New Operator, and that New Operator assume Old Operator's obligations with respect to such Resident Trust Funds and Resident Deposits arising after the Effective Time.

Now, therefore, in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties, intending to be bound, hereby agree to incorporate the foregoing recitals into this Assignment and further agree as follows:

1.      Old Operator hereby assigns, transfers and conveys all of its right, title and interest in, to, and under the Resident Trust Funds and Resident Deposits to New Operator.

2.      New Operator hereby accepts and assumes all liabilities arising after the Effective Time with respect to the Resident Trust Funds and Resident Deposits.

[*next page is signature page*]

13760749.2

IN WITNESS WHEREOF, the undersigned, being duly authorized, have executed and delivered this Assignment as of the date set forth above.

[_____]


By: _____
    Name:
    Title:


[_____]


By: _____
    Name:
    Title:

**EXHIBIT 6.7**

**GENERAL ASSIGNMENT**

**THIS ASSIGNMENT**, is made effective as of [_____, 20__], by [_____], a [_____] ("<u>Assignor</u>") to [_____], a [_____] ("<u>Assignee</u>").

**WHEREAS**, by that certain Operations Transfer Agreement (the "<u>OTA</u>") by and among Assignor and Assignee, Assignor agreed to transfer to Assignee certain personal property and such other assets, as more fully described in the OTA (the "<u>Assets</u>") (capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the OTA); and

**WHEREAS**, the OTA provides, inter alia, that Assignor shall assign to Assignee, certain intangible personal property, including, without limitation, all of the goodwill symbolized and associated with the Facility (collectively, the "<u>Intangible Personal Property</u>"), and any bed rights and other assets located at or used in connection with the Facility, and such other items applicable to the Assets, as more fully provided in the OTA;

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agree as follows:

1.      **Transfer of Intangible Property**.  To the extent permitted by law, Assignor hereby assigns, sets over and transfers to Assignee all of its right, title and interest in, to and under all of Intangible Personal Property including all goodwill symbolized and associated with the Facility, and any bed rights and other assets located at or used in connection with the Facility.

2.      **Transfer of Permits**.  To the extent permitted by law, Assignor hereby assigns, sets over and transfers to Assignee all of its right, title and interest in, to and under Permits as set forth in the OTA.

3.      **Transfer of Warranties**. To the extent permitted by law, Assignor hereby assigns, sets over and transfers to Assignee all of its right, title and interest in, to and under all Warranties as set forth in the OTA.

4.      **Assumption**.  Assignee hereby accepts the foregoing assignment set forth in Sections 1, 2 and 3 hereof, provided, that said assignment and assumption shall in all respects be subject to the terms of the OTA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Assignment shall contradict the OTA, the OTA shall control.

5.      **Miscellaneous**.  This Assignment and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions referred to in the OTA shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.  This Assignment may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, Assignor and Assignee have duly executed this Assignment as of the day and year first above written.

**ASSIGNOR**

[_____]

By: _____
Name:
Title:

**ASSIGNEE**

[_____]

By: _____
Name:
Title:

**EXHIBIT 7.3**

**<u>NEW OPERATOR'S CLOSING CERTIFICATE</u>**

       Pursuant to <u>Section 7.3</u> of the Operations Transfer Agreement (the "**Agreement**"), dated as of _____, 2026 between [_____] ("**Old Operator**") and [_____] ("**New Operator**"), the undersigned, being a duly authorized executive officer of New Operator, does hereby certify that the representations and warranties made by New Operator in the Agreement are true and correct in all material respects as of the Closing Date (as defined in the Agreement) and the covenants to be performed by New Operator pursuant to the Agreement have been performed in all material respects as of the Closing Date (as defined in the Agreement), except with respect to representations and warranties made in the Agreement that relate to a specific point in time or timeframes within the terms of such representation and warranty which are true and correct in all material respects as of such time or times.

Date:_____, 2026

[_____]

By: _____
      Name:
      Title:

# SCHEDULES TO OPERATIONS TRANSFER AGREEMENT

| | |
|---|---|
| *Schedule 1.1* | Permitted Liens |
| *Schedule 1.1(b)(viii)* | Excluded Assets |
| *Schedule 1.2* | Third Party Payor Contracts |
| *Schedule 1.5* | Employees |
| *Schedule 1.9* | Operating Contracts |
| *Schedule 3.1(f)* | Operating License and Material Permits |
| *Schedule 3.1(g)* | Employment Agreements and CBAs |
| *Schedule 3.1(i)* | Employment Actions |
| *Schedule 3.1(k)* | Licensed Beds and Current Rate Schedule |
| *Schedule 3.1(p)* | Litigation and Proceedings |
| *Schedule 3.1(q)* | Resident Roll |
| *Schedule 3.1(w)* | Environmental Matters |
| *Schedule 3.1(y)(i)* | Financial Statements |

**Schedule 1.1**

**Permitted Liens**

**[TBD]**

**Schedule 1.1(b)(x)**

**Excluded Assets**

a.      All Debtor's cash and cash equivalents and short term investments;

b.      Debtor's corporate organizational documents, minute books, tax records and seals;

c.      All of the rights of Debtor under this Agreement and all Transaction Documents; and

d.      All claims for any rebate, refund or credit of taxes, whether real, personal, tangible or intangible, and other governmental charges of whatever nature, and all rebates, refunds, credits and amounts payable in respect thereof, whenever and however paid, issued or credited, in each case, to the extent the same relate to any period prior to the Closing Date (whether in whole or in part, and, if in part, as shall be allocated to the period prior to the closing date based on the relative number of days applicable thereto).

e.      All accounts receivable related to services rendered or goods provided for a period prior to Closing.

The Excluded Assets shall be as further defined as set forth in Section 1(d) of the Purchase Agreement and Section 1.1(b) of this Operations Transfer Agreement.

**Schedule 1.2**

**Third Party Payor Contracts**

[TBD]

**Schedule 1.5**

**Employees**

[TBD]

**Schedule 1.9**

**Operating Contracts**

[TBD]

**Schedule 3.1(g)**

**Employment Agreements and CBAs**

**Schedule 3.1(k)**

**Licensed Beds and Current Rate Schedule**

[TBD]

**Schedule 3.1(p)**

**Litigation and Proceedings**

**Schedule 3.1(q)**

**Resident Roll**

**[TBD]**

**Environmental Matters**

**Schedule 3.1(y)(i)**

**Financial Statements**
