| | | |
|---|---|---|
| IN RE: | : | Case No. 1:26-bk-00118-HWV |
| CEDAR HAVEN ACQUISITION, | : | |
| LLC, | : | |
| Debtor | : | Chapter 11 |
| | : | |
| CEDAR HAVEN ACQUISITION, | : | |
| LLC, | : | |
| Movant | : | |
| | : | |
| v. | : | |
| | : | |
| 590 SOUTH 5TH AVENUE, LLC, | : | |
| CAPITAL FUNDING, LLC, | : | |
| RETIREMENTHOME TV CAPITAL, | : | |
| THE ARBA GROUP, INC., | : | |
| SOUTH LEBANON TOWNSHIP, | : | |
| LEBANON COUNTY TAX CLAIM | : | |
| BUREAU, CORNWALL-LEBANON | : | |
| SCHOOL  DISTRICT | : | |
| Respondents | : | |

**TRUSTEE'S NOTICE OF AUCTION SALE RESULTS AND MOTION TO
APPROVE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS**

Leon P. Haller, Chapter 11 Trustee ("Trustee") of Cedar Haven Acquisition ("Cedar

Haven" or "Debtor") by and through his counsel, Cunningham, Chernicoff & Warshawsky,

P.C., and pursuant to Sections 105, 363(b), (c), (f), (k), and (m), and 365, of Title 11 of the

United States Code, 11 U.S.C. §§101 et seq., (the "Bankruptcy Code" or "Code") and Rules

2002, 6004, 6006, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), hereby provides Notice of Auction Sale Results and moves this Court

for entry of an Order authorizing the herein-described sale free and clear of all liens, claims,

encumbrances, and other interests asserted against certain Assets (all as defined herein).

*NOTICE TO PERSONS RECEIVING THIS MOTION: YOUR RIGHTS MAY BE AFFECTED.*

## JURISDICTION

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

## BACKGROUND

2. On or about January 16, 2026, the Debtor a filed voluntary Chapter 11 Petition under the United States Bankruptcy Code.

3. Debtor is a Pennsylvania limited liability company in the health care business.

4. Debtor owns and operates a skilled nursing facility (the "Facility"), which operates in Lebanon County, Pennsylvania (the "Business"). The Debtor has in excess of 350 residents (the "Residents") at its Facility.

5. On February 17, 2026, the United States Trustee appointed Leon P. Haller as the Chapter 11 Trustee in the above case.

6. Pre-Petition, Michael Flannagan was appointed as Receiver (the "Receiver") for the Debtor's assets by the Court of Common Pleas of Lebanon County, Pennsylvania, by an Order dated October 30, 2025. Up until the date of the appointment of the Trustee, the Receiver has been operating the skilled nursing home business of the Debtor.

7. The Trustee has determined to sell all or some of the assets of the Debtor. The Trustee entered into an agreement (the "Agreement") with Cedar Haven Healthcare

Case 1:26-bk-00118-HWV    Doc 174    Filed 05/04/26    Entered 05/04/26 15:28:49    Desc
Main Document      Page 2 of 12

Center LLC ("CHHC") to purchase its assets (as that term is later defined herein) and subject to a listing of excluded assets (the "Excluded Assets") as set forth in the Agreement (the "Agreement"). The Agreement is attached hereto as Exhibit "A" and made a part hereof. The Debtor treated the Agreement as a Stalking Horse Agreement.

8. The real property where the Debtor operates is located at 590 South 5th Avenue, Lebanon, Lebanon County, Pennsylvania (the "Real Property"). The Real Property is owned by 590 South 5th Avenue, LLC ("590"). 590 is an affiliate of an entity known as The Arba Group, LLC ("Arba").

9. 590 entered into a Purchase and Sale Agreement (the "Real Estate Agreement"), to sell the Real Property to an affiliate of MDA Capital Group, LLC ("MDA"), which is an affiliate of the purchaser under the Agreement.

10. In the Agreement and the Real Estate Agreement, the total purchase price is $27,000,000.00. The Agreement sets forth a purchase price for the Debtor's Assets as $100,000.00.

11. Much of the tangible personal property utilized by the Debtor is owned by 590 and is, in turn, leased to the Debtor by 590 along with a lease of the Real Property.

12. The Debtor's business has greatly suffered as a result of the Covid-19 Pandemic and various supply issues and imposition of taxes and charges which have all caused the costs of supplies and other items used by the Debtor to increase substantially.

13. Further, the labor market in the Pennsylvania locale where the Debtor operates is very tight and difficult. In order to keep employees, it has been necessary for

3

the Debtor to pay substantially higher costs for labor compared with pre-pandemic wages and benefits.

14. In addition, because of the difficult labor market, and because of the state requirements for the number of staff hours per patient, the Debtor needed to utilize a significant amount of outside agencies for labor. The cost per worker for outside agencies is substantially higher than the cost for direct employees.

15. In light of recent Federal budget actions, the Debtor anticipates a reduction in Medicare and Medicaid reimbursements, further stressing the Debtor's financial position.

16. As a result of all the above issues, the Debtor has been suffering financially and, at times, experienced cash flow shortages. As a result, the Debtor failed to pay a substantial amount to 590 for rent and other charges which is in an amount in excess of $2,600,000.00. Further, the Debtor has substantial unsecured debt in addition to the non-payment of rent.

17. Because of the downturn in business and the financial problems which the Debtor is experiencing, it has decided to sell its Facility and Assets, exclusive of any real estate. It is in the best interests of creditors, the estate and residents to sell the Facility as going concerns.

18. The Debtor owns some personal property (the "Assets") contained in its Facility which is not owned by 590. The Debtor's Assets includes various items used in the daily operations, including inventory, stable and perishable food, supplies, office

furniture, computers, janitorial equipment and food service equipment, machinery, grounds equipment, and moveable medical machinery.

19. In order for the Debtor to operate, the Debtor previously received a line of credit from Fremont Financial, an affiliate of the owner of the Debtor ("Fremont"). This debt was thereafter purchased by Arba. Pre-Petition, Fremont was owed the sum of $1,600,000.00. Arba thereupon advanced funds in an additional loan, such that the total amount owed is approximately $2,000,000.00 A Financing Motion has been filed to cause the loan of up to $2,000,000.00 to continue post-Petition, which Motion has been approved.

20. Because of the failure of the Debtor to pay rent and other charges to 590, and because of other financial shortfalls, an action was filed in the Court of Common Pleas of Lebanon County, Pennsylvania for the appointment of a Receiver. As a result, the Receiver, Michael Flanagan, pre-Petition, has been appointed as the Receiver. The Receiver caused the filing of the Chapter 11 case. The Receiver is authorized by the Receivership Order to file the Chapter 11 case.

21. Because of the nature of the long-term care facility business and with respect to the costs of operating the Business, including the secured debt owed Arba, it is believed that the Debtor's Business and Assets have a low value.

**THE PROPOSED SALE**

22. The Debtor intends to sell its Assets as set forth below.

23. The Debtor has engaged the services of Tower Partners, LLC ("Tower") to market the Debtor's Assets in search of higher and better offers.

5

24. The residents of the Facility will benefit from the sale because there will be a seamless continuation of operations, and a smooth transition for the Debtor's elderly and infirm residents (the "Residents") pursuant to an operations transfer agreement with the Purchaser or an affiliate of the Purchaser, by selling the Business as a going concern.

25. Therefore, it is in the best interests of the Residents, and the Debtor's estate, that the Debtor sell the Assets as a going concern, as set forth herein.

26. It is believed that the consideration payable under the Agreements is fair and reasonable and is believed to be an appropriate price for the Assets as a going concern.

**AUCTION SALE PROCESS**

27. Tower began a marketing campaign for the Assets. As part of the marketing campaign, Tower approached approximately 250 possible buyers.

28. The Debtor filed a Motion to Approve Sale of Assets and Business Free and Clear of all Liens, Claims, Encumbrances, And Other Interests (the "Procedures Motion") [Doc 120].

29. On March 30, 2026, the Court entered an Order approving the Procedures Motion [Doc 158] (the "Bid Procedures Order").

30. As set forth above, Tower began marketing the Assets prior to entry of the Bid Procedures Order. Tower continued to market the Real Property and Assets and, as a result, in addition to the Agreement, Tower received an additional bid from an entity known as Jewel Healthcare LLC ("Jewel").

31. The bid from Jewel is in the amount of $27,900,000.00 with an allocation of $200,000.00 to the Assets. The balance of the purchase price is for the Real Property.

6

32. An important component of the sale of the Debtor's Assets is that all parties who were contacted with respect to an interest in purchasing the Assets indicated that they would only purchase the Assets if they purchased the Real Property.

33. Both the Stalking Horse Agreement and the bid from Jewel were predicated upon the purchase of the Real Property.

34. Both the CCHC and Jewel were determined by the Trustee to be qualified bidders.

35. As a result, under the Bid Procedures Order, an auction was held on May 1, 2026.

36. Following aggressive bidding by both CCHC and Jewel, CCHC was determined to be the highest and best offer at a purchase price of $40,375,000.00.

37. Neither CCHC or Jewel have yet allocated any value to the Assets.

38. After negotiations with the owner of the Real Property, 590 (590) has agreed to provide the sum of $2,000,000.00 as a carveout (the "Carveout") from the proceeds for the Real Property to be utilized to pay administrative, priority and unsecured claims in the case to the extent such are not paid from any sale closing.

39. The amount carved out by the real estate owner from the Real Property proceeds of $2,000,000.00 is believed to be higher than any possible allocation from either of the two (2) bidders for the Debtor's Assets and Real Property.

7

## PROPOSED DISTRIBUTION OF SALE PROCEEDS

40. Debtor proposes to pay costs and expenses associated with the sale of the Assets at Closing as follows:

a. All commissions owed to Tower will be paid from the Real Estate proceeds.

b. Any notarization or incidental filing charges required to be paid by Debtor as seller.

c. All other costs and charges apportioned to Debtor, as seller, under the documents contemplated thereby.

d. All costs associated with the preparation of the conveyance instruments and normal services with respect to closing, including payment of a total of $100,000.00 on account of legal fees and expenses owed to Cunningham, Chernicoff & Warshawsky, P.C., Debtor's counsel, in connection with implementation of the sale, the presentation and pursuit of this Motion, consummation of the sale, and otherwise in connection with this case. All fees and expenses payable to Cunningham, Chernicoff & Warshawsky, P.C. shall be subject to such approval as the Bankruptcy Court may require. If any fees and/or expenses have not been approved by the Bankruptcy Court at the time of closing and approval thereof is necessary, then an estimated sum shall be escrowed at closing pending application to the Bankruptcy Court for approval of such fees. Upon approval of any fees and expenses by the Bankruptcy Court, funds in such amount may be distributed from escrow.

e. Payment of all past due fees owed to the Office of the U.S. Trustee, as well as any fees owed as a result of the transaction set forth in this Motion.

41. The net proceeds after costs of sale, from the sale of the Assets or the Carveout will be paid to administrative and unsecured claims pursuant to the priority under the Bankruptcy Code.

42. In the event there is a dispute as to the disposition of the proceeds net of the aforesaid costs of sale, the Debtor request approval of the sale, with any disputed proceeds to be held in trust by the Debtor's counsel, Cunningham, Chernicoff & Warshawsky, P.C.

8

43.     The consideration for the Debtor's interest in the Assets is fair and reasonable as determined through use of extensive marketing and occurred following the auction of the Debtor's Assets.  The consideration is believed to be equivalent to the fair market value thereof.  Thus, the sale, based upon the Trustee's business judgment, is believed to be in the best interest of the Debtor's estate.

## GROUNDS FOR RELIEF

### A.  Approval of Sale Pursuant to Bankruptcy Code Section 363(b)

44.     Bankruptcy Code Section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the state."  11 U.S.C. §363(b)(1).

45.     The proposed use, sale or lease of property of an estate may be approved under Code Section 363(b) if supported by sound business judgment.  See *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396 (Bankr.W.D. Pa. 1991).

46.     Although Code Section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale or lease of assets, courts within the Third Circuit and others, in applying this Section, have invoked the "business judgment rule" as a standard.  See *In re Exaeris*, 380 B.R. 741, 744 (Bankr.D.Del. 2008); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Industrial Valley Refrig. & Air. Conditioning Sup., Inc.*, 77 B.R. 15, 21 (Bankr.E.D.Pa. 1987) (proponent of sale must show "sound business purpose" and meet other requirements of Code Section 363(b)(1));

9

*In re Lionel Corp.*, 722 F.2d 1063, 1068-69 (2d Cir. 1983) (a court may authorize the sale of a Chapter 11 debtor's assets when "a sound business purpose" dictates such action).

47.     As discussed herein, the Debtor's decision to sell the Assets is an exercise of reasonable business judgment.

**B.  The Sale Should be Free of Liens, Claims, Encumbrances, and Other Interests.**

48.     Pursuant to Code Section 363(f), a trustee may sell property free and clear of liens, claims, and encumbrances if one of the following conditions is satisfied.

> applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> --     such entity consents;
>
> --     such interest is in lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> --     such interest is in bona fide dispute; or
>
> --     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).  See *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288 (3d Cir. 2003) (court may approve sale "free and clear" provided at least one of the subsections is met); *Criimi Mae Services L.P. v. WDH Howell, LLC (In re WDH Howell, LLC)*, 298 B.R. 527, 530 (Bankr.D.N.J. 2003).

49.     The Debtor believes that one or more conditions of Code Section 363(f), particularly Code Section 363(f)(2) and (3), are satisfied in the present instance, as the consent of Arba, and payment of an amount equal to the value of the liens of Arba and in the Assets.

50. The Debtor may sell its Assets free and clear of any lien, claim, encumbrance, or interest so long as all secured liens attach to the sale proceeds. See *Milford Group, Inc. v. Concrete Steps Unit, Inc. (In re Milford Group, Inc.)* 150 B.R. 904 (Bankr.M.D.Pa. 1992).

51. Accordingly, the Court should authorize the Debtor to sell its Assets to the Winning Bidder, free and clear of any and all liens, claims, interest, and encumbrances, with such liens to be transferred and attached to the gross proceeds of the sale, with the same validity and priority that such liens had against the Assets, and subject to appropriate costs of sale, as allowed by the Court.

**C. Request that the Sale Approval Order Be Effective Immediately.**

52. Bankruptcy Rule 6004 provides that an order authorizing the use, sale, or lease of property, is stayed until the expiration of 14 days after the entry of the order, <u>unless</u> the court orders otherwise. Fed.R.Bankr.P. 6004(h). Because over time the Assets may decrease in value, Debtor requests that any order approving the sale transaction be effective immediately by declaring inapplicable the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d).

**STATEMENT REQUIRED UNDER LOCAL RULE 6004-4**

53. Cedar Haven Acquisition LLC is a Pennsylvania Limited Liability Company. No other party has an ownership interest in the Assets and which are being sold under this Motion.

11

54. There is no relationship between the Debtor and CCHC, except that of proposed seller and buyer, and as except as to an affiliate of CCHC providing management services for the facility, as set forth above

**CONCLUSION**

**WHEREFORE**, Debtor, Cedar Haven Acquisition, LLC, respectfully requests that this Honorable Court enter an Order providing that:

a. Approving the sale of the Assets free and clear of all liens, claims, encumbrances and other interests to Cedar Haven Healthcare Center LLC;

b. Approving the costs and distributions as set forth above; and

c. Award the Debtor such other and further relief as is just and proper.

Respectfully submitted:

CUNNINGHAM, CHERNICOFF
& WARSHAWSKY, P.C.

By: s/ Robert E. Chernicoff
Robert E. Chernicoff, Esquire
Attorney I.D. No. 23380
2320 North Second Street
P. O. Box 60457
Harrisburg, PA 17106-0457
(717) 238-6570

Date: May 4, 2026

12