| | |
|---|---|
| In re:<br><br>CEDAR HAVEN ACQUISITION, LLC<br><br>Debtor. | Case No. 1:26-bk-00118-HWV<br><br>Chapter 11<br><br>(Related Item # 120) |

**CHARLES BLALACK AND STONE BARN MANAGEMENT, LLC'S
LIMITED OBJECTION TO PROPOSED SALE PROCEDURES**

Charles Blalack ("Blalack") and Stone Barn Management, LLC ("Stone Barn" or, together with Blalack, the "Objecting Parties"), as and for their Objection (this "Objection") to that portion of the *Motion of the Chapter 11 Trustee for Cedar Haven Acquisition, LLC to Set Sale Procedures and to Approve Sale of Assets and Business Free and Clear of all Liens, Claims, Encumbrances, and Other Interests* [ECF # 120][1] (the "Motion") seeking Court approval of the sale of the above-captioned debtor's assets, respectfully represent as follows:

1.     The auction for the Assets (defined below) was supposed to be an auction of the Debtor's Assets.  It was anything but.  Instead, the Trustee initially purported to conduct an auction of both the Debtor's Assets and non-Debtor Real Property (defined below).  That auction resulted in a combined high bid of $40,375,000 for both the Debtor's Assets and the Real Property submitted by MDA, with the next highest combined bid at $40 million.  The high bid represents a $13,375,000 increase over MDA's "stalking horse bid" of $27 million for both sets of assets (the "Auction Premium").

---

[1]  Numerals preceded by "ECF #" refer to docket entries in the Debtor's chapter 11 case, bearing case number 1:26-bk-00118-HWV (the "Chapter 11 Case") pending before the United States Bankruptcy Court for the Middle District of Pennsylvania (the "Court").

2. At approximately 3:30 p.m. today, the Trustee filed the *Trustee's Notice of Auction Sale Results and Motion to Approve Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests* [ECF # 174] (the "Auction Results").

3. The Auction Results state that "[a]fter negotiations with the owner of the Real Property, 590 (590) has agreed to provide the sum of $2,000,000.00 as a carveout (the "Carveout") from the proceeds for the Real Property to be utilized to pay administrative, priority and unsecured claims in the case to the extent such are not paid from any sale closing." *Auction Results*, ¶ 38.

4. According to the Trustee, "[n]either CCHC or Jewel have yet allocated any value to the Assets."[2] The Trustee further asserts, without any support whatsoever, that the $2 million Carveout "is believed to be higher than any possible allocation from either of the two (2) bidders for the Debtor's Assets and Real Property." *Auction Results*, ¶ 38.

5. What this means, is that contrary to the proposed Sale Procedures that the Court approved and that he agreed to, the Trustee conducted an auction at which he failed to seek any concrete bids for the Debtor's Assets, instead solely acting on Arba's behalf to increase the value of non-Debtor Real Property. He was working for Arba. He then concluded the auction and negotiated with Arba for the Estate to retain only a sliver of the Auction Premium as a "carveout" from the sale of the Real Property.

6. The Trustee's characterization of the Auction Premium as a carveout from the real property sale is puzzling to say the least. It defies logic to assert that the Auction Premium was the result of some drastic increase in the market value of real property in the Lebanon area over

---

[2] The Auction Results refer to MDA as CCHC.

the last two months,[3] rather the going-concern value of the Debtor's skilled nursing facility business, as bid between two owners/operators of skilled nursing facilities.

7. Not only was the Trustee's conduct outside the scope of his authorization under the Sale Procedures Order (defined below), but it was also grossly unfair to the Debtor's estate and its creditors, as well as a conflict of interest.

8. While the auction substantially increased the value of the combined bids for the Debtor's Assets and the non-Debtor Real Property, the "Carveout" is wholly insufficient and the Objecting Parties object to approval of any sale which does not provide for the Debtor's estate to retain 100% of the Auction Premium. In the alternative, the Objecting Parties request that the sale of the Debtor's Assets be approved and that the Court set a hearing to determine the allocation of the Auction Premium.[4]

## THE SALE PROCEDURES

9. The Debtor filed the Motion on March 2, 2026. That portion of the Motion seeking approval of certain sale procedures generated objections from the Objecting Parties [ECF # 134] (the "Objecting Parties' Objection"),[5] as well as from the United States Trustee for Region Three

---

[3] If the entirety of the $13.375 million Auction Premium were to be attributed just to the Real Property (without any value being attributed to the Debtor's Assets), it would represent an increase in value of the Real Property of approximately 50% over the $26.9 million purchase price at which Arba contracted to sell the Real Property just two months ago!

[4] The Debtor's schedules, filed on February 13, 2026 [ECF # 24], list $2 million in secured claims, $0 in priority claims, and $12,059,016.55 in general unsecured claims. The general bar date for filing proofs of claim was March 20, 2026 and the governmental bar date is July 15, 2026. There have been 34 proofs of claim filed to date asserting in excess of $6.2 million in priority and general unsecured claims.

[5] The Objecting Parties objected on the basis that the Sale Procedures were unacceptable and appeared to be designed to benefit Arba, rather than the Debtor's estate and creditors. For example, the proposed Sale Procedures would have tethered bids for the Debtor's Assets to a corresponding bid for the Real Property. *Objecting Parties' Objection*, ¶ 4. Further, the Sale Procedures keyed off of the $27 million bid from MDA, the terms of which were

3

(the "UST") [ECF # 133] (the "UST Objection"),[6] Premier Healthcare Management LLC [ECF # 137], and the Commonwealth of Pennsylvania Department of Human Services ("DHS") [ECF # 138] (the "DHS Objection").[7] Following a hearing before the Court, the parties worked together to negotiate a sale procedures order which was thereafter entered by this Court [ECF # 158] (the "Sale Procedures Order").[8]

10.     The Sale Procedures Order authorizes the Debtor to seek Qualified Bids and to hold an auction for the sale of the "Assets". The term "Assets" is defined as comprising the "Debtor's Personal Property, Bed Approvals, and Business". *Sale Procedures Order*, ¶ 3(a). As such, it covers the *Debtor's* Assets only and not the real property and related assets (collectively, the "Real Property") owned by the Debtor's landlord ("Arba"), though the Sale Procedures Order states that an auction "of the Debtor's[9] Real Property will be conducted at the same date and time as the auction for the Assets." *Sale Procedures Order*, ¶ 3(o).

---

set forth on a letter of intent (the "LOI"). Despite that LOI being for both the sale of the Debtor's Assets and the Real Property, the LOI did not contain any allocation of the purchase price between the two sets of assets. Nevertheless, the Motion set $100,000 as the allocation to the Debtor's assets (an arbitrary and, as the results of the auction have borne out, undervalued figure).

[6]  The UST's objection was based, in part, on the attempted tethering of the sale of the Debtor's Assets to the sale of the Real Property and argued that the "Court should not approve any sale procedures that would require it to exercise jurisdiction over non-estate property". *UST Objection*, ¶ 1.

[7]  The DHS objected because, among other things, "there has been no evidence presented supporting the Trustee's valuation of the Debtor's Assets as a proportion of the total sale price, and thus an independent appraisal should be conducted." *DHS Objection*, ¶ 22.

[8]  Capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Procedures Order.

[9]  The term "Debtor's" in this sentence appears to be a typographical error.

4

11. "Qualified Bids" are bids otherwise meeting the standards set forth in paragraph 3 of the Sale Procedures Order "for any or all of the Assets" (Sale Procedures Order, ¶ 3(d)(ii)). No bid was required for the Real Property in order to be a Qualified Bid. *Sale Procedures Order*, ¶ 3(o)).

12. A Qualified Bidder may "not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid" unless such bidder obtained "prior written consent of the Trustee". *Sale Procedures Order*, ¶ 3(d)(viii). The Objecting Parties are not aware of any such request having been made by any Qualified Bidder, nor the Trustee providing prior written consent to any such request.

### THE REAL PROPERTY PURCHASE AGREEMENT

13. On or about March 5, 2026, MDA Capital Group, Inc. ("MDA"), through its designated affiliate, 590 South 5th Propco LLC, entered into an agreement with Arba's real property-owning affiliate, 590 South 5th Avenue, LLC for the purchase and sale of the Real Property. A copy of that agreement (the "Real Property Purchase Agreement") is annexed hereto as Exhibit "A".

14. Pursuant to the Real Property Purchase Agreement, the Seller is required to close on the sale of the Real Property to the Buyer for the purchase price of $26.9 million. The Real Property Purchase Agreement is a bilateral contract between a non-Debtor Seller and a non-Debtor Buyer, with a fixed purchase price of $26.9 million. There is nothing in that agreement which conditions the Seller's obligation to convey the Real Property on the price paid for Debtor's Assets. Nor is there any obligation for the Buyer to pay any more than the contracted $26.9 million purchase price, regardless of how much it pays for the Debtor's assets.

5

## THE AUCTION

15. On May 1, 2026, the Trustee, through his counsel, held an auction at which MDA and Jewel Healthcare ("Jewel") participated. The auction was conducted by Trustee's representatives, pursuant to this Court's Order setting forth "Sale Procedures [that] are reasonably designed to maximize the value to be achieved for the Debtor's Assets." *Sale Procedures Order*, ¶ 2.

16. The Sale Procedures Order did not authorize the Trustee (or any other estate representative) to conduct the auction for the Real Property on behalf of Arba – a non-Debtor. Nor did the Trustee seek such authorization. Further, the Objecting Parties are not aware of any agreement that the Trustee or Debtor may have had with Arba for the allocation of the bids as between the Assets and Real Property. Even if one existed, the Trustee never sought or obtained Court approval for any such agreement.

17. Both of the bidders for the Assets sought to purchase the Real Property as well. Though he was only authorized under the Sale Procedures Order to solicit overbids for the Assets, the Trustee solicited combined overbids for both the Assets and the Real Property, without any allocation of the overbid purchase price between the two sets of assets.

18. MDA's highest combined overbid came in at $40,375,000 for the Assets and the Real Property. Jewel's highest combined overbid came in at $40 million for both sets of assets. Neither MDA nor Jewel allocated any portion of their respective overbids between the Assets and the Real Property.

## THE LIMITED OBJECTION

19. The Objecting Parties object to the extent that the Trustee seeks to provide anything less than 100% of the Auction Premium to the Debtor's estate. Alternatively, the Objecting Parties

6

contend that the sale of the Debtor's Assets may be approved with the Court setting a further hearing to determine the amount of the purchase price to be paid for the Debtor's Assets.

20.     As has been previously argued by the Objecting Parties in connection with the Sale Procedures, the overriding concern is that the Trustee must put the Estate's interest first, not that of Arba.  The law is clear that the value of the estate must be maximized by the proposed sale:

> The Trustee's decision of what is best for the estate should be undertaken with the goal of maximizing the value of the estate.  *See In re Integrated Re., Inc.,* 147 B.R. 650, 659 (S.D.N.Y. 1992) *citing In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (N.D. Ga. 1988) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible *for the estate*.") (emphasis added); *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998). A trustee maximizes value for creditors by selecting the "highest and best bid, and thereby protecting the interests of [the debtor], its creditors, and its equity holders." *In re Fin. News Networks, Inc.*, 126 B.R. 152, 157 (S.D.N.Y. 1991), *aff'd sub nom.* 980 F.2d 165, 169 (2d Cir. 1991).*See also In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) ("[T]he debtor will need to demonstrate to the bankruptcy court that the proffered purchase price is the highest and best offer."), *aff'd* 147 B.R. 650 (S.D.N.Y. 1992).This duty is an obligation to the estate as a whole, not to individual creditors. *See In re Lionel*, 722 F.2d at 1071 ("In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.").

*In re GSC, Inc.*, 453 B.R. 132, 169-70 (Bankr. S.D.N.Y. 2011).

21.     The failure to meet this burden will result in the proposed sale not being approved:

> The Debtor and the Committee failed to establish at the Hearing that the Sale satisfies any of the foregoing requirements. The timing, relationship of J. Kachkar to Exaeris, the proposed release of J. Kachkar, the dearth of evidence of marketing, *the absence of any evidence of the value of assets, no evidence whatsoever about the negotiations* between J. Kachkar and Debtor or the Committee, require the Court to proceed with extreme caution and applying the

7

> facts to the legal standards for the Sale mandates that the Court deny the Motion.

*In re Exaeris Inc.,* 380 B.R. at 744. (emphasis added).

22.     Here, the Trustee must ascribe all of the Auction Premium to the Estate.  Not only was the value of the Real Property set by a binding Real Property Purchase Agreement at $26.9 million, but the results of the auction made it clear that there was very significant going-concern value for the Debtor's skilled nursing facility business.  The two bidders are not developers or other parties looking to transform the Real Property into any other use.  They are skilled nursing facility operators, looking to continue the Debtor's business in place.  Indeed, Priority, which submitted the highest combined bid, has been managing the Debtor's business since October, 2025.  The Trustee, who conducted the auction through his counsel, was not authorized by the Sale Procedures Order to solicit value on behalf of Arba.  Rather, he was tasked with maximizing the value of the Debtor's Assets in the auction.

23.     Arba (which is contractually obligated to close on the sale of the Real Property to MDA's affiliate for $26.9 million in any event) may not reap the rewards of the Debtor's auction for its Assets, conducted by its Trustee, for the benefit of its Estate.  It was not authorized to do so by the Sale Procedures Order nor by any Court-approved agreement with the Debtor or the Trustee.  It contracted for the sale of its Real Property at a set price and may not now enjoy the upside generated by the going-concern value of the Debtor's business.  The Auction Premium must be utilized to make distributions to the Debtor's creditors, and the proposed sale should not be approved absent an allocation of 100% of the Auction Premium going to the Estate.

## **CONCLUSION**

24.     For the foregoing reasons, the Trustee cannot meet his burden to show that the value of the estate will be maximized by the sale or that it is otherwise fair and in the best interests of

the Estate.  Accordingly, the proposed sale should either be denied or the hearing adjourned to determine the allocation of the Auction Premium.

Dated:  May 4, 2026                                    COZEN O'CONNOR

*/s/ Mark E. Felger*
Mark E. Felger
(PA Bar I.D. 56266)
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone:  (215) 665-2000
Email: mfelger@cozen.com

            -and-

Frederick E. Schmidt, Jr.
3 WTC, 175 Greenwich Street
New York, NY 10580
Telephone: (212) 883-4948
Email: eschmidt@cozen.com

*Counsel for Charles Blalack and*
*Stone Barn Management, LLC*

9