# EXHIBIT "A"

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

# PURCHASE AND SALE AGREEMENT

## by and between

### 590 SOUTH 5th AVENUE, LLC

("Seller"),

### and

### 590 SOUTH 5TH PROPCO LLC

("Purchaser")

3/5/2026

March__, 2026

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

<u>**PURCHASE AND SALE AGREEMENT**</u>

3/5/2026

This **PURCHASE AND SALE AGREEMENT** (this "<u>Agreement</u>"), dated as of March _____ 2026 (the "<u>Execution Date</u>"), is by and between **590 South Fifth Avenue, LLC**, a Delaware limited liability company ("<u>Seller</u>"), the Receiver as defined below, and **590 South Fifth Propco LLC** a New Jersey limited liability company ("<u>Purchaser</u>"). Seller and Purchaser are sometimes referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>".

WHEREAS:

A.    Seller owns that certain parcel of real property located at 590 South 5th Avenue, Lebanon, Pennsylvania 17042 upon which is located that certain 342-bed skilled nursing facility currently known as Cedar Haven Healthcare Center and operated by Michael F. Flanagan, as receiver ("<u>Receiver</u>"), and on behalf of Cedar Haven Acquisition, LLC d/b/a Cedar Haven Acquisition, LLC, a Delaware limited liability company ("<u>Existing Operator</u>") pursuant to the Order of the Court of Common Pleas, Lebanon County Pennsylvania dated October 30, 2025 ("<u>Receiver Order</u>");

B.    On January 16, 2026, the Existing Operator filed a voluntary petition for relief in the United States Bankruptcy Court for the Middle District of Pennsylvania ("<u>Bankruptcy Court</u>") under Chapter 11 of the Bankruptcy Code, creating the Existing Operator's bankruptcy estate ("<u>Estate</u>") and the Existing Operator has continued in possession of the property and is operating and managing its business as a debtor in possession;

C    The Property is currently leased by the Seller to the Existing Operator under terms and conditions which are modified by the Receiver Order ("<u>Existing Lease</u>") as well as a separate lease with Lebanon County which has expired ("<u>County Lease</u>");.

D.    Seller wishes to sell and Purchaser wishes to purchase the Property (as that term is hereinafter defined) subject to the terms and conditions set forth herein; and

E.    The Existing Operator and the Receiver, and a certain affiliate of Purchaser ("<u>New Operator</u>") are concurrently herewith entering into that certain Operations Transfer Agreement ("<u>OTA</u>") in order to provide for an orderly transition of the operations of the Facility and the health, safety and welfare of its residents.

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

1.    Purchase.  Subject to the terms and conditions set forth herein, on the Closing Date (as hereinafter defined), Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller all of the following (collectively referred to herein as the "Property") free and clear of all liens and encumbrances other than Permitted Exceptions (hereinafter defined):

(a)    the land described on <u>Exhibit A</u> attached hereto and incorporated herein, including all improvements, structures, buildings, fixtures, heating, plumbing, air-conditioning, ventilation, sprinkler, alarm, security and electrical equipment and all ducts, pipes, cables and wires appurtenant thereto together with any appurtenant rights and easements thereto (collectively, the "<u>Real Property</u>");

Case 1:26-bk-00118-HWV    Doc 175-1    Filed 05/04/26    Entered 05/04/26 18:46:29    Desc Exhibit A    Page 3 of 42

(b)     all tangible assets, whether owned or leased, including but not limited to, all hard assets, furniture, fixtures, equipment, instruments, supplies, inventory, vehicles, artwork, leasehold improvements, phone systems, computer hardware, databases, machinery, tools (and related repair and maintenance records), and all other tangible personal property used in the operation of and located at the Facility (collectively, the "Tangible Property");

(c)     all intangible property now or on the Closing Date owned by Seller and used in connection with the Facility, including (i) all rights under any guaranties or warranties relating to the Real Property or Personal Property (including those relating to construction or fabrication) to the extent assignable, (ii) all licenses, permits, and certificates of occupancy, if any, issued by any federal, state, municipal or local governmental authority relating to the use, maintenance, occupancy or operation of the Facility, and all variances issued by any municipal, state or federal agency or authority relating to the ownership, use, occupancy, operation or maintenance of the Real Property, to the extent assignable, (iii) certificates of need and/or associated bed operating rights associated with the Facility, if and as assignable, (iv) the goodwill associated with the business and the reputation of the Facility, and (v) all site plans, surveys, plans and specifications, construction bids and floor plans in the possession of Seller and which relate to the Real Property (collectively, "Intangible Personal Property", and together with the Tangible Personal Property, the "Personal Property"); and

(d)     all other assets of Seller relating to or used in connection with the Facility.

The term "Property" shall not include the following ("Excluded Assets"):

(i)     All Seller's cash and cash equivalents and short term investments;

(ii)     Seller's corporate organizational documents, minute books, tax records and seals;

(iii)     All of the rights of Seller under this Agreement and all Transaction Documents; and

(iv)     All claims for any rebate, refund or credit of taxes, whether real, personal, tangible or intangible, and other governmental charges of whatever nature, and all rebates, refunds, credits and amounts payable in respect thereof, whenever and however paid, issued or credited, in each case, to the extent the same relate to any period prior to the Closing Date (whether in whole or in part, and, if in part, as shall be allocated to the period prior to the Closing Date based on the relative number of days applicable thereto).

2.     Purchase Price; Prorations.

In consideration of the purchase and sale of the Property, on the Closing Date, the Purchaser shall pay to the Seller the sum of Twenty-Six Million Nine Hundred Thousand Dollars ($26,900,000) ("Purchase Price") to be paid as hereinafter provided, subject to the prorations and adjustments set forth herein and under the OTA. Prior to the Closing, Purchaser and Seller shall use commercially reasonable efforts to agree upon an allocation statement ("Allocation Statement") set forth on Schedule 2 which sets forth the value of the Purchased Assets that shall be used for the allocation of the Purchase Price among the Property in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision. If the Parties are able to agree upon the allocation of the Purchase Price, Purchaser and Seller shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with such mutually agreed upon

Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings). Purchaser and Seller shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. If, on the other hand, Purchaser and Seller are unable mutually to agree upon the manner in which the Purchase Price should be allocated, Purchaser and Seller shall be free to make their own respective good faith allocations of the Purchase Price for tax purposes, in which event any information provided to the Internal Revenue Service regarding this transaction shall reflect that the Parties have not agreed upon an allocation of the Purchase Price. Notwithstanding the foregoing, prior to Closing, Purchaser and Seller shall agree upon an allocation of the Purchase Price solely for the purpose of determining the realty transfer tax in connection with the recording of the Deed (as defined herein), and such allocation shall not be more than $24,900,000.00.

(a)  The Purchase Price shall be paid by the Purchaser pursuant to the following terms:

(i)  On the Execution Date, Purchaser shall deposit with Mid-Penn Abstract Company ("Title Company") the sum of Five Hundred Thousand Dollars ($500,000) ("Deposit") to be paid into escrow and held in non-interest bearing account by and in accordance with the provisions of the "Deposit Escrow Agreement" attached as Exhibit B. Upon final discharge, release and/or satisfaction of all Facility outstanding obligations due under the Nursing Facility Assessment Program ("Nursing Home Assessment"), the Purchaser shall deposit with the Title Company an additional Two Hundred Fifty Thousand Dollars ($250,000). When a final non-appealable order and approval for the New Operator to become the Facility's licensed operator is issued by a court having jurisdiction, the Purchaser shall deposit with the Title Company an additional Two Hundred Fifty Thousand Dollars ($250,000). All deposits made by the Purchaser under this Section 2(a)(i) shall be collectively referred to as the "Deposit". The Deposit shall be held by the Title Company in non-interest bearing account pursuant to the Deposit Escrow Agreement.

(ii)  The Deposit shall become nonrefundable at the expiration of the Due Diligence Period. The Deposit shall be released by the Title Company and paid to Seller at the Closing, and Purchaser shall receive a credit against the Purchase Price. If this Agreement is terminated prior to Closing, the Deposit shall be paid to Seller as liquidated damages, or otherwise refunded to Purchaser or disbursed as provided for in Section 13.

(b)  Except as set forth herein, as (i) the Existing Lease is a triple net lease, and (ii) the Existing Operator is entitled under the Existing Lease to all revenue of the Property and liable for all expenses of the Property, including the payment of real property taxes, (ii) there shall be no credits or prorations at the Closing with respect to the revenues or costs associated with owning or operating the Property as between Purchaser and Seller, and all such prorations shall be between Seller and Existing Operator under the terms of the Existing Lease, and between Existing Operator and New Operator under the terms of the OTA, provided, however, to the extent proceeds from the sale of operations under the OTA are not sufficient to cause expenses of the Property to be paid in full, credits and prorations shall be made a part of the Closing under this Agreement, as necessary.

3.  Due Diligence.

(a)     Purchaser may terminate this Agreement at any time from the date hereof until forty-five (45) days from the Execution Date ("Due Diligence Period") by giving written notice of termination ("Termination Notice") to Seller.  Upon receipt of a Termination Notice pursuant to this Section 3(a), Seller shall cause the Title Company to promptly return the Deposit to Purchaser and the Parties shall be relieved of any further liability under this Agreement.

(b)     Contemporaneously with or prior to the execution of this Agreement and throughout the period ending on the Closing Date or earlier termination hereof, Seller shall deliver (or ensure that Existing Operator deliver) to Purchaser, copies of all plans, maps, surveys, descriptions, permits, certifications, licenses, approvals, environmental audits, existing title materials, financial reports, regulatory surveys, and all other diligence materials reasonably requested by Purchaser and in the possession of Seller (collectively, "Diligence Materials").  Seller will either provide Purchaser copies of the Diligence Materials or at Purchaser's request shall make all Diligence Materials available to Purchaser by uploading such Diligence Materials to a virtual data room.

(c)     Seller acknowledges that Purchaser has the right to perform its due diligence on the Property, which due diligence shall include any property condition and/or environmental inspections or evaluations ("Inspections") of the Property (collectively, "Purchaser's Inspection Reports").  Purchaser agrees that all Inspections shall be subject to applicable provisions regarding confidentiality of resident information.  Purchaser shall provide Seller with a certificate of insurance for its contractors and subcontractors identifying Seller as an additional insured in connection with any Inspection upon request thereof by Seller.

4.     Excluded Liabilities.   Except as expressly and unambiguously set forth herein, Purchaser shall not assume any claims, lawsuits, liabilities, obligations, contracts, agreements or debts of Seller or Receiver whatsoever, whether statutory, regulatory, judicially created or constitutional ("Excluded Liabilities"), including without limitation: (i) malpractice or other tort claims, statutory or regulatory claims, claims of state or federal agencies whether civil or criminal, fraud-based claims or claims for breach of contract; (ii) any accounts payable, taxes, or other obligation or liability of Seller to pay money incurred by Seller or Receiver; (iii) any collective bargaining agreements or other agreements or understandings with any labor union or collective bargaining unit or any employment or consulting agreements of any kind; (iv) any Seller or Receiver obligations to make contributions, fees, dues or any other payments under any pension plan, defined benefit plan, 401(k) plan. and (v) any other obligations or liabilities arising in whole or in part from Seller's or Receiver's acts or omissions or in any way related to the ownership of the Property prior to the Closing.

5.     Closing.   Subject to the satisfaction of the closing conditions set forth in Section 9 and Section 10 below including without limitation confirmation from the Pennsylvania Department of Health that the change of ownership of the Facility to New Operator has been approved and all licenses necessary to operate the Facility will be issued to New Operator effective the closing date of such change of ownership pursuant to the OTA ("License Approval"), the closing of the transactions contemplated herein ("Closing") shall occur on the first day of the month following receipt of License Approval ("Closing Date"). The Closing shall occur in escrow through the Title Company.  The Closing Date may be such different date as agreed to in writing by the Parties.

6.     Seller's Covenants, Representations and Warranties.

(a)     As a material inducement to Purchaser to enter into this Agreement and to pay the Purchase Price for the Property as set forth herein, and except as otherwise set forth in Schedule 6 delivered to Purchaser concurrently herewith ("Seller's Disclosure Schedule"), Seller hereby covenants, warrants and represents to Purchaser as follows:

(i)     Seller is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware and authorized to do business as a foreign entity in the Commonwealth of Pennsylvania.  Seller has the power and authority to own the Property.

(ii)     Seller has the full power and authority to make, execute, deliver and perform this Agreement and the other instruments to be executed and delivered by it pursuant hereto ("Seller's Transaction Documents").  Such execution, delivery and performance have been duly authorized by all necessary action on the part of Seller and its members and managers, as applicable.

(iii)     Seller's Transaction Documents constitute the valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as limited by bankruptcy, insolvency, reorganization and other laws now or hereafter in effect affecting creditors' rights and remedies or by equitable principles.

(iv)     The authorization, execution and delivery of this Agreement and the Seller's Transaction Documents and the consummation of the transactions contemplated hereby and thereby by the Seller, do not and will not, with or without the giving of notice or passage of time or both (A) violate, conflict with or result in the breach of any term or provision of or require any notice, filing or consent under (1) the certificate of formation or operating agreement of the Seller or (2) any statutes, laws, rules, regulations, ordinances, licenses or permits of any governmental body, authority or agency applicable to the Seller (except for such notices to, and consents and approvals of, state governmental and regulatory authorities applicable to the change of ownership of the Facility) or (3) any judgment, decree, writ, injunction, order or award of any arbitrator, court or governmental body, authority or agency binding upon the Seller, including but not limited to the Receiver Order; (B) conflict with, result in the breach of any term or provision of, require any notice or consent under, give rise to a right of termination of, constitute a default under, result in the acceleration of, or give rise to a right to accelerate any obligation under any loan agreement, mortgage, indenture, financing agreement, lease or any agreement or instrument of any kind to which the Seller is a party or by which the Seller may be bound (except as shall be paid in full at Closing); or (C) result in any lien, claim, encumbrance or restriction on any of the Property (except for Permitted Exceptions, as hereafter defined).

(v)     Seller has good title to the Property, free and clear of any security interests, liens and encumbrances, except Permitted Exceptions and such liens and encumbrances as will be released at Closing.

(vi)     There are no actions, suits or legal, administrative, arbitration or other proceedings or governmental investigations pending or, to the best of the Seller's knowledge, threatened against Seller before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign which affect or relate to the Property.  The Seller is not a party to or subject to provisions of any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which affects or relates to the Property.

(vii)    Seller has received no notice that the Property is not in compliance with all federal, state or local laws, ordinances, rules, regulations, orders or directives or under common law relating to the environment ("Environmental Laws"), except for such noncompliance which is not reasonably expected to adversely affect the ownership or operation of the Property, and neither the Seller, nor, to the Seller's knowledge, any other party, has caused any hazardous wastes or hazardous substances (as defined in any applicable Environmental Law) to enter into the soil or groundwater of the Property.   Seller has provided to Purchaser (to the extent in existence and in Seller's possession) the following:  (A) a copy of each permit or pending application for any permit and each order, judgment, decree, consent agreement or similar document imposing obligations on Seller issued pursuant to or in connection with any Environmental Law with respect to the Property; and (B) copies, if any, of all material reports in the custody or control of Seller, including, without limitation, "Phase I," "Phase II," "environmental assessment" and similar reports, relating to the environmental condition of the Property or the compliance of Seller with Environmental Laws with respect to the Property, and (C) documentation, if applicable, demonstrating the full compliance of Seller with any applicable Environmental Laws that condition, restrict, or prohibit the transfer, sale, lease or assignment of the Property, including, without limitation, any so-called "environmental property transfer laws".

(viii)    Other than the Existing Lease and the County Lease, the Seller is not a party to, nor is the Property subject to, any lease, sublease, agreement, contract, commitment, understanding or arrangement affecting or relating to the Property or the use, occupancy or benefit thereof, which, upon the Closing hereunder, will be binding upon the Facility or the Purchaser, except for the Permitted Exceptions.  Concurrent with the Closing hereunder, Seller shall terminate the Existing Lease and Purchaser will assume the County Lease.

(ix)    Subject to the terms and conditions set forth herein, Seller shall deliver the Property on the Closing Date in substantially the same condition as on the date hereof, normal wear and tear, and damage due to casualty and/or the exercise of the powers of condemnation or eminent domain, excepted.

(x)    The Property is properly zoned for its current use and operation. There is no pending or, to Seller's knowledge, threatened, request, application or proceeding to alter or restrict the zoning or otherwise restrict the current or any planned use of the Property.  To Seller's knowledge, there is no plan, study or effort by any governmental authority or agency or any private party or entity that would adversely affect the authorization of the current use and operation or any planned use of the Property for zoning purposes.  Seller has received no written notice of any litigation or governmental proceeding seeking eminent domain or rezoning of all or any portion of the Property or which adversely affects the operations of the Facility. No portion of the Real Property is in a flood zone or floodway and otherwise affected by any stream (surface or underground), body of water, wetlands, flood prone area, flood plain, floodway or special flood hazard.

(xi)    The certificate of occupancy for the improvements of the Property and all other consents, licenses, permits, approvals and certificates required for the use thereof have been issued to, and fully paid for by or on behalf of Seller, are in full force and effect, have not been revoked, and will not be invalidated, violated or otherwise adversely affected by the transfer of the Property to Purchaser.

(xii)    There are no rights of first refusal or options to purchase the Property or any portion or portions thereof in effect as of the date of this Agreement.

-7-

(xiii)     There are no (1) pending or, to Seller's knowledge, threatened special assessments affecting the Property or (2) to Seller's knowledge, contemplated improvements affecting the Property that may result in special assessments affecting the Property.  There are no tax abatements, phase-ins or exemptions affecting the Property.

(xiv)     All contractors and subcontractors and other persons or entities engaged by Seller who have performed work on or supplied materials to any portion of the Property have been fully paid for all amounts due and owing, and, to the knowledge of Seller, there are no claims against the Property arising from any non-payment by Seller which may give rise to a mechanic's lien against the Property or any portion thereof.

(xv)     Seller has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns except to the extent any non-payment of taxes or governmental charges would not affect any successor owner of the Property.

(xvi)     Seller is not a party or subject to or otherwise in material default under any contract, lease or other agreement, judgment, order or decree of any governmental entity, or any settlement agreement that pertains to the Property.

(xvii)     All insurance coverage for fire, liability, worker's compensation, and other forms of insurance applicable to the Property or the Facility or the business conducted at the Facility are (i) in full force and effect and there is no notice of cancellation or reduction of coverage nor grounds for cancellation or reduction of the coverage provided thereby, (ii) have not been subject to any lapse in coverage, and (iii) are in compliance with all contractual obligations, of the type and in the amounts customarily carried by Persons conducting a business similar to the operation of the Facility and are sufficient for compliance with all applicable legal requirements.

(xviii)     Seller has not received notice of any violation of any other law or municipal ordinance, order or requirement noted or issued against the Property by any governmental authority having jurisdiction over the Property, that has not been cured, corrected or waived as of the Closing Date.

(xix)     Seller has received no notice that the Property's sprinkler system is not in full operational compliance with all applicable codes, laws, regulations, statutes, ordinances, life safety codes, covenants, conditions or restrictions of any governmental or quasi-governmental entity.

(xx)     Intentionally Omitted.

(xxi)     Seller is not a "foreign person" for purposes of § 1455 of the Internal Revenue Code.

(xxii)     Seller has provided to Purchaser copies of the updated year-to-date financial statements of the Facility which have not be altered from those received from the Existing Operator and annual financial statements for the calendar years ending December 31, 2023 and 2024 and interim financial statements for the calendar year ending 2025 (collectively, the "Financial Statements").  The Financial Statements have been prepared from the books and records of Existing Operator.  Except as set forth in the most recent Financial Statements delivered to Purchaser and the Receivership action and possible litigation related thereto, since the date of such Financial Statements,

-8-

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

there have been no events, transactions or information relating to the Facility (or the operations thereof) or the Property which, singly or in the aggregate, could reasonably be expected to have a Material Adverse Effect. "Material Adverse Effect" shall mean any circumstance, event, effect or change that, individually or in the aggregate, is or would reasonably be expected to be materially adverse to (1) the business conducted at the Facility, or the results of operations, prospects or condition (financial or otherwise) of the Facility including without limitation, any revocation of any licenses required to operate the Facility, the issuance of any moratorium on the acceptance of residents to the Facility, a material reduction in reimbursement rates or the denial of payment by any third-party payor with respect to any residents of the Facility, (2) the Property; or (3) the ability of Seller or Existing Operator to perform their respective obligations under this Agreement or the OTA or to consummate the transactions contemplated herein and therein.

(xxiii) Except for License Approval, approval of the Lebanon County Court of Common Pleas under the Receivership and/or the Bankruptcy Court approval and the regulatory approvals required to be obtained as a condition to the closing under this Agreement and the OTA, no registration or filing by Seller with, or consent or approval of or other action by, any governmental authority is or will be necessary for the valid execution, delivery and performance by Seller of this Agreement.

(xxiv) Seller has not engaged any agent, broker, investment banker, person or firm who is entitled to a commission or fee in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated herein. To the extent any agent, broker, investment banker, person or firm has acted on behalf of Seller or under the authority of Seller, Seller shall be responsible for any such broker's or finder's fee or any other commission or similar fee payable directly or indirectly to such agent, broker, investment banker, person or firm in connection with any of the transactions contemplated herein.

(b) All of the foregoing representations and warranties shall be true, correct and complete in all respects, both as of the date hereof and as of the Closing Date, and Seller shall certify in writing at Closing that each and all of said representations and warranties are true, correct and complete as of and with respect to that date in all material respects as hereinafter provided.

(c) From the date hereof and until the earlier termination of this Agreement or the Closing, Seller shall (except as otherwise consented to or approved by Purchaser in writing):

(i) *Not create or permit to become effective any liens or encumbrance or charge of any kind upon the Property (other than Permitted Exceptions);*

(ii) *Preserve and keep all of its books and records related to or prepared in connection with the Property. Seller shall permit representatives and agents of Purchaser to duplicate any material contained in such books and records at no cost to Seller;*

(iii) *Use its best efforts to obtain, on or prior to the Closing, any consents necessary for Seller to fulfill its obligations to consummate the transactions contemplated hereby;*

(iv) *Maintain or cause Existing Operator to maintain the Property in substantially the same condition as they existed on the Execution Date, normal wear and tear excepted;*

-9-

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

(v)     *Maintain or cause Existing Operator to maintain all current insurance policies with respect to the Property and the business conducted at the Facility in full force and effect;*

(vi)     *Comply in all material respects with all applicable laws, and with all applicable rules and regulations of all governmental authorities, in conjunction with the execution, delivery and performance of this Agreement and the transactions contemplated hereby;*

(vii)     *File federal, state, and local tax returns, and pay all amounts then due, for all periods through and including the Closing Date;*

(viii)     *Afford Purchaser's employees, auditors, legal counsel, representatives of Purchaser's lenders, or other authorized representatives all reasonable opportunity and access during normal business hours upon reasonable notice to inspect and investigate the Property, including for review of all accounting records and other business records;*

(ix)     *Not sell, lease or otherwise dispose of all or any part of any Property. In addition, Seller shall not sell, lease or otherwise dispose of any personal property in, related to or necessary for operation of any Facility other than in the ordinary course of business, which shall be replaced with items of the same or better quality and in a manner consistent with its ordinary course. Notwithstanding the foregoing, Purchaser acknowledges that the operations of the Facility are subject to a Receivership and that court and/or the Bankruptcy Court approval related thereto may require Seller to take certain actions related to the operations of the Facility to meet its legal obligations related thereto ("Receivership Obligations");*

(x)     *Not take or permit any actions to close the Facility, change the number of licensed beds, or change the Medicare or Medicaid certification statuses of the Facility;*

(xi)     *Not solicit, accept or negotiate any offer to purchase any portion of the Property from any person or entity other than Purchaser except as related to the Receivership Obligations; and*

(xii)     *Promptly inform Purchaser in writing after becoming aware of any material event adversely affecting the ownership, use, occupancy, operation, management or maintenance of the Property, whether or not insured against, or which would result in a material change in a representation or warranty made by Seller hereunder or the assumption by Purchaser of a liability not expressly provided for in this Agreement.*

7.     Purchaser's Covenants, Representations and Warranties.

(a)     As a material inducement to Seller to enter into this Agreement and to sell the Property to Purchaser as set forth herein, Purchaser hereby covenants, warrants and represents to Seller as follows:

(i)     Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania. Purchaser has the power and authority to purchase the Property and to conduct the business presently being conducted by it.

(ii)     Purchaser has the full power and authority to make, execute, deliver and perform this Agreement including the instruments and documents to be executed and delivered by it pursuant hereto ("Purchaser's Transaction Documents," collectively with the Seller's Transaction Documents, the "Transaction Documents"). Such execution, delivery, performance and

consummation have been duly authorized by all necessary action, corporate or otherwise, on the part of Purchaser, its members and managers.

(iii)     Purchaser's Transaction Documents, when executed by Purchaser, constitute the valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as limited by bankruptcy, insolvency, reorganization and other laws now or hereafter in effect affecting creditors' rights and remedies or by equitable principles.

(iv)     The authorization, execution and delivery of this Agreement and the Purchaser's Transaction Documents and the consummation of the transactions contemplated hereby and thereby by the Purchaser, do not and will not, with or without the giving of notice or passage of time or both (A) violate, conflict with or result in the breach of any term or provision of or require any notice, filing or consent under (i) the articles of organization or operating agreement of the Purchaser or (ii) any statutes, laws, rules, regulations, ordinances, licenses or permits of any governmental body, authority or agency applicable to the Purchaser or (iii) any judgment, decree, writ, injunction, order or award of any arbitrator, court or governmental body, authority or agency binding upon the Purchaser; or (B) conflict with, result in the breach of any term or provision of, require any notice or consent under, give rise to a right of termination of, constitute a default under, result in the acceleration of, or give rise to a right to accelerate any obligation under any loan agreement, mortgage, indenture, financing agreement, lease or any agreement or instrument of any kind to which the Purchaser is a party or by which the Purchaser may be bound.

(b)     All of the foregoing representations and warranties shall be true, correct and complete in all material respects, both as of the date hereof and as of the Closing Date, and Purchaser shall certify in writing at Closing that each and all of said representations and warranties are true, correct and complete as of and with respect to that date as herein provided.

8.     Condition of Title and Survey.

(a)     The Real Property shall be conveyed to Purchaser by a special warranty deed to be delivered to Purchaser at Closing, free and clear of all liens and encumbrances, subject only to (i) real estate taxes and assessments not yet due and payable; (ii) easements, restrictions and other conditions of record not objected to by Purchaser pursuant to this Section 8; (iii) the rights of residents pursuant to their occupancy agreements; and (iv) applicable zoning and use laws and regulations to the extent the same are not violated by the improvements located at the Real Property (collectively, "Permitted Exceptions"). Purchaser shall order a title insurance commitment for a title insurance policy ("Title Commitment") from the Title Company within ten (10) business days of the date hereof. In addition, Purchaser shall have the right to order a new or updated survey for the Property ("Survey") and a new zoning report for the Property ("Zoning Report"), which order shall be placed within ten (10) business days after Seller delivers an existing survey and zoning report for the Property to Purchaser (if such items are available). On or before fifteen (15) days after receipt of both the Title Commitment, Survey and Zoning Report ("Title Objection Date"), Purchaser shall have the right to notify Seller of any matters shown on the Title Commitment, Survey and/or Zoning Report that are not acceptable to Purchaser other than the Permitted Exceptions (such exceptions referred to herein as "Title Defects"). If any updates to the Title Commitment, Survey and/or Zoning Report after the Title Objection Date shall disclose any additional matters, Purchaser shall have ten (10) business days from the receipt of such updates within which to notify Seller thereof, in which case any such matters for which Purchaser provides notice shall also be treated as "Title Defects" hereunder.

-11-

(b)     If Seller shall receive written notice of any Title Defect in accordance with Section 8(a), Seller may elect in its sole discretion, by written notice to Purchaser, to either (i) undertake at its expense to cure such Title Defects on or before the Closing, or (ii) not cure such Title Defects. In the event Seller does not respond to Purchaser's written notice of a Title Defect, Seller shall be deemed to have elected not to cure such Title Defect (except for Seller's Monetary Liens). In the event that Seller does not elect to cure (or is deemed not to have elected to cure) such Title Defects pursuant to this Section 8(b), Purchaser may, by notice to Seller delivered prior to Closing terminate this Agreement, in which event the Deposit shall be returned to Purchaser and Seller shall reimburse Purchaser for its out-of-pocket and documented costs of the Title Commitment, Survey and Zoning Report.  In the event Purchaser does not elect to terminate this Agreement pursuant to the preceding sentence, Purchaser shall be deemed to have waived such Title Defects and such Title Defects, as well as any matters shown in the Title Commitment, Survey or Zoning Report to which Purchaser does not object as permitted herein, shall be deemed as "Permitted Exceptions" hereunder. Notwithstanding the foregoing, Purchaser shall not be required to object to, and Seller shall be required to pay off at the Closing, any financing obtained or assumed by Seller and secured by a mortgage, an assignments of leases and rents, subordination agreements, UCC financing or other liens covering the Property and to either pay off or cause the Title Company to insure or endorse over any mechanic's or materialmen's liens for work or materials undertaken or acquired by or on behalf of Seller or Existing Operator, any tax or judgment lien against Seller, and any other Title Defects that may be cleared through the payment of money (provided, however, Seller shall be entitled to utilize the Purchase Price proceeds to effectuate any or all of the foregoing; all of the foregoing shall be referred to herein as "Seller's Monetary Liens").  Further, any exception relating to rights of others or adverse possession are hereby deemed Title Defects and notice or objection by Purchaser is hereby made without further notice required.

(c)     To the extent required by the applicable governmental authority in connection with the lawful transfer of the Property to Purchaser or the issuance of the Facility's operating license to New Operator, Seller shall obtain or cause Existing Operator to obtain prior to Closing a certificate of occupancy as to the Real Property and shall deliver same to Purchaser prior to or at the Closing.  If there are any municipal violations affecting the Real Property, Seller shall correct or cause Existing Operator to correct and remove such violations prior to Closing, and Seller shall be required to pay any fines or penalties associated therewith.

9.     Conditions Precedent to Obligations of Purchaser.  The obligations of Purchaser under this Agreement are subject to, and shall be conditioned upon, the satisfaction (or the waiver in writing by Purchaser) prior to, or as of, the Closing Date of each of the following conditions:

(a)     Compliance by Seller and Representations Correct.  All of the covenants and obligations of this Agreement to be complied with and performed by Seller at or before the Closing Date shall have been complied with and performed in all material respects, and the representations and warranties made by Seller in this Agreement shall be true, correct and complete in all material respects, both as of the date hereof and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date.

(b)     Seller Transaction Documents.  Seller shall have delivered to the Title Company or Purchaser, as applicable, all of the documents, instruments, agreements and deliverables set forth in Section 11(a) below.

(c)     No Legal Action.  No action, suit, investigation, other proceeding or claim shall have been instituted before any court or before or by any government or governmental agency or instrumentality against any of Seller, Existing Operator or the Facility that would materially adversely affect the operation or financial condition of the Property, nor shall there be any actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against any of Seller, Existing Operator or the Facility, to restrain or prohibit or would make illegal the consummation of the transactions contemplated hereby.

(d)     Closing Under the OTA.  All conditions to New Operator's obligation to consummate the closing under the OTA shall have been satisfied (other than those conditions that by their nature are to be satisfied at the closing of the OTA, each of which is capable of being satisfied at the Closing under this Agreement) and the OTA closing shall take place simultaneously with the Closing under this Agreement.

(e)     No Material Damages, etc.  The Property shall not have been materially damaged as a result of fire, explosion, disaster, condemnation, accident, or any other similar material event or occurrence.

(f)     Title Policy.  Upon payment of the premium therefor, the Title Company shall be prepared issue its title policy, dated the Closing Date, insuring that, upon Closing, Purchaser will acquire good and marketable fee simple title to the Real Property, free and clear of all liens and encumbrances except for Permitted Exceptions or liens created by Purchaser.

(g)     Permits, Consents, etc.  All actions by (including any authorization, consent or approval) or in respect of (including notice to), or filings with, any governmental authority or other person that are required to consummate the transactions contemplated under this Agreement or the OTA, including the License Approval, shall have been obtained, provided that no such authorization, consent or approval shall have been revoked.

(i)     No Material Adverse Effect.  Since the date hereof, there shall have been no event or series of events which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(j)     Receivership.  Seller shall have received a final and unappealable court order whether under the state court receivership or by the Bankruptcy Court which allows for the sale of the assets described in the OTA to Purchaser or its affiliate free and clear of all liens and pre-closing Nursing Home Assessment liability ("Receivership Sale Order").

10.     Conditions Precedent to Obligations of Seller.  The obligations of Seller under this Agreement are subject to, and shall be conditioned upon the satisfaction (or the waiver in writing by Seller) prior to, or as of, the Closing Date of each of the following conditions:

(a)     Compliance by Purchaser and Representations Correct.  All of the covenants and obligations of this Agreement to be complied with and performed by Purchaser at or before the Closing Date shall have been complied with and performed in all material respects, and the representations and warranties made by Purchaser in this Agreement, shall be correct in all material respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date.

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

(b)     _Purchaser Transaction Documents_.  Purchaser shall have delivered to the Title Company or Seller, as applicable, all of the documents, instruments, agreements and deliverables set forth in Section 11(b) below.

(c)     _Closing Under the OTA_.  All conditions to Existing Operator's and Receiver's obligation to consummate the closing under the OTA shall have been satisfied (other than those conditions that by their nature are to be satisfied at the closing of the OTA, each of which is capable of being satisfied at the Closing under this Agreement).

(d)     _Permits, Consents, etc_.  All actions by (including any authorization, consent or approval) or in respect of (including notice to), or filings with, any governmental authority or other person that are required to consummate the transactions contemplated under this Agreement or the OTA, including the License Approval, shall have been obtained, provided that no such authorization, consent or approval shall have been revoked.

(f)     _Receivership_.  Seller shall have received the Receivership Sale Order.

11.     Deliveries at Closing.

(a)     Seller shall deliver to Purchaser or, if applicable, to the Title Company to be held in escrow in accordance with the terms of this Agreement, on or before the Closing Date the following, each of which shall be in form and substance required herein or as otherwise reasonably satisfactory to Purchaser:

(i)     A Special Warranty Deed for the Real Property, duly executed by Seller, in substantially the form of Exhibit C attached hereto and made a part hereof;

(ii)     A Bill of Sale and Assignment, duly executed by Seller, substantially in the form of Exhibit D attached hereto and made a part hereof;

(iii)     A termination of the Existing Lease duly executed by Seller, Existing Operator and Receiver;

(iv)     A FIRPTA Certificate, duly executed by Seller, substantially in the form of Exhibit E attached hereto and made a part hereof;

(v)     A Closing certificate, duly executed by Seller, substantially in the form of Exhibit F attached hereto and made a part hereof;

(vi)     A duly executed counterpart of the Indemnification Escrow Agreement substantially in the form of Exhibit H attached hereto and made a part hereof;

(vii)     Intentionally Omitted.;

(viii)     A Closing statement setting forth all adjustments to the Purchase Price contemplated herein duly executed by Seller (the "Closing Statement");

(ix)     A complete set of keys for the buildings located on the Real Property, appropriately tagged for identification;

-14-

(x) Such title affidavits, transfer tax forms and other documents as are customarily provided by sellers of commercial property comparable to the Property or as may be required by the Title Company in connection with the conveyance of the Property, duly executed by Seller and in form and substance reasonable satisfactory to the Title Company; and

(xi) Such further documents, instruments and agreements as are contemplated herein or as reasonably requested by Purchaser.

(b) At Closing, Purchaser shall deliver the Purchase Price to the Title Company in accordance with the provisions set forth herein, together with an original counterpart of the following:

(i) The Closing Statement;

(ii) A Closing certificate substantially in the form and substance of Exhibit G, attached hereto and made a part hereof;

(iii) A duly executed counterpart of the Indemnification Escrow Agreement substantially in the form of Exhibit H attached hereto and made a part hereof; and

(iv) Such title affidavits, transfer tax forms and other documents as are customarily provided by purchasers of commercial property comparable to the Property or as may be required by the Title Company in connection with the conveyance of the Property, duly executed by Purchaser and in form and substance reasonable satisfactory to the Title Company

(v) Such further documents, instruments and agreements as are contemplated herein or as reasonably requested by Seller.

12. Casualty and Condemnation.

(a) Casualty. The risk of loss or damage to the Property by fire or other casualty until the Closing shall be the responsibility of the Seller. The Seller shall give the Purchaser prompt notice of any damage or destruction to all or any portion of the Property which materially adversely affects the ordinary operations of the Facility and thereafter shall promptly notify Purchaser (i) whether Seller shall fully repair and restore such damage or destruction to not less than its prior condition prior to the Closing Date and (ii) the amount of insurance proceeds available for such repair and restoration and the amount of any deductible associated therewith. If Seller so elects (or is required as aforesaid) to fully repair and restore such damage or destruction prior to the Closing Date, the completion of such repairs and restoration shall be a condition precedent to Closing, provided that Seller may extend the Closing Date for up to sixty (60) days to complete such repairs and restoration. If Seller elects not to make such repairs, the Purchaser may, by written notice given to the Seller not more than ten (10) days after receipt of Seller's notice, terminate this Agreement, in which event, this Agreement shall cease, terminate and come to an end, and the Deposit shall be returned to the Purchaser and neither Party shall have any rights or liabilities against or to the other except as expressly set forth herein.

(b) In the event this Agreement has not been terminated in accordance with the provisions of paragraph (a) above, then the Parties shall proceed to the Closing and (i) the Seller shall assign to the Purchaser its right to receive all insurance proceeds available for the aforesaid repairs and

restoration and (ii) the Purchaser shall receive a credit against the Purchase Price at Closing in an amount equal to the deductible associated with the aforesaid insurance proceeds.

(c)     Condemnation.  The Seller shall give the Purchaser prompt notice of any actual or threatened taking or condemnation of all or any portion of the Property.  If, prior to the Closing, there shall occur a taking or condemnation of all or any portion of the Property, or a deed has been given in lieu thereof, or, if there is pending any proceeding in condemnation or eminent domain for the taking or use of all or any part of the Property, then, in such event, the Purchaser may, at its option, terminate this Agreement by written notice given to the Seller within ten (10) days after the Purchaser has received the notice referred to above or at the Closing, whichever is earlier.  In the event the Purchaser terminates this Agreement pursuant to this paragraph, this Agreement shall cease, terminate and come to an end, the Deposit shall immediately be returned to the Purchaser and neither Party shall have any rights or liabilities against or to the other except as expressly set forth herein.

(d)     In the event this Agreement has not been terminated in accordance with the provisions of paragraph (c) above, then the Parties shall proceed to the Closing and the Purchaser shall receive a credit against the Purchase Price at Closing in an amount equal to the proceeds of any condemnation award received by the Seller (less Seller's reasonable costs and expenses of obtaining such award), and, to the extent there shall be any remaining award to be paid, Seller shall execute and deliver such assignment to Purchaser of Seller's right, title and interest in and to such award as shall be reasonably and mutually acceptable to Purchaser and Seller. This provision shall survive the Closing.

(e)     This Section is an express provision with respect to destruction and eminent domain and is intended to supersede any applicable statute regarding risk of loss.

13.     Termination.

(a)     In addition to the express provisions contained herein regarding termination of this Agreement, this Agreement may be terminated at any time prior to the Closing Date by:

(i)     Seller, in the event of a breach or default by Purchaser of any of its covenants, representations or warranties set forth in this Agreement or in the event of a breach or default by New Operator of any of its covenants, representations or warranties set forth in the OTA, in each case, that is not cured within thirty (30) days' of receipt of written notice of such breach or default from Seller. If Purchaser timely cures such breach or default, then Seller shall not be entitled to terminate this Agreement pursuant to this subsection;

(ii)     Purchaser, in the event of a breach or default by Seller of any of its covenants, representations or warranties set forth in this Agreement or in the event of a breach or default by Existing Operator of any of its covenants, representations or warranties set forth in the OTA, in each case, that is not cured within thirty (30) days' of receipt of written notice of such breach or default from Purchaser. If Seller timely cures such breach or default, then Purchaser shall not be entitled to terminate this Agreement pursuant to this subsection;

(iii)     Seller, if any condition precedent to Purchaser's obligation to consummate the Closing have not been satisfied by the Closing Date and Seller has not waived the conditions that were not satisfied on or before the Closing Date, or Purchaser, if any condition precedent to Seller's obligation to consummate the Closing have not been satisfied by the Closing

-16-

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

Date and Purchaser has not waived the conditions that were not satisfied on or before the Closing Date. Notwithstanding the foregoing, (1) subsection (i) of this Section 13(a) shall govern if the failure of such condition precedent is due to a breach or default by Purchaser of any of its covenants, representations or warranties set forth in this Agreement or a breach or default by New Operator of any of its covenants, representations or warranties set forth in the OTA and (2) subsection (ii) of this Section 13(a) shall govern if the failure of such condition precedent is due to a breach or default by Seller of any of its covenants, representations or warranties set forth in this Agreement or a breach or default by Existing Operator of any of its covenants, representations or warranties set forth in the OTA;

    (iv) Purchaser, if any condition precedent to Purchaser's obligation to consummate the Closing has not been satisfied by the Closing Date and Purchaser has not waived the conditions that were satisfied on or before the Closing Date. Notwithstanding the foregoing, (1) subsection (i) of this Section 13(a) shall govern if the failure of such condition precedent is due to a breach or default by Purchaser of any of its covenants, representations or warranties set forth in this Agreement or a breach or default by New Operator of any of its covenants, representations or warranties set forth in the OTA and (2) subsection (ii) of this Section 13(a) shall govern if the failure of such condition precedent is due to a breach or default by Seller of any of its covenants, representations or warranties set forth in this Agreement or a breach or default by Existing Operator of any of its covenants, representations or warranties set forth in the OTA; and

    (v) Purchaser, in accordance with the provisions of Section 3(a).

    (b) If this Agreement is terminated by Purchaser pursuant to Section 13(a)(v) above, Purchaser shall be entitled to the return of the Deposit, whereupon this Agreement shall terminate and be of no further force or effect, except as otherwise set forth herein. In the case of a Seller or Existing Operator default which would give the Purchaser the right to terminate this Agreement pursuant to Section 13(a)(ii) above, Purchaser shall be entitled to either (x) terminate this Agreement pursuant to Section 13(a)(ii) above, whereupon Seller shall cause the Title Company to promptly return the Deposit to Purchaser and Seller shall reimburse Purchaser for its actual, direct and reasonable out-of-pocket costs in connection with this Agreement and the OTA and upon payment of such amounts, this Agreement shall terminate and be of no further force or effect, except as otherwise set forth herein, or (y) seek specific performance and/or injunctive relief through an action to be instituted within one year of the date of the scheduled Closing. If this Agreement is terminated by Seller pursuant to Section 13(a)(i) above, the Seller shall be entitled to retain the Deposit which shall be paid to Seller by the Title Company as liquidated damages for Purchaser's default and as Seller's exclusive remedy. Each party acknowledges and agrees that (i) Seller will suffer substantial damages as a result of a termination of this Agreement due to Purchaser's default, (ii) that Seller's damages, while substantial, are incapable of being determined with precision and (iii) the Deposit is a reasonable and fair estimate of Seller's damages resulting from Purchaser's default.

    (c) The Parties expressly agree that the OTA shall be cross defaulted with this Agreement, such that (i) any default or breach by New Operator under the OTA shall be deemed a default by Purchaser hereunder and (ii) any default or breach by Existing Operator under the OTA shall be deemed a default by Seller hereunder. This Agreement shall terminate in the event that the OTA is terminated in accordance with its terms.

    (d) This Section 13 shall survive the Closing or the earlier termination of this Agreement.

Case 1:26-bk-00118-HWV Doc 175-1 Filed 05/04/26 Entered 05/04/26 18:46:29 Desc Exhibit A Page 18 of 42

14.     Indemnification

(a)     Purchaser's Indemnity.   Seller shall indemnify and defend Purchaser and Purchaser's officers, agents, representatives, employees, heirs, successors and assigns and hold them harmless against and with respect to any and all damage, loss, liability, cost and expense (including, without limitation, reasonable attorney's fees and expenses) (all of the foregoing hereinafter collectively referred to as "Loss" or "Losses") resulting from (i) any third party, including governmental, claim arising from or relating to the Property during the period prior to and ending on the Closing Date, (ii) Seller's failure to pay, discharge or perform any of the Excluded Liabilities, (iii) the failure of any representation or warranty of Seller set forth in this Agreement to be true and correct at and as of the Closing Date as though such representations and warranties were made at and as of such date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date), (iv) the failure of Seller to comply with any covenant or obligation set forth herein, and (v) all indemnification obligations of the Existing Operator under the OTA.

(b)     Seller's Indemnity.   Purchaser shall indemnify and defend Seller and its officers, agents, representatives, employees, heirs, successors and assigns and hold them harmless against and with respect to any and all Losses resulting from (i) any third party, including governmental, claim arising from or relating to the Property during the period from and after the Closing Date, (ii) the failure of any representation or warranty of Purchaser set forth in this Agreement to be true and correct at and as of the Closing Date as though such representations and warranties were made at and as of such date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date), and (iii) the failure of Purchaser to comply with any covenant or obligation set forth herein.

(c)     Indemnity Claims.  If any claim ("Claim") is asserted by a Party entitled to indemnification hereunder, such Party (an "Indemnified Party") shall notify (a "Claims Notice") the Party (an "Indemnifying Party") required by the terms of this Agreement to indemnify the Indemnified Party within ten (10) business days; provided, however, the failure or delay by an Indemnified Party to give prompt notice of any Claim (if given prior to the expiration of any applicable survival periods) shall not release, waive or otherwise affect an Indemnifying Party's obligations with respect to the Claim, except to the extent that the Indemnifying Party can demonstrate actual material loss or prejudice as a result of such failure or delay.

(i)     The Claims Notice shall describe the Claim and the specific facts and circumstances in reasonable detail, shall include copies of any notices received by Indemnified Party relating to such Claim, and shall indicate the amount, if known, or an estimate, if possible, of Losses that have been or may be incurred or suffered.

(ii)     The Indemnifying Party shall defend and may compromise (subject to the limitations set forth below) any claim by a third party ("Third Party Claim"), at its own expense and by its own counsel, who shall be reasonably acceptable to the Indemnified Party.  The Indemnified Party may participate, at its own expense, in the defense of any Third Party Claim assumed by the Indemnifying Party. Without the approval of the Indemnified Party, which approval shall not be unreasonably withheld or delayed, the Indemnifying Party shall not compromise a Third Party Claim defended by the Indemnifying Party which would require the Indemnified Party to perform or take any action or to refrain from performing or taking any action, pay any amount not paid upon settlement by the Indemnifying Party or admit to any wrongdoing or violation of applicable law.

-18-

(iii)     If, within ten (10) business days of the Indemnifying Party's receipt of a claim notice involving a Third Party Claim, the Indemnifying Party has not notified the Indemnified Party that the Indemnifying Party will assume the defense or, following such notification, Indemnifying Party fails to actively and diligently defend such Third Party Claim, the Indemnified Party may assume control of the defense or compromise of such Claim, and the costs and expenses of such defense, including costs of investigation and reasonable attorneys' fees, shall be added to the Losses associated with the Claim. The Indemnified Party shall have the right to compromise such Claim without the consent of the Indemnifying Party.

(iv)     The Party assuming the defense of any Claim shall keep the other Party reasonably informed at all times of the progress and development of the Party's defense of and compromise efforts related to such Claim and shall furnish the other Party with copies of all relevant pleadings, correspondence and other papers. In addition, the Parties shall cooperate with each other, and make available to each other and their representatives all available relevant records or other materials required by them for their use in defending, compromising or contesting any Claim.

(d)     Survival; Limitations on Indemnity.

(i)     The indemnification obligations of each of the Parties contained in this Agreement shall survive the Closing for a period of one (1) year.  Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the Indemnified Party to the Indemnifying Party prior to the expiration date of such survival period shall not thereafter be barred by the expiration of the survival period and such claims shall survive until finally resolved.

(ii)     The rights of indemnity provided by this Agreement, including this Section 14, shall be the sole and exclusive remedy of the Parties notwithstanding any other rights and claims, whether created by law or otherwise, the Parties may have relating in any way to the subject matter of this Agreement.

(iii)     Each Indemnified Party shall take, and cause its affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto; provided, however, that any failure to mitigate shall not affect the obligations of the Indemnifying Party hereunder, except to the extent such failure to mitigate has increased Indemnifying Party's costs or otherwise prejudiced or harmed Indemnifying Party's position.

15.     Security.  Indemnification Escrow.  To secure Seller's indemnification obligations under this Section 14 and Article V of the OTA, at Closing, Seller shall deliver an amount equal to the sum of $100,000 (collectively, the "Indemnification Escrow") shall be deposited by Seller in escrow at Closing with the Title Company, or such other agent as agreed to by the Parties ("Indemnity Escrow Agent"), to be held in accordance with this Section 14(e) and pursuant to an Indemnification Escrow Agreement in the form attached as Exhibit H hereto (the "Indemnification Escrow Agreement"). The Parties acknowledge that in no event shall Seller's obligations in connection with any Claim or Loss exceed the Indemnification Escrow, it being understood that Seller's indemnification obligations are capped at the Indemnification Escrow Amount.

16.     Confidentiality.

(a)     Each of the Parties hereto recognizes and acknowledges that, during the course of negotiations in connection with this Agreement and in preparation for the Closing hereunder, each Party has disclosed and will disclose to the other Party and its representatives, confidential and proprietary information, including, without limitation, books and records, documents and information concerning its and its affiliates' business activities, owners, finances, plans, and practices (collectively, the "Confidential Information"), all of which constitute and will constitute valuable, special and unique assets of the disclosing Party.  Each Party agrees not to disclose any Confidential Information of the other to any third party, except as provided herein or as required by law.  In addition, each Party agrees to disclose Confidential Information of the other only to its agents, consultants and representatives who have a legitimate need to know such information and who shall: (i) be advised of the confidentiality provisions of this Agreement; and (ii) agree to be bound by the confidentiality provisions hereof.

(b)     Each Party hereby acknowledges that if any breach of this section occurs, the other Party would be irreparably and immediately harmed and could not be made whole by monetary damages.  Accordingly, in addition to any other remedy to which it may be entitled in law or in equity, each Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and/or to compel specific performance of this Section, and the other Party shall not oppose the granting of such relief on the basis that monetary damages are adequate.  Each Party also agrees to reimburse the other Party for all reasonable costs and expenses, including reasonable attorney's fees, incurred by such Party in enforcing obligations under this Section.

(c)     Confidential Information does not include all or any portion of information which (i) becomes generally available to the public other than as a result of a breach of this Section by the receiving Party, or (ii) was or becomes rightfully available to on the receiving Party a non-confidential basis from a source other than the disclosing Party or its representatives; provided, that such source is not prohibited from disclosing such information to the receiving Party by a contractual, legal or fiduciary obligation to the disclosing Party or its representatives.

(d)     Notwithstanding any other provision of this Agreement, the terms of this Section shall survive the termination of this Agreement.

17.     Break-Up Fee.

(a)     Acknowledgment of Stalking Horse Status.  Seller and Purchaser acknowledge that Purchaser has agreed to enter into this Agreement and serve as the "stalking horse bidder" in connection with a coordinated sale process involving (i) the sale of the Property by Seller and (ii) a related sale of the Facility assets located on the Property, and that Purchaser's execution of this Agreement has conferred a material benefit upon Seller by establishing a floor value for the Property and facilitating a competitive sale process.

(b)     Break-Up Fee Obligation.  Seller agrees that, if this Agreement is terminated in accordance with its terms following the approval by the Bankruptcy Court of a higher or otherwise better bid for the Property (a "Superior Property Transaction"), or if this transaction does not close other than for the intentional material default of Purchaser, Seller shall pay Purchaser a break-up fee in the amount of Eight Hundred Thousand Dollars ($800,000) (the "Break-Up Fee"). The Break-Up Fee shall be deemed earned and payable only if (i) this Agreement is terminated to permit Seller to consummate a Superior Property Transaction; and Seller consummates such Superior Property

Transaction; or (ii) this Agreement does not close for any reason other than the intentional material default of Purchaser. Seller agrees and acknowledges that the Break-Up Fee is reasonable and necessary to induce Purchaser to enter into this Agreement; the Break-Up Fee represents liquidated damages and not a penalty; and the Break-Up Fee constitutes an actual and necessary cost of effectuating a value-maximizing transaction.

(c)  Payment. The Break-Up Fee shall be paid from the proceeds of the closing of the Superior Property Transaction as a cost of sale and simultaneously with such closing or by the Seller if this transaction does not close for any reason other than as a result of the intentional material default by Purchaser.

(d)  No Estate Liability. Notwithstanding anything to the contrary, the Break-Up Fee shall be payable solely by Seller and shall not: be an obligation of the Existing Operator or its Estate, be payable from property of such Estate, or constitute an administrative expense claim against the Estate.

(e)  Exclusive Remedy. If earned, payment of the Break-Up Fee shall constitute Purchaser's sole and exclusive remedy against Seller arising from termination of this Agreement in connection with a Superior Property Transaction or default.

18.  Drafting. The Parties hereto have carefully reviewed and negotiated the terms of this Agreement and the Transaction Documents, and Seller and Purchaser hereby acknowledge and agree that they have had a full and fair opportunity to review and negotiate the Agreement and the Transaction Documents with the advice of its counsel. Therefore, there shall be no presumption in favor of the non-drafting party.

19.  Costs and Expenses.

(a)  Except as expressly otherwise provided in this Agreement, each Party shall bear its own costs and expenses in connection with this Agreement and the transactions contemplated hereby.

(b)  Purchaser shall pay the cost of any title examination, the Title Commitment, the new or updated Survey and title insurance premium, and Purchaser and Seller shall split evenly the cost of any transfer or conveyance taxes, and/or deed transfer tax required for the transfer of the Property to Purchaser, except that Seller shall be responsible for any and all costs, expenses and prepayment penalties due to Seller's lender, and the preparation and recording of such releases and such instruments as are appropriate to present clear title as required herein. Each Party shall be responsible for its own counsel fees in the fulfilling of the obligations under this Agreement. All other closing costs of whatever kind or nature shall be paid by Purchaser or Seller, as applicable, pursuant to local custom (as indicated by the Title Company).

20.  Benefit and Assignment. This Agreement binds and inures to the benefit of each Party and its successors and proper assigns. Neither Party shall be permitted to assign its rights or obligations under this Agreement without the prior consent of the other Party; provided, however, that effective as of Closing, Purchaser may assign all of its rights, obligations and interests hereunder to any of its affiliates and Purchaser may collaterally assign this Agreement and/or Purchaser's rights hereunder to its lender.

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

21. Effect and Construction of this Agreement. The captions used herein are for convenience only and shall not control or affect the meaning or construction of the provisions of this Agreement. This Agreement may be executed in one or more counterparts, and all such counterparts shall constitute one and the same instrument. Copies of original signatures sent by facsimile transmission shall be deemed to be originals for all purposes of this Agreement. All gender employed in this Agreement shall include all genders, and the singular shall include the plural and the plural shall include the singular whenever and as often as may be appropriate. When used in this Agreement, the term "including" shall mean "including but not limited to."

22. Waiver, Discharge, etc. This Agreement shall not be released, discharged, abandoned, changed or modified in any manner, except by an instrument in writing executed by or on behalf of each of the Parties hereto by their duly authorized officer or representative. The delay or failure of any Party to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of nor impair any such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

23. Rights of Persons Not Parties. Nothing contained in this Agreement shall be deemed to create rights in persons not Parties hereto, other than the successors and proper assigns of the Parties hereto.

24. Governing Law; Disputes. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard any contrary rules relating to the choice or conflict of laws. The Parties agree that the federal courts in the Commonwealth of Pennsylvania shall have exclusive jurisdiction over any dispute related to this Agreement.

25. Waiver of Jury Trial. EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT, INCLUDING TO ENFORCE OR DEFEND ANY RIGHTS HEREUNDER, AND AGREES THAT ANY SUCH ACTION SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

26. Legal Fees. The prevailing party in any suit or arbitration brought to enforce any of the terms or provisions of this Agreement shall be entitled to recover reasonable attorneys' fees and expenses in any such action or proceeding.

27. Severability. Any provision, or distinguishable portion of any provision, of the Agreement which is determined in any judicial or administrative proceeding to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the Parties waive any provision of law which renders a provision hereof prohibited or unenforceable in any respect.

28. Entire Agreement. This Agreement including the schedules, exhibits and the other Transaction Documents, together with the OTA and the agreements and instruments referenced herein and therein, constitute the entire agreement between the Parties hereto with respect to the

subject matter hereof and thereof, and there are no agreements, understandings, restrictions, warranties, or representations between the Parties with respect to the subject matter hereof other than as set forth herein or therein.

29.     Post-Closing Assistance.  After the Closing, each Party (a "Requesting Party") shall, from time to time, upon written request therefor, execute and deliver to any other Party, any confirmatory instruments which such Requesting Party may reasonably request in order to consummate the transactions contemplated under this Agreement and/or under the Transaction Documents.

30.     1031 Exchange.  Purchaser may consummate the purchase or sale of the Property as part of a so-called like kind exchange (the "Exchange") pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended (the "Code"), provided that:  (a) the Closing shall not be delayed or affected by reason of the Exchange; (b) Purchaser shall pay any additional costs that would not otherwise have been incurred had Purchaser not consummated an Exchange; and (d) neither party's acquiescence to an Exchange shall affect or diminish in any manner its rights hereunder nor shall the party not performing an Exchange be responsible for compliance with or be deemed to have warranted to the other party that the Exchange in fact complies with Section 1031 of the Code.

31.     Notices.  All notices provided for herein shall be made either by (a)(i) by hand delivery, (ii) by certified or registered mail and deposited in the U.S. Mail, postage prepaid, or (iii) by reputable overnight delivery service making delivery against a signed receipt, **and** (b) by email transmission to the following addresses:

To Seller:

> **590 5ᵀᴴ AVENUE, LLC**
> 6300 Wilshire Blvd. #1800
> Los Angeles, CA 90048
> Attn: Ira     Semdra
> Email:  Ir   a@thearbagroup.com
>
>
> By: _____

with a copy to:

> CAPOZZI ADLER, PC
> 355 N 21st Street, Suite 205
> Camp Hill, PA 17011
> Attn:  Craig I. Adler, Esquire
> Email:craiga@capozziadler.com

To Purchaser:

> **590 SOUTH FIFTH PROPCO LLC**
> 111 S Franklin Avenue, Unit 1360
> Valley Stream, NY 11582
> Att'n: Joseph Glatzer
> Email: jglatzer@phg-us.com

with a copy to:

> NBC Law LLP
> The Chrysler Building
> 430 Lexington Avenue
> New York, NY 10017
> Attn:   Brett Burnbaum, Esq.
> Email:  bburnbaum@nbclaw.com

Either Party may upon notice to the other change its address for the receipt of notices.  Any notices sent as provided herein shall be deemed delivered when actually received, when delivery is refused by the intended recipient, or when delivery is first attempted but cannot be completed due to the intended recipient's failure to provide notice of a change in address.  Any notices required hereunder may be delivered to each Party or each Party's respective counsel by email or fax transmission without the need to deliver a hard copy of the same.

**[Signatures on Next Page]**

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the date first set forth.

**SELLER:**

**590 SOUTH 5TH AVENUE, LLC**

By: _Ira Smedra_
Name: Ira Smedra
Title: President

With a copy to:

By: _____
Name:
Title:

**PURCHASER:**

**590 SOUTH FIFTH PROPCO LLC**

By: _____
Name: David Gamzeh
Title: DG

With a copy to:

By: _____
Name:
Title:

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

## EXHIBITS AND SCHEDULES

| | | |
|---|---|---|
| Exhibit A | - | Description of Real Property |
| Exhibit B | - | Deposit Escrow Agreement |
| Exhibit C | - | Form of Warranty Deed |
| Exhibit D | - | Form of Bill of Sale and Assignment |
| Exhibit E | - | Form of FIRPTA Certificate |
| Exhibit F | - | Form of Seller Closing certificate |
| Exhibit G | - | Form of Purchaser Closing certificate |
| Exhibit H | - | Form of Indemnification Escrow Agreement |
| | | |
| Schedule 2 | - | Allocation of Purchase Price |
| Schedule 6 | - | Seller's Disclosure Schedule |

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

## EXHIBIT A

## REAL PROPERTY

The land and improvements thereon located at, more particularly described as:

# LEGAL DESCRIPTION

All that certain parcel or tract of land situate on the east side of South Fifth Avenue (S.R. 0897) in South Lebanon Township, Lebanon County, PA shown as Lot #1 on a "Final Minor Subdivision Plan for Lebanon County Commissioners" prepared by Steckbeck Engineering & Surveying, Inc. dated May 14, 2014, recorded on July 11, 2014, in Plan Book 80, at page 66, being more particularly bounded and described as follows to wit:

Beginning at a point on the eastern right-of-way line of South Seventh A venue, said point on the dividing line between the herein described and Lot #2 on the aforementioned plan; thence going along Lot #2 the five following courses and distances; (1) South 83°11'54" East a distance of 116.14' to a point; (2) South 59°28'03" East a distance of 231.49' to a point; (3) South 42° 17'09"East a distance of 107.82' to a point; (4) South 59°48'27" East a distance of 220.76' to a point; (5) South 41°24'58" east a distance of 396.13' to a point on the norther right-of-way line of Metro Drive (T-395); thence going along said right-of-way line the two following courses and distances: (1) along the arc of a circle turning to the right with an arc length of 78.01', 'with a radius of 2262.01' (erroneously set forth as 2156.82' on Plan recorded in Plan Book 80, page 60), with a chord bearing of South 49°34'19" West, with a chord length of 78.01' to a point; (2) South 50°33'35" West a distance of 992.28' to a point on the eastern right-of-way line of South Fifth Avenue (S.R. 0897); thence going along said right-of-way line the three following courses and distances; (1) North 39°22'14" West a distance of 592.50' to a point; (2) along the arc of a circle turning to the left with an arc length of 261.55', with a radius of 746.19', with a chord bearing of North 49°24'44" West, with a chord length of 260.22' to a point; (3) North 59°27'14" West a distance of 488.43' to a point on the southern right-of-way line of vacated Apple Alley; thence going along said right-of-way line, North 81°33'19" East a distance of 960.64' to a point; thence going along lands of Shenedoah Podolak, North 08° 17'41" West a distance of 140.00' to a point on the southern right-of-way line of East High Street; thence going along said right-of-way line, North 81 °33'19" East a distance of 70.50' to a point on the eastern right-of-way line of South Seventh Avenue; thence going along said right-of-way line, North 08°26'41" West a distance of 136.04' to the point of beginning.

CONTAINING in area: 23.689 acres.

The above description also being set forth on ALTA/ACSM Land Title Survey by Steckbeck Engineering & Surveying, Inc. dated December 17, 2014, #1599-14-001.

TOGETHER WITH the following permanent easements for the benefit of Grantee and its assigns:

(a) The underground electrical line and control panel easement along South Seventh Avenue, as depicted on the Final Minor Subdivision Plan recorded in Plan Book 80, Page 66, drawing attached as Exhibit "1" to the Deed recorded in Lebanon County Record Book 2205, Page 6203. Grantee shall have access to the easement area for purpose of providing

and maintenance or repairs to the lines withing the easement and shall promptly restore the area after effecting any such maintenance or repairs; and

(b) The Storm Drainage Easement along the north side of the Lebanon County Prison, as depicted on the Final Minor Subdivision Plan recorded in Plan Book 80, Page 66, drawing attached as Exhibit "1" to the Deed recorded in Lebanon County Record Book 2205, Page 6203. Each party shall bear the cost and responsibility of any needed maintenance and repairs to the storm water drainage facilities on their respective properties.

Grantee agrees to indemnify and hold Grantor and its agents and subsidiaries harmless from and against, and to reimburse the Grantor with respect to any claim, loss, damage, liability, cost or expense which may be sustained or suffered by reason of Grantee's activities under these easements. Grantee shall promptly restore any damage that occurs as a result of its activities pursuant to the easements.

RESERVING, HOWEVER, a permanent easement for the benefit of Grantor and its assigns, the sanitary sewer easement on the north side of the conveyed property depicted on the Final Minor Subdivision Plan recorded in Plan Book 80, Page 66, drawing attached as Exhibit "1" to the Deed recorded in Lebanon County Record Book 2205, Page 6203.

ALSO RESERVING, HOWEVER, a temporary, non-exclusive access easement on the existing driveway from Metro Drive (T-395) as depicted on Exhibit 1, to provide access to the south side of the Lebanon County Correctional Facility. This easement shall automatically terminate on October 1, 2016, and no further instrument shall be required to be executed or recorded in order to evidence the termination of this easement.

Grantor agrees to indemnify and hold Grantee and its subsidiaries harmless from and against, and to reimburse the Grantee with respect to any claim, loss, damage, liability, cost or expense which may be sustained or suffered by reason of Grantor's activities under these easements. Grantor shall promptly restore any damage that occurs as a result of its activities pursuant to the easement.

BEING THE SAME PREMISES which County of Lebanon, successor the Directors of the Poor and of the House of Employment for the County Lebanon, a governmental entity by Deed dated December 18, 2014, and recorded December 24, 2014, in Lebanon County Record Book 2205, Page 6203, granted and conveyed unto 590 South 5th Avenue, LLC, a Delaware limited Liability Company.

# EXHIBIT B

## DEPOSIT ESCROW AGREEMENT 3/5/2026

THIS DEPOSIT ESCROW AGREEMENT is dated March ___, 2026, and is by and among 590 South 5th Avenue, LLC, a Delaware limited liability company (the "Seller"), having an address at ABC _____; 590 South Fifth Propco LLC, a New Jersey limited liability company, having an address at 111 S. Franklin Avenue, Unit 1360, Valley Stream, NY 11582 ("Purchaser") (each of the Seller and the Purchaser, a "Party" and, collectively, the "Parties"), and Mid-Penn Abstract Co. (the "Escrow Agent"), having an address at 355 N 21st Street, Suite 205, Camp Hill, PA 17011.

WHEREAS, Purchaser and Seller are concurrently herewith entering into a Purchase and Sale Agreement (the "Purchase Agreement;" terms defined in the Purchase Agreement having the same meaning when used herein) with respect to the sale of substantially all of the assets of the Seller relating to the Facility described therein;

WHEREAS, Purchaser has agreed to deliver a good faith deposit to be held in escrow hereunder;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. Purchaser and Seller hereby appoint the Escrow Agent as escrow agent hereunder, and the Escrow Agent hereby accepts such appointment.

2. Concurrently herewith, Purchaser is causing the delivery to the Escrow Agent, and the Escrow Agent acknowledges receipt of, the sum Five Hundred Thousand Dollars ($500,000.00) (the "Deposit"), shall be deposited by the Escrow Agent in an interest bearing account or accounts (such amount being hereinafter referred to as the "Escrow Fund"). The Escrow Agent shall bear no liability for any loss occasioned by investment of the Escrow Fund or by any failure to achieve the maximum possible yield from the Escrow Fund.

3. The Escrow Fund shall be held by the Escrow Agent and shall only be released upon the earliest to occur of any of the following:

(a) At the Closing of the transactions contemplated by the Purchase Agreement, the Escrow Agent shall deliver the Escrow Fund to the Seller with same to be applied to the Purchase Price.

(b) If the Escrow Agent shall receive (i) joint written instructions from Purchaser and Seller or (ii) a certified copy of an order or directive from any court or governmental authority, then, in such event, the Escrow Agent shall release the Escrow Fund to the Party designated therein.

4.      Upon the distribution of the Escrow Fund in accordance with the terms set forth herein, this Agreement shall terminate and the Escrow Agent shall have no further liability or obligation hereunder.

5.      Purchaser and Seller and the Escrow Agent agree and acknowledge as follows:

(a)      The duties and responsibilities of the Escrow Agent shall be limited to those expressly set forth in this Agreement and are ministerial in nature.

(b)      The Escrow Agent shall have the right, but shall not be required, in the event of any dispute, to deposit the Escrow Fund with any court of competent jurisdiction and shall thereafter be released from all of its obligations hereunder.  Escrow Agent shall be reimbursed for all costs and expenses of such action, including reasonable attorney's fees and disbursements, by the Party determined not to be entitled to the Escrow Fund.

(c)      The Escrow Agent is authorized, in its sole discretion, to disregard any and all notices or instructions given by any of the Parties hereto or by any other person, firm or corporation, except such notices or instructions as hereinabove provided for and orders or process of any court entered or issued with or without jurisdiction.  If the Escrow Fund is at any time attached, garnished or levied upon under any court order, or in the event that payment of the Escrow Fund shall be stayed or enjoined by any court order, or in the event that an order, judgment or decree shall be made or entered by any court affecting the Escrow Fund, or any part thereof, then and in any of such events, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree, which it believes to be binding upon it.

(d)      The Escrow Agent shall not be liable to any person, firm or corporation, including any of the Parties hereto, by reason of any error of judgment, or for any act done, or omitted to be done, by it in good faith, or for any mistake of fact or law in connection with this Agreement and the performance thereof unless caused by, or arising out of, its own bad faith, gross negligence or willful misconduct.

(e)      The Escrow Agent shall not be required to institute or defend any action or legal process involving any matter referred to herein which in any manner affects it or its duties or liabilities hereunder unless or until it has received full indemnity in an amount, and of such character, as it shall in its sole discretion require.

(f)      Escrow Agent may resign at any time by giving 30 calendar days prior written notice of such resignation to Purchaser and Seller.  Purchaser and Seller together (but not alone) may terminate the appointment of Escrow Agent hereunder upon prior written notice to Escrow Agent specifying the date upon which such termination shall have effect.  In the event of such resignation or termination, Purchaser and Seller shall within 10 days of such notice jointly appoint a successor Escrow Agent and Escrow Agent shall turn over to such successor Escrow Agent all funds held by it pursuant to the Escrow Agreement and shall execute all instruments evidencing such transfer as may be reasonably requested by Purchaser or Seller.  Upon receipt of the funds, the successor Escrow Agent thereupon shall be bound by all of the provisions hereof and Escrow Agent shall have no further obligation hereunder.

6.      Purchaser and Seller agree to complete the forms necessary to comply with the backup withholding and interest reporting regulations of the Internal Revenue Code of 1986, as amended, or any successor thereto, including, without limitation, Forms W-9, a separate copy of which is to be completed by Purchaser and Seller and delivered to Escrow Agent contemporaneously with the execution and delivery of this Escrow Agreement.

7.      If any term, condition or provisions of this Escrow Agreement, or any application thereof to any circumstance or party hereto, shall ever be held to be invalid or unenforceable, then in each such event the remainder of this Escrow Agreement or the application of such term, condition or provision to any other circumstance or party hereto (other than those as to which it shall be invalid or enforceable) shall not be thereby affected, and each such term, condition and provision hereof shall remain valid and enforceable to the fullest extent permitted by law.

8.      This Escrow Agreement may be executed in any number of counterparts, each counterpart for all purposes being deemed an original, and all such counterparts shall together constitute only one and the same instrument.

9.      All notices or other communications required to be given hereunder shall be in writing and shall be delivered by hand, overnight courier or certified mail, postage prepaid, return receipt requested, and shall be deemed given when received, to the parties hereto at the addresses set forth above or such other address as any party may provide by written notice given in the manner provided herein.

10.      This Agreement represents the entire agreement of the Parties hereto with respect to the matters set forth herein. This Agreement may only be amended or modified by an instrument in writing executed and delivered by each of the Parties hereto. The Escrow Agent shall not be bound by any amendment or modification unless it agrees thereto in writing.

11.      Seller and Purchaser jointly and severally shall reimburse and indemnify Escrow Agent for, and hold it harmless against, any and all loss, liability, costs or expenses in connection herewith, including reasonable attorneys' fees and disbursements, incurred without willful misconduct or gross negligence on the part of Escrow Agent arising out of or in connection with its acceptance of, or the performance of its duties and obligations under, this Agreement, as well as the reasonable costs and expenses of defending against any claim or liability arising out of or relating to this Agreement.

12.      This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day above written.

SELLER:
590 SOUTH FIFTH AVENUE, LLS
a Delaware limited liability company

By: _Ira Smedra_
903030BAD22649C...
Name: Ira Semdra

Title: President

PURCHASER:
590 SOUTH FIFTH PROPCO LLC,
a New Jersey limited liability company

By: _____
AAA1330473D2499...
Name: David Gamzeh

Title: DG

ESCROW AGENT:
MID-PENN ABSTRACT CO.

By: _____
Name: Craig I. Adler
Title: President

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

**EXHIBIT C**

**SPECIAL WARRANTY DEED**

[To follow]

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

# EXHIBIT D

## BILL OF SALE AND ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS THAT, _____ (the "Seller"), for the sum of $10.00 and other good and valuable consideration to it in hand paid by _____, LLC (the "Purchaser"), does by these presents, sell, assign, transfer and convey unto the Purchaser, all of Seller's right, title, and interest, if any, in and to the Personal Property (as such term is defined in that certain Purchase and Sale Agreement dated as of _____, 20___ by and between Purchaser and Seller). Seller hereby covenants that it will, at any time and from time to time upon written request therefor, execute and deliver to Purchaser, its nominees, successors and/or assigns, any new or confirmatory instruments which Purchaser, its nominees, successors and/or assigns, may reasonably request in order to assign and transfer to Purchaser its rights, title and interest in, the Personal Property.

IN WITNESS WHEREOF, the undersigned, being duly authorized, has executed and delivered this instrument effective as of _____, 20___.

_____

By: _____
          Name:
          Title:

# EXHIBIT E

## FIRPTA NON-FOREIGN STATUS CERTIFICATION

BUYER: _____, LLC

SELLER: _____

PROPERTY: _____

Section 1445 of the Internal Revenue Code provides that a transferee (Buyer) of a U.S. real property interest must withhold tax if the transferor (Seller) is a foreign person.  To inform the Buyer that withholding of tax is not required upon its disposition of the above-referenced property, the Seller hereby certifies the following:

1. The Seller is not a foreign person (as such term is defined in Section 1445(f)(3) of the Internal Revenue Code) for purposes of U.S. income taxation.

2. The Seller's U.S. taxpayer identification number is _____

3. The Seller's address is _____.

The Seller understands that this certification may be disclosed to the Internal Revenue Service by the Buyer and that any false statement made herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, the Seller declares that the Seller has examined this certification and to the best of the Seller's knowledge and belief it is true, correct and complete.

Date: _____, 20\_\_\_               _____

By:_____
Name:_____
Title:_____

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

# EXHIBIT F

## SELLER OFFICER'S CERTIFICATE

Pursuant to <u>Section 13(a)(v)</u> of the Purchase and Sale Agreement (the "Agreement"), dated as of _____, 20\_\_\_ between _____ (the "Seller") and _____, LLC (the "Purchaser"), the undersigned, being a duly authorized executive officer of the Seller, does hereby certify that the representations and warranties made by the Seller in the Agreement are true and correct in all material respects as of the Closing Date (as defined in the Agreement) and the covenants to be performed by the Seller pursuant to the Agreement have been performed in all material respects as of the Closing Date (as defined in the Agreement).

_____

By: _____
        Name:
        Title:

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

## EXHIBIT G

## <u>PURCHASER CLOSING CERTIFICATE</u>

       Pursuant to <u>Section 12(b)</u> of the Purchase and Sale Agreement (the "Agreement**"**), dated as of _____, 20___ between _____ (the "Seller") and _____, LLC (the "Purchaser"), the undersigned, being a duly authorized executive officer of the Purchaser, does hereby certify that the representations and warranties made by the Purchaser in the Agreement are true and correct in all material respects as of the Closing Date (as defined in the Agreement) and the covenants to be performed by the Purchaser pursuant to the Agreement have been performed in all material respects as of the Closing Date (as defined in the Agreement).

                          _____, LLC

             By: _____

                 Name:

                 Title:

# EXHIBIT H

## INDEMNIFICATION ESCROW AGREEMENT

[To follow]

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

# SCHEDULE 2

## *ALLOCATION OF PURCHASE PRICE*

Docusign Envelope ID: C49E46A6-36C2-4596-AB3D-8A39D453DF2A

## SCHEDULE 6

## SELLER'S DISCLOSURE SCHEDULE