IN RE:

**CEDAR HAVEN ACQUISITION, LLC,**
Debtor

No. 1:26-bk-00118-HWV

Chapter 11

**OBJECTION OF THE COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT OF HUMAN SERVICES
TO TRUSTEE'S NOTICE OF AUCTION SALE RESULTS AND
MOTION TO APPROVE SALE OF ASSETS FREE AND CLEAR OF
ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS**

The Commonwealth of Pennsylvania, Department of Human Services (alternatively, "Commonwealth" or "DHS"), by and through the Pennsylvania Attorney General, David W. Sunday, Jr., does hereby object as a party in interest to the *Trustee's Notice Of Auction Sale Results And Motion To Approve Sale Of Assets Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests* ("Final Sale Motion") filed by the above-captioned Chapter 11 Trustee (the "Trustee") of Cedar Haven Acquisition, LLC (the "Debtor"), and in support thereof states as follows:

**I.      BACKGROUND**

1.      On January 16, 2026 (the "Petition Date"), court-appointed Receiver Michael Flanagan (the "Receiver") filed, on behalf of the Debtor, a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Pennsylvania (the "Bankruptcy Court"), pending at Case No. 26-00118-HWV (the "Bankruptcy Case").

2.      The Debtor owns and operates a long-term care nursing facility (the "Facility") that is licensed to operate as such facility in the Commonwealth, subject to the laws, rules, and

regulations of the Commonwealth, and participated in, among other programs, the Medical Assistance ("MA") program. The real property where the Debtor operates (the "Real Property") is owned by 590 South 5th Avenue, LLC ("590"). 590 is an affiliate of The Arba Group, LLC ("Arba").

3. Upon Petition by 590 in the Court of Common Pleas of Lebanon County, Pennsylvania, for the appointment of a receiver due to Debtor's financial distress and delinquency of rent, Michael Flanagan was appointed as the Receiver of Cedar Haven Acquisition, LLC, on October 30, 2025. Doc 13.

4. On January 26, 2026, the United States Trustee ("UST") filed a *Motion for an Order Directing the Appointment of a Trustee Under 11 U.S.C. § 1104*. The Debtor consented to the immediate appointment of a Chapter 11 Trustee by stipulation on February 10, 2026. Doc 62.

5. Up until the date of the appointment of a Chapter 11 Trustee, the Receiver was operating the Facility of the Debtor. The Receiver employed The Priority Group, an affiliate of MDA Capital Group, LLC ("MDA"), to manage the day-to-day operations of the Facility. Doc 120, p. 8.

6. Pursuant to The Health Care Facilities Act, 35 P.S. §§ 448.101 – 448.904b, as implemented by Title 28 of the Pennsylvania Administrative Code, the Department of Health of the Commonwealth licenses health care facilities including long-term care nursing facilities. 28 Pa. Code § 51.2.

7. Under the MA program, DHS has the authority to implement a monetary assessment on long-term care nursing facilities located in the Commonwealth. *See* 62 P.S. § 801-A *et seq*. (otherwise referred to as the "Nursing Facility Assessment Program" or "Program"). The purpose of the annual monetary assessment is to generate additional revenues for MA recipients

to have access to medically necessary nursing facilities.  62 P.S. § 802-A, Authorization.

8.	On March 2, 2026, the Trustee filed a *Motion of the Chapter 11 Trustee For Cedar Haven Acquisition, LLC To Set Sale Procedures And To Approve Sale Of Assets And Business Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests*. Doc 120. Objections (collectively, the "Sale Procedures Objections") concerning, among other issues, the tethered sale of Real Property with Debtor's Assets, were timely filed by the UST, Charles Blalack and Stone Barn Management, Premier Healthcare Management LLC, and the Commonwealth (collectively, the "Objecting Parties"). *See* Docs 133, 134, 137, and 138.

9.	The Court heard from all interested parties at a hearing held on March 17, 2026, and directed the Trustee to submit a revised proposed order addressing issues raised in the Sale Procedures Objections. The Court ultimately entered an Order Approving Debtor's Sale Procedures and Setting Final Sale Hearing on March 30, 2026 (the "Revised Sale Procedures"). Doc 158.

10.	While the Objecting Parties had opportunity to review and approve the Revised Sale Procedures, rights were reserved with respect to any objection to the sale until the time of the Final Hearing, scheduled for May 5, 2026. Doc 158, p. 7.

## II.	REVISED SALE PROCEDURES

11.	As provided in the Revised Sale Procedures, the Trustee entered into an agreement with MDA as the stalking horse bidder for the sale of substantially all of the Debtor's assets along with the Real Property owned by 590 for a total price of $27 million. Of the $27 million sale price, $26.9 million was allocated for the real property and $100,000 was allocated for the "Debtor's Assets," which include the "Debtor's Personal Property, Bed Approvals, and Business." Doc 158, p. 3(a). Competing offers could be submitted up until April 29, 2026. Doc 158, p. 3(a).

12.     In the event of one or more Qualified Bids, the Revised Sale Procedures provided that an auction would be conducted on May 1, 2026 (the "Auction"). "At the conclusion of the Auction, the highest and best Qualified Bid received by the Trustee, in his business discretion, unless the Court orders otherwise, shall be deemed the Successful Bidder." Doc 158, p. 3(f).

13.     The Revised Sale Procedures provided that at the conclusion of the Auction, the Trustee would review each Qualified Bid on the basis of financial and contractual terms and factors relevant to the Sale process, and "identify the best bid for the Assets (the "Successful Bid") and the bidder making such best bid (the "Successful Bidder"). Doc 158, p. 3(m).

14.     Furthermore, the Trustee's considerations when determining the highest and best bid (the "Successful Bid") included a bidder's ability to close, whether such bid was likely to meet the criteria under section 365(d) of the Bankruptcy Code for assuming and assigning executory contracts and unexpired leases, and the well-being of the Residents of the Debtor's facility. Doc 158, p. 3(j).

15.     While an auction of the Real Property owned by 590 was contemplated as part of the auction process of the Debtor's Assets, there was no requirement for a Bidder to submit a bid for the Real Property. Doc 158, p. 3(o). No language in the Revised Sale Procedures provided consideration of the price of the Real Property.

16.     As soon as feasible following the conclusion of the Auction, the Trustee was to file a "Notice of Successful Bidder" identifying the Successful Bidder and the Assets proposed to be sold to such Successful Bidder, along with the purchase price. Doc 158, p. 3(m).

## III.     THE AUCTION

17.     More than one Qualified Bid was submitted for the Sale, resulting in the Auction held on May 1, 2026, at 2pm. Interested creditors, including the Commonwealth, were permitted

to attend in an observational capacity only.

18.     Both Qualified Bids were for the Debtor's Assets as well as the non-debtor Real Property. The two bidding parties present were the stalking-horse bidder, the Priority Group, and Jewel Healthcare. Jewel Healthcare's initial bid was in the amount of $27,900,000 with an allocation of $200,000 to the Assets, as stated in the Auction and in the Final Sale Motion. Doc 174, p.31.

19.     The highest bid at the Auction was $40,375,000, submitted by the Priority Group.

20.     The Trustee instructed that once the high bid was determined, each bidding party would then have an opportunity to submit their allocation of purchase price to the Debtor's Assets versus the Real Property. It was also indicated that the Trustee would consult with the sellers of the Real Property before selecting a bid. Upon information and belief, the bidding parties were not fully informed of how allocations would be submitted and considered ahead of time, and counsel for Jewel asked questions and/or expressed concern about the fairness and transparency of the process.

## IV.     THE FINAL SALE MOTION

21.     On May 4, 2026, the Trustee filed the Final Sale Motion, identifying the highest and best offer at a purchase price of $40,375,000.00 submitted by "CCHC." Doc 174, p. 36. While CCHC is not identified in the Final Sale Motion, upon information and belief, CCHC is an affiliate of MDA and/or the Priority Group.

22.     The Final Sale Motion states that Tower Partners, LLC ("Tower") marketed the Debtor's Assets and approached approximately 250 buyers. Doc 174, p. 27. All commissions to Tower are paid from the Real Estate proceeds. Doc 174, p. 40(a).

23.     Despite representations by the Trustee at the Auction that each bidder would have

the opportunity to submit allocations, the Final Sale Motion states that neither bidder "ha[s] yet allocated any value to the Assets." Doc 174, p. 37.

24.     Instead, after negotiations with 590, the Final Sale Motion states that 590 will provide a sum of $2,000,000 (a "Carveout") from the proceeds for the Real Property to be used to pay administrative, priority and unsecured claims. The Trustee asserts that the Carveout is "believed to be higher than any possible allocation" from either of the bidders, although neither bidder appears to have proposed an allocation as stated above. Doc 174, p. 39.

## V.     OBJECTION TO THE SALE AND AGREEMENT

25.     The Commonwealth objects to the Final Sale Motion as proposed because: (i) despite the Revised Sale Procedures, the Auction functioned essentially as a sale of non-debtor Real Property instead of a market-value sale of Debtor's Assets; (ii) the allocation of the purchase price between debtor and non-debtor assets, resulting from a negotiated Carveout from the Real Property sale, is entirely unsupported by evidence, not in accordance with the Revised Sales Procedures and is not in the best interest of the estate, and (iii) the Motion should clarify the transfer of bed approvals.

**The Auction Did Not Comply with
the Revised Sale Procedures as a Sale of Debtor's Assets**

26.     The Commonwealth objects to the Final Sale Motion because the Trustee did not properly adhere to the Revised Sale Procedures in conducting the auction or selecting the Successful Bidder.

27.     When considering the Trustee's Final Sale Motion, the Court must assess whether the Trustee has established sound business judgment for the terms of the proposed sale. The Court may consider factors such as: "any improper or bad faith motive; (2) price is fair and the negotiations or bidding occurred at arm's length, (3) adequate procedure, including proper

exposure to the market and accurate and reasonable notice to all parties in interest." *In re Scimeca Foundation, Inc.*, 497 B.R. 753, 771–72 (Bankr. E.D. Pa. 2013) (citations omitted).

28. After much negotiation with creditors, the Trustee's initial Sale Procedures were revised so that any sale of non-debtor property was adequately severed from the sale of the Debtor's Assets, ensuring an open and transparent arms-length transaction for the sale of the Debtor's Assets. The Revised Sale Procedures were designed to maximize the value of the Debtor's Assets and to provide maximum benefit to the Debtor's Estate.

29. However, the procedures followed in the Auction on May 1, 2026, unequivocally and inappropriately tethered the sale of non-debtor Real Property to Debtor's Assets. At the outset, the Trustee announced that bidders would be required to apportion their total purchase price to Debtor's Assets versus the Real Property, which would then be considered by the Trustee in selecting the Successful Bidder. The procedure for bidders to provide their apportionment—which would only occur after the high total bid was reached—was never explained. Nor was it ever explained how the Trustee would employ that apportionment figure in determining the successful bidder. The rules of the auction were undefined, causing confusion among the bidders.

30. When the high total purchase price was reached (bid by the stalking horse bidder), Jewel (the "Underbidder") inquired whether it would have the opportunity to compete on the apportionment ratio between the Debtor's Assets and the Real Property. The Trustee denied that request, and the Underbidder stated that they objected to the process.

31. Furthermore, despite the fact that the Trustee had just two months prior negotiated a sale price for the Real Property, the Trustee maintained that he would have to consult with the Real Property owners before or simultaneous to considering the apportionments offered by bidders.

32. The Final Sale Motion frames any money from the auction coming into the Debtor's Estate as a "Carveout" from the sale of non-debtor Real Property. Doc 174, p. 38. The Final Sale Motion's description of the Auction Sale Process from p. 27–39 does not align with the Revised Sale Procedures. The Auction was intended to reach a fair-market value for the Debtor's Assets, and instead a proposed Carveout was reached by an opaque negotiation behind closed doors between the Trustee and the Real Property owner.

33. Because the Auction as conducted did not comply with the structure of the Revised Sale Procedures, the Commonwealth objects to the apportionment as proposed by the Trustee.

**The Allocation of Sale Proceeds<br>Between Debtor and Non-Debtor Assets<br><u>Is Unsupported and Not in the Best Interest of the Estate</u>**

34. The Commonwealth objects to the Final Sale Motion because there has been no evidence presented which supports the allocation of sale proceeds. To the contrary, there is ample evidence that the allocation is intended to benefit the non-debtor property owner at the expense of the Debtor's estate and its creditors.

35. As already established in the earlier Sale Procedures Objections, a Section 363 sale of Debtor's Assets must still preserve the protections afforded to creditors under the plan confirmation process and Section 1129 of the Bankruptcy Code. *In re Abbotts Dairies*, *Inc., 788 F.2d 143, 150 (3d Cir. 1986). The Trustee is obligated to provide evidence that the sale of the Debtor's Assets is for fair value. *See In re Lionel Corp.*, 733 F.2d 1063, 1071 (2d Cir. 1983).

36. The proposed carveout in the instant Final Sale Motion arises from negotiations between the Trustee and the non-debtor Real Property owner, not from an auction of the Debtor's Assets. Further, the Trustee offers no evidence nor even explanation as to how—despite a $13 million premium over the prior negotiated sale price of the real estate—the value of the Debtor's

Assets remained at a constant $100,000. *See In re Abbotts*, 788 F.2d at 149 (where the Third Circuit remanded the finding that a 363 sale was done in good faith, partially because no evidence was introduced establishing value of the assets).

37. The Auction resulted in a total sale price over $13 million more than the stalking horse bid. One would expect that most, if not all, of that premium would be attributable to the sale of Debtor's Assets as a going concern. Instead, without even the scantest of explanation, the Trustee offers a "carveout" of $2 million. Where did this number come from? We are only left to guess. The Trustee maintains he never received an allocation from the bidders, yet he is comfortable determining the value of the Debtor's Assets despite the total absence of an arms-length bidding process.

38. The Trustee's proposed allocation is devoid of support, which is made all the more puzzling when one considers that the initial sale terms for the Real Property were at a value of $26.9 million. Doc 120-1.

39. The Trustee's duty is to maximize the value of estate assets, not maximize return to non-debtor parties. The Trustee has not fulfilled his duties. Despite the Revised Sale Procedures—finalized after input by potential bidders, creditors and this Court—the Trustee conducted an auction which did not adhere to the guidelines of that process and then compounded that failure by awarding an allocation unsupported by evidence which benefits the Real Property owner rather than the Debtor's estate and creditors.

40. At this juncture, with the auction process so muddied, an allocation of less than the full premium over the stalking horse bid of $26.9 million going to the Debtor's Estate should be accompanied by a full appraisal, not mere statements and conclusions. *See In re Scimeca Foundation, Inc.*, 497 B.R. at 775 (acknowledging that an appraisal is generally probative of value

to determine the reasonableness of the trustee's proposed sale).

41.     Therefore, without further evidence establishing the value of the Debtor's Assets, the Trustee's arbitrary allocation should not be approved by this Court.

**The Sale Order Should Clarify the Proper**
**Procedures for Transfer of Bed Approvals**

42.     The Commonwealth objects to the Operations Transfer Agreement included in the Final Sale Motion to the extent it currently provides for the transfer of Medicaid and Medicare Provider Agreements and Commonwealth licenses ("Bed Approvals").

43.     Medicaid and Medicare approvals may only be transferred through the regulatory process of Change of Ownership ("CHOW"). Pursuant to 28 Pa. Code § 201.12(a.1), "[a] person may not operate or assume ownership of a facility without *first* obtaining a license from the Department." (Emphasis added.)

44.     Pursuant to regulations and policies of the MA Program:

> "When there is a change in ownership of a nursing facility, the Department will enter into a provider agreement with the buyer or transfer the current provider agreement to the buyer subject to the terms and conditions under which it was originally issued, if:
>     (i)   Applicable State and Federal statutes and regulations are met.
>     (ii)   The buyer has applied to the Division of Provider Enrollment, Bureau of Provider Relations, Office of MA, Department of Human Services, and has been determined to be eligible to participate in the MA Program.
>     (iii)   The seller has repaid to the Department monies owed by the seller to the Department as determined by the Comptroller, Department of Human Services."

55 Pa. Code § 1101.43(b)(3), *The effect of change in ownership of a nursing facility*.

45.     The Bed Approvals may be transferred to a buyer only after the buyer applies to the MA Program and is deemed eligible to participate. The buyer may not circumvent the thorough due diligence of DHS's change in ownership ("CHOW") process by attempting to simply assume the MA licenses by contract.

46.     In an abundance of caution and in light of section 1.2 of the Operations Transfer Agreement, the Commonwealth makes clear that the Debtor may not transfer its Bed Approvals or Provider Agreements outside of the CHOW process. Any prospective buyer may not close on the sale and assume operations unless and until the Buyer obtains approval for all operating licenses, MA licenses, and any other required government agency approval in its own name. The Commonwealth reserves all rights to supplement this Objection.

WHEREFORE, the Commonwealth of Pennsylvania, Department of Human Services respectfully requests that this Honorable Court deny the *Final Sale Motion* and grant such other relief as it deems just and proper.

DATE:  May 4, 2026

Respectfully submitted,

DAVID W. SUNDAY, JR.
ATTORNEY GENERAL

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL
The Phoenix Building
1600 Arch Street, Suite 300
Philadelphia, PA 19103
Phone: (215) 560-2424
E-mail: crmomjian@attorneygeneral.gov

By:   *Christopher R. Momjian*
CHRISTOPHER R. MOMJIAN
Senior Deputy Attorney General
PA ID No. 57482

CHELSEA SUMMERS
Deputy Attorney General
PA ID No. 338538

*Counsel for Commonwealth of Pennsylvania,*
*Department of Human Services*